Lawrence Riff, Cal. Bar. No. 104826
lriff@steptoe.com
Morgan Hector, Cal. Bar. No. 246573
mhector@steptoe.com
STEPTOE AND JOHNSON, LLP
633 West Fifth Street, Suite 700
Los Angeles CA 90071
213.439.9494 / 213.439.9599 (fax)

Carter Dillard, Cal. Bar No. 206276
cdillard@aldf.org
John Melia, Ca. Bar No. 278323
jmelia@aldf.org
ANIMAL LEGAL DEFENSE FUND
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation; et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, and the Honorable TOM VILSACK, its Secretary; et al., <br><br> Defendants. | Case No. 12-cv-04028-ODW(PJWx) <br><br> Hon. Otis D. Wright II <br><br> NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF <br><br> [Separate Statement of Undisputed Material Facts; Declarations; and Proposed Judgment Submitted Concurrently Herewith] <br><br> Date:  February 4, 2013 <br> Time:  1:30 p.m. <br> Place:  Courtroom 11 – Spring Street <br> Pretrial Conference:  April 15, 2013 <br> Trial Date:  May 7, 2013 |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that Plaintiffs Animal Legal Defense Fund, Regal Vegan, Inc., Sarah Evans, Michelle Schurig, Caroline Lee, Daniel Stahlie, Farm Sanctuary, Compassion Over Killing, and Animal Protection and Rescue League ("Plaintiffs"), will and hereby do move for summary judgment against Defendants United States Department of Agriculture, and the Honorable Tom Vilsack, its Secretary, and Food Safety Inspection Service, and the Honorable Alfred V. Almanza, its Administrator ("Defendants"), pursuant to Federal Rule of Civil Procedure 56, on their sole claim for relief under the Administrative Procedure Act, 5 U.S.C. § 706(2)(a).  Specifically, Plaintiffs request the Court enter: (i) a declaration that the agencies' 2009 denial of a 2007 petition for rulemaking to exclude force-fed foie gras from the food supply was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (ii) an order setting aside the denial; (iii) an order requiring the USDA, through FSIS, to initiate rulemaking specifically to exclude force-fed foie gras from the human food supply.  This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 27, 2012.

This Motion is made on the grounds that, based on the Administrative Record, as a matter of law Defendants' denial of the petition for rulemaking was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, that there is no genuine issue of any material fact, and, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Plaintiffs are entitled to judgment in their favor as a matter of law. This Motion is supported by Plaintiffs' Memorandum of Points & Authorities, the Separate Statement of Uncontroverted Facts and Conclusions of Law, the Declarations of Sarah Evans, Caroline Lee, Michelle Schurig, Daniel Stahlie, Ella Nemcow, Bruce Friedrich, Erica Meier, Bryan Pease, and Stephen Wells, the Court's file in this matter, including the

1   Administrative Record submitted by Defendants, and upon such other and

2   additional evidence as the Court may hear.

3

4                           STEPTOE & JOHNSON LLP

5

6

7             By:  ___/s/ Morgan L. Hector_____

8                  Lawrence P. Riff
                   Morgan L. Hector
9                  Attorneys for Plaintiffs

10

11                          ANIMAL LEGAL DEFENSE FUND

12

13            By:  ___/s/ Carter Dillard_____

14                 Carter Dillard
                   John Melia
15                 Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS .................................................... 2

A.  The USDA and FSIS ..................................................... 2

B.  Statutory Framework and Regulations Governing Foie Gras. ...................... 2

C.  The 2007 Petition for Rulemaking ................................... 3

1.  Production of Force-Fed Foie Gras in the United States. ............................ 3

2.  Force-Feeding Induces Liver Disease in Ducks and Geese. ....................... 4

3.  Force-Feeding Causes Various Other Serious Conditions. ......................... 5

4.  Ducks Removed From Foie Gras Facilities Are Diseased. ......................... 6

5.  Force-feeding is fatal. ........................................... 7

6.  Consumption of Foie Gras Carries Serious Health Risks. ......................... 7

D.  Defendants' 2009 Denial of the Petition for Rulemaking. ............................ 8

E.  The Administrative Record and 2008 Letter from HVFG. ............................ 9

III.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS ..... 10

A.  Subject Matter Jurisdiction Is Proper. ........................................... 10

B.  Plaintiffs Have Standing. ....................................... 11

1.  Individual Plaintiffs Have Standing. ..................................... 11

2.  Organization Plaintiffs Have Standing. ................................... 12

IV.  LEGAL STANDARD UNDER APA ................................... 13

A.  Standard of Review of Agency Action. ...................................... 13

i

B.   Summary Judgment Based Upon the Record Is Appropriate. .....................14

V.   ARGUMENT ..........................................................................................15

A.   The Denial Was Arbitrary and Capricious Because It Failed to Offer a Rational Explanation for the Denial..................................................................15

B.   The Denial Runs Counter to the Evidence Showing Force-Fed Foie Gras Is Adulterated and Presents Possible Health Risks. ...............................................21

VI.   CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1 (D.C.Cir. 1987)..........................25

*Arkansas Power & Light Co. v. ICC,* 725 F.2d 716 D.C.Cir. 1984)......................14

*Axiom Resource Management, Inc. v. U.S.*, 564 F.3d 1374 (Fed.Cir. 2009) ..........15

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003)........................................................12

*Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)............11

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994)......................................14, 18, 21, 25

*Boswell Memorial Hospital v. Heckler*, 749 F.2d 788 (D.C.Cir. 1984).................15

*City & County of San Francisco v. United States*, 130 F.3d 873 (9th Cir. 1997) ....................................................................................................................15

*Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) ...........................13

*Federal Communications Comm'n v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984) ...............................................14

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.D.C. 2002) ....................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).......................................................12

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 ..............................................................................................................13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)...........................................................................................................11

*Massachusetts v. EPA*, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).................................................................................................................passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).................................................14, 15, 19

*Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) .......................................................................... 12

*Natural Res. Def. Council (NRDC) v. EPA*, 658 F.3d 200 (2d Cir. 2011) ............. 15

*Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766 (9th Cir. 1985) ...................................................................................................... 15

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dept. of Agriculture*, 415 F.3d 1078 (9th Cir. 2005) ................................. 13

*Staub v. Shalala*, 895 F.Supp. 1178 (W.D. Wis. 1995) ............................................ 12

*Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) .................. 12

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

7 C.F.R. § 2.53(a)(2)(i) ................................................................................................. 2

9 C.F.R.§ 381.7 ............................................................................................................. 3

9 C.F.R. § 381.78 .................................................................................................. 2, 21

9 C.F.R. § 381.83 .............................................................................................. 16, 18

9 C.F.R. § 381.85 ................................................................................................ 3, 16

9 C.F.R. § 381.86 .......................................................................................... 3, 16, 18

9 C.F.R. § 381.210 ........................................................................................................ 3

9 C.F.R. § 381.215 ........................................................................................................ 3

9 C.F.R. § 381.216 ........................................................................................................ 3

9 C.F.R. § 392.1, *et seq.* ............................................................................................. 12

5 U.S.C. § 702 ...................................................................................................... 11, 12

5 U.S.C. § 706(2)(A) .................................................................................................. 21

21 U.S.C. 463(b) ........................................................................................................... 2

21 U.S.C. § 451 ................................................................................... 2, 12, 13, 17

MOTION FOR SUMMARY JUDGMENT
Case No. 12-04028-ODW

21 U.S.C. § 452 ........................................................................................2

21 U.S.C. § 453 ...................................................................................3, 16

21 U.S.C. § 455 ...................................................................................3, 16

21 U.S.C. § 458 ......................................................................................20

21 U.S.C. § 460 ..............................................................................2, 16, 18

21 U.S.C. § 463 ......................................................................................20

21 U.S.C. § 467b .....................................................................................21

28 U.S.C. § 1331 .....................................................................................11

28 U.S.C. § 1346 .....................................................................................11

28 U.S.C. § 1391(e) .................................................................................11

42 U.S.C. § 7521(a)(1) ............................................................................19

Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* .................1, 11, 14

Declaratory Judgment Act, 28 U.S.C. § 2201-2 ......................................11

Poultry Products Inspection Act, 21 U.S.C. § 451 *et seq.* .................11, 16

**OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Cal. Health & Safety Code § 25980 ...........................................................3

Cal. Health & Safety Code § 25981 ...........................................................3

Cal. Health & Safety Code § 25982 ...........................................................3

Cal. Health & Safety Code § 25983 ...........................................................3

Cal. Health & Safety Code § 25984 ...........................................................3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs bring this action for review on an administrative record under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*., challenging Defendants' August 27, 2009 denial (the "Denial") of Plaintiffs' petition for rulemaking (the "Petition") to exclude force-fed foie gras from the human food supply. Defendants' Denial was arbitrary, capricious, and an abuse of discretion, because:

- There is no rational connection between the Denial and the agency's fatally inconsistent finding that the livers of force-fed birds are abnormal and exhibit hepatic lipidosis;

- There is no rational connection between the Denial and the agency's conclusion that "additional research is *needed* on the potential human health effects associated with the consumption of foie gras" (emphasis added);

- The agency inexplicably failed to consider and address voluminous evidence that, in violation of the Poultry Products Inspection Act and its implementing regulations, force-fed foie gras comes from poultry that: suffer from inflammation; are in an abnormal physiologic state; are dying and disabled; and suffer from toxemia and septicemia; and

- The proffered explanations for the Denial "ran counter to the evidence before the agency" and did not provide a rational connection between the facts found and the choice the agency made.

The Denial must therefore be set aside by this Court.  Plaintiffs request the Court enter: (i) a declaration that the Denial was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (ii) an order setting aside the Denial; and (iii) an order requiring Defendants to initiate rulemaking specifically to exclude force-fed foie gras from the human food supply.

*///*

## II.    STATEMENT OF FACTS

### A.    The USDA and FSIS

The United States Department of Agriculture ("USDA") is the federal executive department responsible for developing and executing federal government policy on farming, agriculture, and food. (Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law ("UF"), ¶1). Its current Secretary is Defendant Tom Vilsack. (UF ¶2). Among the USDA's many duties is to assure food safety, served in part through the Food Safety & Inspection Service ("FSIS"), an agency within the USDA responsible for the safety of the nation's supply of meat, poultry, and egg products. (UF ¶3). The FSIS Administrator is Defendant Alfred Almanzo. (UF §4).

### B.    Statutory Framework and Regulations Governing Foie Gras.

Among the most important responsibilities of the USDA is to prevent unsafe and unwholesome poultry products from entering the American food supply, in part by excluding diseased and unhealthy birds. The Poultry Products Inspection Act of 1957 ("PPIA") specifically empowers and requires the USDA to regulate the production and sale of poultry, explaining that "[i]t is essential . . . that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome [and] not adulterated." 21 U.S.C. § 451. The goal of the PPIA is "to provide for the inspection of poultry and poultry products and . . . to prevent the movement or sale . . . of poultry products which are adulterated . . . ." 21 U.S.C. § 452; *see also* 9 C.F.R. § 381.78. The FSIS and its Administrator have the responsibility to promulgate rules and regulations under the PPIA. 21 U.S.C. 463(b); 7 C.F.R. § 2.53(a)(2)(i).

The PPIA and FSIS regulations prohibit the sale of products that are:

- the product of "dead, dying, disabled, or diseased poultry."  21 U.S.C. § 460(d).

- "for any . . . reason unsound, unhealthful, unwholesome, or otherwise unfit

for human food." 21 U.S.C. § 453(g)(3).

- "affected by an inflammatory process," independently or in combination with evidence of "a general systemic disturbance." 9 C.F.R. § 381.86.

- affected by "any septicemic or toxemic disease." 9 C.F.R. § 381.83.

- affected by an "abnormal physiologic state." 9 C.F.R. § 381.83.

- carrying any "organisms or toxins dangerous to the consumer." 9 C.F.R. § 381.85.

Pursuant to the PPIA, the USDA and FSIS have the responsibility to inspect poultry carcasses and products and to condemn all carcasses or products that are adulterated or otherwise fall within the above categories. *Id.;* 21 U.S.C. § 455; 9 C.F.R.§§ 381.7, 381.76, *et seq*. In addition, any poultry product made "wholly or in part" from "any dead, dying, disabled, or diseased poultry is subject to detention" (9 C.F.R. § 381.210), as well as seizure (9 C.F.R. §§ 381.215, 381.216). California has already banned force-fed foie gras. Cal. Health & Safety Code §§ 25980-25984.

### C.    The 2007 Petition for Rulemaking.

On November 28, 2007, several of the current Plaintiffs, in addition to others ("Petitioners"), petitioned the USDA and FSIS to promulgate regulations to prevent force-fed foie gras from entering the human food supply. (UF ¶6). The Petitioners explained that the force-feeding process necessarily induces disease, including a condition called hepatic lipidosis, in ducks and geese, and also threatens the safety of those who consume force-fed foie gras. Administrative Record, Dkt. No. 18 ("AR"), 1-1150 (the "Petition") (UF ¶7). The Petition is 23 pages long, and is accompanied by over one thousand pages of supporting exhibits that prove beyond doubt that force-fed foie gras violates every one of the statutory and regulatory standards cited above. (UF ¶8).

#### 1.    Production of Force-Fed Foie Gras in the United States.

The Petition was directed at the three known U.S. facilities that produce and

process force-fed foie gras, slaughtering approximately 500,000 birds each year: Artisan Foie Gras, located in Sonoma, California, and Hudson Valley Foie Gras & Duck Products ("HVFG") and LaBelle Farms, both located in New York State. (UF ¶9). The Petition noted that all three farms have their own slaughter and processing facilities that are subject to the PPIA, FSIS implementing regulations, and USDA and FSIS policy. (UF ¶10).

### 2.   Force-Feeding Induces Liver Disease in Ducks and Geese.

The Petition explained that, during force-feeding, ducks are manually restrained, usually by the neck, while an inflexible, unlubricated tube is forcibly inserted into their esophagi. Within seconds, a large volume of nutritionally deficient corn mash is delivered through this ten-inch tube directly into the birds' stomachs. (UF ¶¶11-12). This process is repeated two or three times daily for three to four weeks immediately preceding slaughter. *Id.* The bird is slaughtered shortly before it would die from its diseased state, once the fatty, diseased liver has reached maximum size. (UF ¶¶11-13).

The force-feeding of ducks and geese is intended to cause a disease known as hepatic lipidosis, which is the condition of having an enlarged, fatty, and degenerate liver. (UF ¶¶14). The accumulation of lipids, or fats, in the liver, is induced in ducks and geese through "over-feeding with a carbohydrate-rich diet." (UF ¶15). Hepatic lipidosis is also known as hepatic steatosis. (UF ¶16).[1]

Hepatic lipidosis is widely considered pathological, despite the fact that it is influenced by diet and environment. (UF ¶¶18-20). The Petition also included evidence from the European Union Scientific Committee on Animal Health and Animal Welfare which similarly concluded that "because normal liver function is seriously impaired in birds with the hypertrophied liver which occurs at the end of force feeding this level of steatosis *should be considered pathological*." (UF ¶19)

---

[1] Hepatic lipidois and hepatic steatosis are sometimes also referred to as fatty degeneration or fatty infiltration. (UF ¶¶16-17).

(emphasis added). The report also states that "environmental factors can precipitate the development of a disease process in the absence of a specific pathogen." (UF ¶20).

### 3. Force-Feeding Causes Various Other Serious Conditions.

The Petition also explained that force-feeding, in part by disabling the liver, causes other severe ailments in addition to and as a result of hepatic lipidosis. Each of these conditions further destroys the health of force-fed ducks and geese, reducing the quality and wholesomeness of food products made from these birds.

### a. Secondary Effects of Hepatic Lipidosis.

Basic side effects of hepatic lipidosis include morbid obesity, depression, loss of appetite, diarrhea, and poor feathering. (UF ¶21). Obesity in turn contributes to extreme respiratory distress and causes blood vessel compression, leading to severe circulatory problems. (UF ¶22).

Attacking the liver, hepatic lipidosis also impairs its ability to filter toxins from the body. Left unfiltered, toxins accumulate in the circulatory system. (UF ¶23). Toxin accumulation in the central nervous systems leads to a fatal condition called hepatic encephalopathy, which impairs brain function and results in seizures, lack of coordination, muscle tremors, stupor, coma, and death. (UF ¶24).

### b. Toxemia and Septicemia.

Impaired liver function also contributes to the development of toxemia, or toxicity of the blood, one of the "many and varied" "accidents and illnesses" that occur during the course of force-feeding. (UF ¶25). Signs of toxemia include "petechial (pinpoint) hemorrhages on the heart, liver, kidneys, muscles, and serous membranes." (UF ¶26) (FSIS Poultry Slaughter Inspection Training Manual).

Septicemia, defined by the FSIS as a "syndrome of septic bacterium accompanied by fever, hemorrhage, and severe systemic illness associated with the presence and persistence of pathogenic microorganisms or their toxin in the blood," (UF ¶27) (FSIS Public Health Veterinarian Training Manual), is common

in force-fed ducks (UF ¶28). Necropsies of ducks removed from foie gras facilities in 2005 indicated heavy growth of dangerous bacteria including *Serratia species*, *Escherichia coli* (*E. Coli*), as well as the growth of *Streptococcus species* (*id.*), and *Staphylococcus* bacteria. (UF ¶28).

### c.    Inflammatory Disease.

Inflammatory conditions are yet another side-effect of force-feeding. (UF ¶29). Necropsies performed on force-fed ducks taken from foie gras facilities confirm the presence of inflammatory disease, including (1) inflammation of the liver and kidneys; (2) "inflammatory changes . . . in the portal tracts and in the lungs" (*id.*); and (3) inflammatory lesions in the liver and lungs that ranged from congestion to pneumonia. (UF ¶29). Cholangiohepatisis is also found, caused by a bacterial infection that results in inflammation of the liver and bile ducts. (UF ¶30). Enteritis, an inflammation of the small intestine that usually appears at the end of the first week of force-feeding, is also common. (UF ¶31).

### 4.    Ducks Removed From Foie Gras Facilities Are Diseased.

The Petition also included necropsies and examinations of force-fed ducks removed from *actual* foie gras facilities that consistently confirmed the presence of this litany of diseases and ailments. (UF ¶32). Many of the conditions are summarized in the American Veterinary Medical Association's House of Delegates "Position Statement on Force Feeding of Ducks and Geese to Produce Foie Gras," and include: hepatic lipidosis, fractured limbs, crop impaction, aspiration pneumonia, ruptured livers, and esophageal trauma secondary to insertion of the feeding pipes, including granulomas, fungal and bacterial infections, and ruptured esophagi. (UF ¶32) (studies finding yeast, bacterial infections, hyperkeratosis, fungal infections, and septicemia related to the bacteria *Staphylococcus aureus*). Clinical examinations of foie gras livers purchased from HVFG and LaBelle Farms Foie Gras revealed pathologies like those noted in the necropsies of ducks that were removed from foie gras facilities. (UF ¶33).

### 5.      Force-feeding is fatal.

The Petition included extensive evidence that force-feeding is associated with an increased mortality rate. A European survey found that, before slaughter, force-fed ducks had a mortality rate ten to twenty times higher than that of ducks that were not force-fed. (UF ¶34). The owner of Sonoma Foie Gras, a foie gras production facility in California, stated in a 2004 television interview that he limited force feeding to three to four weeks – periods over *twice* as long as those in the European study (UF ¶34) – because the "ducks would become too ill and die soon after, if not slaughtered by then."[2] (UF ¶35). In addition to the conditions described above, causes of death include nutritionally deficient feed, (UF ¶36), and respiratory distress, or dyspnea, related to hepatic lipidosis (UF ¶37).

### 6.      Consumption of Foie Gras Carries Serious Health Risks.

Secondary amyloidosis, or AA amyloidosis, is a serious disease with a high mortality rate that affects humans. Secondary amyloidosis "leads to hepatomegaly (enlarged liver) and kidney failure, and is ultimately fatal." (UF ¶39). The Petition explained that commercially available foie gras contains a specific, soluble protein called serum amyloid A-related (SAA) protein which, in a 2007 study published in the Proceedings of the National Academy of Sciences, served as "a potent" factor in enhancing the onset of secondary amyloidosis, even when ingested orally. (UF ¶40). The Petition included evidence from Dr. Alexander Whitehead, who has studied SAA for more than twenty-five years and concluded "to a reasonable degree of scientific certainty" that "the AA from duck foie gras would be able to survive in the human stomach . . . and ultimately form potential nucleation sites in major human organs." (UF ¶41).

---

[2] Video and photos taken at the facility showed dozens of birds exhibiting the expected symptoms and the corpses of birds that likely died as a result. (UF ¶ 38) (photos and videos of force-fed ducks located at Hudson Valley Foie Gras).

1    Although the prevalence of secondary amyloidosis in the human population

2    is unknown, the majority of cases occur in people with "sustained inflammatory

3    processes, particularly rheumatoid and juvenile chronic arthritis." (UF ¶42). As a

4    result, the authors of the 2007 study concluded that "it would seem prudent for

5    children and adults with rheumatoid arthritis or other diseases who are at risk for

6    this disorder to avoid foods that may be contaminated with AA fibrils." *Id*.

7    Because the AA fibrils "that form potential nucleation sites may persist in the host

8    and support the development of secondary amyloidosis when chronic

9    inflammation occurs at a later date," consumers who may someday develop a

10   chronic inflammatory disease are also at greater risk for contracting secondary

11   amyloidosis after eating foie gras. (UF ¶43). The amyloids in foie gras may also

12   support the development of other amyloid-associated disorders such as

13   Alzheimer's disease or type II diabetes. (UF ¶44).

14   **D.    Defendants' 2009 Denial of the Petition for Rulemaking.**

15   FSIS denied the Petition on August 27, 2009 in a cursory two-page decision

16   that failed to cite *a single* study, article, expert, or exhibit in support of its denial

17   (the "Denial") (UF ¶¶45-46). In the Denial, FSIS conceded that the appearance of

18   the enlarged and fatty livers of force-fed birds would be "considered abnormal"

19   and that they "would be characterized as affected by hepatic lipidosis." (UF ¶47).

20   Despite this, the Denial declared hepatic lipidosis does not constitute adulteration

21   because it has a physiological, rather than pathological, origin. (UF ¶48).

22   FSIS further conceded that amyloidosis is common in foie gras and that the

23   2007 study in the Proceedings of the National Academy of Sciences demonstrated

24   a connection between the presence of amyloid and the onset of Secondary

25   Amyloidosis. (UF ¶49). FSIS discounted the study, however, purportedly because

26   amyloid could be present for reasons other than force-feeding, and because the

27   study involved animals, not humans, under "experimental conditions." (UF ¶50).

28   The FSIS ultimately "concluded that *additional research is needed on the*

8

*potential human health effects associated with the consumption of foie gras*." (UF ¶51) (emphasis added). The Denial failed to address any other portion of the Petition and its exhibits. (UF ¶52).

### E.      The Administrative Record and 2008 Letter from HVFG.

The Administrative Record consists primarily of the Petition, with Exhibits 1 through 65, the two-page Denial, and miscellaneous scientific studies included by Defendants. These scientific studies include (1) a background on hepatic lipidosis (UF ¶53); (2) an analysis of "Amyloids, prions and the inherent infectious nature of misfolded protein aggregates," which notes transgenic mice engineered to be susceptible to amyloidosis can "spontaneously" develop the condition (UF ¶¶54-55); and (3) additional background on hepatic lipidosis and amyloidosis (UF ¶56).

The Administrative Record also includes a February 26, 2008 letter from Congressman Maurice D. Hinchey to the USDA, enclosing a letter from Marcus Henley, Operations Manager of HVFG, a producer of force-fed foie gras, to Lori DuBord of the Office of Congressman Hinchey. (UF ¶57). Congressman Hinchey's letter includes HVFG's "material in rebuttal" to the Petition, which consists of approximately ten exhibits, ranging from scientific studies, affidavits, and court pleadings. In the letter, Congressman Hinchey pleads with the USDA to reject the Petition, arguing that HVFG is an "integral component of the economy of Sullivan County, New York." (UF ¶58). The enclosed letter from HVFG ("HVFG Letter") purports to address "liver enlargement in waterfowl and claims made by Dr. Alan Solomon." (UF ¶59).

The exhibits attached to the HVFG Letter fall into a few categories:

(1) Studies arguing reversibility of the liver's "fatty condition" means it should not be considered "diseased." (UF ¶¶60 (HVFG Letter Ex. 1, observing ducks under controlled force-feeding conditions); 65-68 (HVFG Letter, Ex. 3, observing force-feeding "conducted following professional standards, under a

[sic] artisan's working conditions," purporting to conclude that, while two week periods of force-feeding result in reduced blood purification capabilities, arthritis, callosities and widened esophagi, these specific negative effects were reversible following a four week period of "rest"); 70-71 (Ex. 4, arguing hepatic steatosis in force-fed waterfowl is "reversible"); 74 (Ex. 5, same); 77 (Ex. 6, same)).

(2) Studies arguing waterfowl are not emotionally or physically damaged by the stress associated with force-feeding. (UF ¶¶ 72-74 (HVFG Letter, Ex. 5, a study setting forth "experimental data" to "the ethical debate on the practice of force-feeding," purporting to conclude that one cannot say "with certainty that the practice seriously impairs the welfare of waterfowl, in the sense that it is a major cause of stress or fear, pain and even injury and pathology"); 78 (Ex. 6)).

(3) Articles and statements arguing foie gras's historic significance means it should be allowed to continue. (UF ¶62 (HVFG Letter, Ex. 1); 77 (Ex. 6)).

(4) Attacks on the potential risks to human health. (UF ¶¶ 79 (HVFG Letter, Ex. 7, affidavit from Dr. Detwiler disputing a number of Dr. Whitehead's claims, including that AA Amyloidosis is a "prion disease," and that prion and amyloid diseases can be transmitted to humans from affected animals that enter the food chain, due to an absence of conclusive evidence); 80 (Ex. 8, excerpt of an interview in which Muriel Eliaszewicz of the "French food safety agency" states that it would be "premature" to conclude that foie gras is unsafe in light of the study linking the consumption of foie gras to the onset of amyloidosis in mice)).

The remaining exhibit consists of pleadings from a legal action (UF ¶81).

## III.   THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.   Subject Matter Jurisdiction Is Proper.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346, because this action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the Poultry

Products Inspection Act, 21 U.S.C. § 451 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201-2. Venue is proper as well. 28 U.S.C. § 1391(e).

**B.    Plaintiffs Have Standing.**

To have standing, a plaintiff must show a concrete and particularized injury that is either actual or imminent, fairly traceable to the defendant, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). However, where a litigant has been "accorded a procedural right to protect his concrete interests" – here, the right to challenge agency action unlawfully withheld – the litigant "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) quoting *Lujan*, *supra*, 504 U.S. at 572, n. 7. There need only be "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.*

Further, under the APA, 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Standing under this section is proper where the plaintiff's interests "arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The "zone of interests" test requires the court to discern the interests "arguably to be protected" by the statute and then to determine if the plaintiff's interests are among them. *Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co*., 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998).

**1.    Individual Plaintiffs Have Standing.**

Individual Plaintiffs Evans, Schurig, and Stahlie (the "Consumer Plaintiffs") readily satisfy the standing requirement. As consumers of foie gras (UMF ¶89), they are subject to the health risks described above, and fall well

within the "zone of interests" intended to be protected by the PPIA, including explicitly "the health and welfare of consumers." 21 U.S.C. § 451.[3]

This concrete injury is directly traceable to FSIS's Denial of the Petition. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-82, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Until the FSIS institutes regulations to seize and condemn force-fed foie gras, it will persist in the food supply. This presents health risks to past and present consumers of foie gras that are sufficient for purposes of standing. *See Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003) (increased risk of contracting BSE from agency regulation allowing downed cows into the food supply to be a cognizable injury for standing purposes).[4] A favorable judicial decision would redress these plaintiffs' injuries because it would require the FSIS to reconsider the Petition, for which Plaintiff Stahlie was a Petitioner (UMF ¶90). *See Massachusetts*, 549 U.S. at 517-18. Plaintiffs were "vested with [the] procedural right" to petition FSIS pursuant to 9 C.F.R. §§ 392.1-392.9 and challenge the agency's decision under 21 U.S.C. § 702, and the redressability prong of the standing inquiry is therefore met because "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518. The individual Plaintiffs have standing.

### 2.   Organization Plaintiffs Have Standing.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct.

---

[3] Plaintiff Lee, a former consumer of foie gras (UF ¶91), also has standing because, due to Defendants' Denial in violation of the APA and PPIA, she has been forced to avoid eating foie gras (UF ¶91). *See Staub v. Shalala*, 895 F.Supp. 1178, 1187-88 (W.D. Wis. 1995) (plaintiffs unable to consume dairy products because of increased risk of potential harm is injury-in-fact for standing purposes).

[4] Defendants' refusal to act also undermines any market for the production of non-force-fed foie gras. *See* Petition at 2, n. 1 (AR4).

---

2197, 45 L.Ed.2d 343 (1975)). If an organization's injury is a frustration of its organizational purposes, the organization also must assert an injury beyond "a setback to the organization's abstract social interests." *Id*. at 1124 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) (finding that a fair housing organization has standing to sue under the Fair Housing Act where its resources were diverted to investigating and other efforts to combat defendant's discrimination); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dept. of Agriculture*, 415 F.3d 1078, 1102-1103 (9th Cir. 2005) (holding organization's purpose was economic rather than environmental and thus outside scope of National Environmental Policy Act).

Here, the agency action denying the Petition and allowing foie gras into the food supply has frustrated the missions of ALDF, COK, APRL, and Farm Sanctuary.[5] (UMF ¶¶92-95). Each has also diverted substantial resources in combatting the action and taking remedial steps with consumers, such as education, because force-fed foie gras is in the food supply. (UMF ¶96). Article III standing is thus satisfied for the organization Plaintiffs.

## IV.   LEGAL STANDARD UNDER APA

### A.   Standard of Review of Agency Action.

Refusals to engage in requested rulemaking constitute final agency action reviewable under the APA. *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 723 (D.C.Cir. 1984); *Federal Communications Comm'n v. ITT World Communications, Inc*., 466 U.S. 463, 464, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984).

---

[5] The only separately situated organizational plaintiff is Regal Vegan, Inc., which sells a foie gras substitute, "faux gras," and is directly and competitively harmed by the presence of force-fed foie gras in the American food supply and market (UF ¶97). 21 U.S.C. § 451 ("Unwholesome [or] adulterated . . . poultry products are injurious to the public welfare, *destroy markets* for wholesome, not adulterated, and properly labeled and packaged poultry products" (emphasis added)).

A final agency action may be set aside "if the decision was 'arbitrary and capricious' within the meaning of the [APA]" *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994). Such is the case where an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id*. (quotation omitted).

The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quotation omitted). The reviewing court "may not consider reasons for agency action which were not before the agency," and may not "infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals." *Beno v. Shalala*, 30 F.3d at 1073. "Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Id*. at 1073-74, quoting *Motor Vehicle Mfrs.*, 463 U.S. at 50.

## B.   <u>Summary Judgment Based Upon the Record Is Appropriate.</u>

The district "court is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). "Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id*. Thus, "[i]n reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g*, 753 F.2d at 770). The Court's review of the administrative record "must be

searching and careful." *Natural Res. Def. Council (NRDC) v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (internal quotation marks omitted). [6]

## V.   ARGUMENT

### A.   The Denial Was Arbitrary and Capricious Because It Failed to Offer a Rational Explanation for the Denial.

Agency action must be set aside where the agency has failed to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In addition, the agency's proffered reasoning must not "rest[] on reasoning divorced from the statutory text." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).

Here, the FSIS's reasoning was deficient and, in its deficiency, unmoored from the governing statutory text. Force-fed foie gras exemplifies the kind of product that the statute and regulations define as adulterated; it is *literally* the product of a dying, disabled, and diseased bird, the liver and carcass of which is unhealthful and unwholesome because it is inflamed, septicemic, and toxemic.

Defendants regulate the entry of all poultry products into the food supply under the PPIA. 21 U.S.C. § 451, *et seq.* The PPIA directs Defendants to inspect poultry or poultry products at processing locations (21 U.S.C. § 455) and seize and condemn poultry products if the agencies find that they are unsafe, either because the products are "adulterated" (21 U.S.C. § 453), made from dead, dying,

---

[6] Defendants' were "unable to locate" a "handful of letters from the public" in compiling the Administrative Record. (Dkt. 18-1 at 2, n. 1). These do not appear to have been a basis for the Denial and Plaintiffs believe all material evidence is before the Court, and is "[]sufficient to permit meaningful review consistent with the APA." *Cf. Axiom Resource Management, Inc. v. U.S.*, 564 F.3d 1374, 1381 (Fed.Cir. 2009). In the Court's discretion, however, remand on this basis alone may be ordered. *See Boswell Memorial Hospital v. Heckler*, 749 F.2d 788, 793 (D.C.Cir. 1984) (holding that, under the APA, "[r]eview is to be based on the full administrative record . . . To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record,'" and remanding for further proceedings).

disabled or diseased poultry (21 U.S.C. § 460), or subject to one of the FSIS's implementing regulations mandating the condemnation of poultry products affected by an inflammatory process, an abnormal physiologic state, or a number of other conditions (9 C.F.R. §§ 381.83, 381.85, 381.86).

The Petition asked Defendants to regulate force-fed foie gras under the PPIA, and prevent it from entering the human food supply. (UF ¶6). FSIS's two-page Denial was based explicitly on a conclusory statement, and, surprisingly, that the admission FSIS lacks information: It found that (1) the presence of fatty change in a duck or goose liver used to produce foie gras alone does not render the foie gras adulterated or otherwise unfit for human food; and (2) additional research is needed on the potential human health effects associated with the consumption of foie gras. (UF ¶¶45-46). Regarding the former, the FSIS stated that it had "considered the condition of the livers of ducks and geese used to produce foie gras" and acknowledged "that the appearance of the livers of these birds would be characterized as affected by hepatic lipidosis," and would be considered "abnormal . . . both grossly and microscopically." (UF ¶47).

The FSIS went on to state, however, that the condition cannot be considered to be a "disease" because it is "due to a physiologic condition," *i.e.*, "overwhelming of the hepatocyte's ability to process and export fat, rather than disease." (UF ¶48). Thus, the FSIS urges that a distinction between the cause of the abnormality (physiologic versus pathologic, *i.e.*, force-feeding versus pathogen), not the abnormality itself, is the beginning and the end of its required analysis. This is nonsensical and irrational, and contradicts the FSIS's own regulations which require condemnation of any poultry product "showing evidence of an *abnormal physiologic state*." 9 CFR § 381.83 (emphasis added). If a human practice leads to the same abnormal physiological state as would a "disease", as FSIS concedes here, there is no rational basis to allow such "diseased" material into the food supply, irrespective of cause. *See* Pet. Ex. 37

(AR767) ("[O]ne is not making use of a natural physiological process in [poultry] to produce a delicacy but rather a pathological process which can be reproduced in certain species [by force-feeding].")). FSIS failed to offer a "satisfactory explanation" for its position, which is contradicted by the FSIS's own regulations, and the Denial should be set aside as a result.

Similarly, there is no "rational connection" between the FSIS's conclusion that there might be potential health risks associated with foie gras and its refusal to exclude foie gras from the food supply. In denying the Petition, the FSIS stated that it "has also concluded that additional research is needed on the potential human health effects associated with the consumption of foie gras." The FSIS further stated that, "[t]herefore, we are denying your petition." (UF ¶46). Plaintiffs' Petition catalogued in detail these potential human health risks. Thus, there is no reason, in logic or fact, to (a) conclude that further research is necessary to ascertain human health risks of foie gras, yet (b) permit that product to enter the human food supply, *while offering no plans to actually engage in such necessary research*. This irrational conclusion renders the Denial arbitrary. After all, the goal of the PPIA is "that the health and welfare of consumers be *protected* by *assuring* that poultry products distributed to them are wholesome [and] not adulterated." 21 U.S.C. § 451 (emphasis added). Food that may cause direct risks to human health because of the presence of amyloids should not be allowed into the food supply pending "additional research." The Denial articulated no rational basis for a contrary conclusion and must therefore be set aside.

Finally, despite Plaintiffs' voluminous Petition and exhibits, FSIS decided to address, however briefly, only two issues in its Denial: (1) whether the accumulation of lipids in the liver itself from force-feeding render the liver "adulterated" or "diseased" under the PPIA; and (2) whether the presence of amyloids in foie gras presents a risk to human health. (UF ¶52). The Denial thus ignored substantial evidence showing that the birds used in foie gras production

17

fall squarely within the other conditions that mandate the condemnation of foie gras. Specifically, the Denial ignored the fact that these animals:

- exhibit systemic inflammatory processes including arthritis and bacterial infections as proscribed by 9 C.F.R. § 381.86 (UF ¶¶29-32);

- suffer from an abnormal physiologic state, as proscribed by 9 C.F.R. § 381.83, caused by the liver expanding to 6 to 10 times its original size, restricting the birds' ability to move and breathe (UF ¶33);

- are disabled, under 21 U.S.C. § 460(d), *i.e.*, unable to walk due to enlargement of their livers and use of nutritionally deficient feed (UF ¶32);

- are dying, as proscribed by 21 U.S.C. § 460(d), and that many do in fact die, because of the ailments caused by force-feeding (UF ¶34);

- suffer from septicemia, as proscribed by 9 C.F.R. § 381.83, including due to the presence of E. Coli and other bacteria (UF ¶28); and

- suffer from toxemia, as proscribed by 9 C.F.R. § 381.83, *i.e.*, the presence toxins in the blood due to the failing liver (UF ¶¶24-25).

<u>Each</u> of these conditions could have independently formed the basis for the FSIS to grant the Petition under the PPIA and its own implementing regulations, yet <u>none</u> was addressed in the Denial. The FSIS thus "entirely failed to consider an important aspect of the problem." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994). For this reason as well, the Denial should be set aside. [7]

This case is, then, similar to *Massachusetts v. EPA*, in which the Supreme Court invalidated the U.S. Environmental Protection Agency's ("EPA") denial of a rulemaking petition under section 202(a)(1) of the Clean Air Act. 549 U.S. 497,

---

[7] The inclusion of this evidence in the Administrative Record does not mean Defendants can now attempt to address it on the merits. *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("But once EPA has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute"); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding Court may not "infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals").

510-11, 534-35 (2007). That section provides that the EPA Administrator "shall" prescribe standards "applicable to the emission of any air pollutant from any class or classes of new motor vehicles [that] cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1); *see also Massachusetts*, 549 U.S. at 506. The petition requested that the EPA regulate greenhouse gases because they constitute air pollution that contributes to climate change, which endangers public health and welfare. 549 U.S. at 510. The EPA denied the petition, claiming that it did not have the statutory authority to regulate greenhouse gases and that, even if it did have the authority, it would be unwise to regulate. *Id.* at 511-12.

The Supreme Court rejected the agency's arguments, ruling that while the "EPA no doubt has significant latitude as to the manner, timing, content, and coordination of its regulations with those of other agencies," "once EPA has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute." *Id.* at 533. EPA could "avoid taking further action only if it determine[d] that greenhouse gases do not contribute to climate change" or provided a "reasonable explanation" for why it could not or would not determine whether they do. *Id.* The Court rejected the EPA's "laundry list of reasons not to regulate," including its "policy judgments" that existing voluntary programs responded effectively to the threat of global warming, and that curtailing motor vehicle emissions would be an "inefficient, piecemeal approach" to address climate change. *Id.* As the Court explained, it was "evident [EPA's reasons not to regulate] have nothing to do" with the statutory inquiry whether greenhouse gas emissions contribute to air pollution that endangers public health, and "[s]till less do they amount to a reasoned justification for declining to form a scientific judgment." *Id.* at 533-34.

The applicable provisions of the PPIA, 21 U.S.C. §§ 458 and 460, parallel the Clean Air Act provision at issue in *Massachusetts*, and FSIS's rationales for

denying Plaintiffs' Petition mirror the justifications the Supreme Court rejected in that case. The PPIA mandates that Defendants condemn any poultry product if the agency determines that the product is "adulterated," "unwholesome," or "unfit for human consumption" (21 U.S.C. §§ 458, 467b), and the FSIS is required to promulgate rules to carry out these provisions (21 U.S.C. § 463). Similarly, Section 202 of the Clean Air Act mandates that EPA promulgate emission standards for an air pollutant "[i]f EPA makes a finding of endangerment." *Massachusetts*, 549 U.S. at 533. In both cases, the question of whether the agency must regulate turns on a single factor: the outcome of the agency's evaluation. The Supreme Court required the EPA to "form a scientific judgment" whether endangerment exists or provide a "reasonable explanation" for its inability or refusal to do so. *See id*. at 533-34; *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.D.C. 2002) (setting denial of petition for rulemaking where agency failed to consider relevant data or to give adequate reason for denial).

Applying the Supreme Court's decision in *Massachusetts*, once confronted with the Petition seeking regulation of foie gras, Defendants were required to determine *on the merits* whether foie gras is safe for human health, adulterated, diseased, or made from poultry that is dying, disabled, or suffering from inflammation, septicemia, toxemia, or other "abnormal physiologic state." At the very least, FSIS was required to provide a reasonable explanation grounded in the statute as to why it could not or would not make that determination.

The FSIS did neither. Instead, in denying the Petition, FSIS (1) offered a circular, nonsensical argument that because the physiologic state of the foie gras livers are caused by human practices and not a disease, they were not "adulterated" even though they are admittedly "abnormal" and "affected by hepatic lipidosis"; (2) concluded that "additional research is needed on the potential human health effects associated with the consumption of foie gras," yet denied the Petition; and (3) ignored the mountain of evidence showing force-

feeding leads to not only a diseased liver, but a variety of other illnesses and conditions that require condemnation under the PPIA and FSIS's own regulations. The PPIA nowhere mentions a "wait-and-see" approach to a diseased and adulterated poultry product that may be unsafe for human health. *Cf. U.S. v. Bacto-Unidisk*, 394 U.S. 784, 798 (1969) (noting that there is "well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health"). Rather, it commands the USDA, through the FSIS, to seize and condemn such a product. *See* 21 U.S.C. § 467b; 9 C.F.R. §§ 381.78, 381.210 *et seq*. Thus, the reasons FSIS gave for denying the Petition, like those tendered by EPA when it refused to determine whether greenhouse gases endanger the public welfare, are unmoored from the governing statute, not in accordance with law, and the Denial must therefore be vacated under the APA, 5 U.S.C. § 706(2)(A).

**B.      The Denial Runs Counter to the Evidence Showing Force-Fed Foie Gras Is Adulterated and Presents Possible Health Risks.**

Agency action must be set aside where the agency "offered an explanation for its decision that runs counter to the evidence before the agency." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). Here, even on the points for which the agency did offer an explanation – (i) whether the increase in lipids in the liver render it diseased or adulterated and (ii) whether the presence of amyloidosis constituted a risk to human health – the explanation ran counter to the evidence before it.

As described above, Section II.C.2, force-feeding causes serious liver impairment due to steatosis (*i.e.*, swelling), a condition which "should be considered pathological," *i.e.*, a disease. The Petition also presented evidence that amyloids in foie gras present risks to human health, including secondary

1  amyloidosis and related diseases such as Alzheimer's. Section II.C.6, *supra*. The
2  Denial was unexplainably counter to this evidence and should be set aside.
3       The additional evidence now included in the Administrative Record does
4  nothing to alter this conclusion. For example, the studies submitted by
5  Congressman Hinchey on behalf of HVFG to the FSIS that argue the
6  "reversibility" of the damage caused by force-feeding means the organ is not
7  "adulterated" or "diseased," (Exs. 1-4, AR1156-1206), do not address or are
8  dismissive of the simple fact that the process is lethal when continued and that
9  mortality rates increase by at least one thousand percent due to force-feeding
10  (from 0.2% to at least 2-4%). (UF ¶¶34-35) Obviously, death is not reversible.
11  These studies were also conducted under unrealistically ideal conditions, such as
12  force-feeding under an "artisan's working conditions" and with large pens in
13  which the ducks and geese could "run around" in between the experimental bouts
14  of force-feeding to test specifically reversibility. (UF ¶¶64, 68-69). They are also
15  based on a two week force-feeding period, in contrast to the standard industry
16  three weeks in the U.S. (Compare UF ¶35 (statement from HVFG noting 3-4 week
17  force-feeding period) with UF ¶65 (European study of effects of two-week cycles
18  of force-feeding). These studies thus do nothing to combat the evidence of the
19  effects of force-feeding *in actual practice*, mountains of which were included with
20  the petition, and which unequivocally show foie gras is a diseased, adulterated
21  poultry product. See Section II.C, *supra*.
22       Similarly, articles attached to the HVFG Letter lauding the historical
23  significance and lineage of foie gras (UF ¶¶62, 76) are irrelevant to the
24  determination required under the PPIA and the FSIS's implementing regulations.
25  Arguments that enlargement of the liver is a genetic predisposition and part of the
26  natural pre-migratory behavior of the birds (UF ¶¶61, 71) similarly fail as
27  irrelevant. Birds currently used for foie gras production are not migratory and, in
28  any event, the pre-migratory gorging has a significantly different effect on the

liver (which never grows to more than double its normal size in the wild) than the force-feeding of nutritionally deficient mash. (UF ¶¶ 82-88). The agency's reliance on these arguments shows perfectly how little they considered the merits of the Petition.

Studies purporting to show the animals are not disturbed by force-feeding (UF ¶¶72-73, 78) are similarly irrelevant in determining whether the liver is fit for human consumption. They are also impossible to reconcile with the miserable physical conditions which frequently kill or disable the birds. (UF ¶¶32, 34).

The additional studies beyond the HVFG Letter that are included by Defendants in the Administrative Record are similarly unavailing. Exhibit 5 is merely a background on hepatic lipidosis. It states that cell damage caused by hepatic lipidosis is "not always lethal," but notes that the cells affected by hepatic lipidosis "are injured and cannot adequately carry out their normal functions." (UF ¶53). It also notes that "[l]ipidosis is sometimes an expression of cell injury and, when it is, may be preceded or accompanied by cell swelling.  In addition, lipidosis can occur as an expression of injury in cells that are destined to die. . . . Presumably, many of the cells containing lipids are severely injured and destined to die." *Id.* The article also concludes that, "[a]s a result of lipidosis, the animal may show signs of clinical illness." *Id.*

A second article addressing hepatic lipidosis also fails to support the Denial. (UF ¶¶54-55). Its focus is on the distinction between physiologic and pathologic hepatic lipidosis and is therefore presumably part of the Administrative Record to support the FSIS's conclusion that "foie gras is the result of a physiologic condition [and] [t]hus, the condition of the foie gras liver is not a 'disease.'" (UF ¶48). The article does no such thing. As an initial matter, it does not address force-fed poultry, so its significance, if any, must be severely discounted. It also defines "physiologic fatty liver" as that which "occurs in late pregnancy and heavy lactation" (UF ¶58), so it cannot be assumed that any conclusions the article

reaches would apply to the livers of force-fed poultry.  Finally, to the extent the article argues for a physiologic-pathologic distinction, it does so functionally, arguing that physiologic lipidosis reflects "otherwise normal hepatocytes" while pathologic lipidosis would include some "degenerative change in hepatocytes" *Id*. FSIS failed to make this analysis of draw these conclusions, instead focusing solely on the cause of the lipidosis, and ignoring the degenerative changes to the liver and hepatocytes amply demonstrated by the Petition (*E.g.*, UF ¶¶18, 33).

The third article addresses amyloidosis and the study cited in the Petition, Exhibit 44, showing a link between foie gras and the onset of secondary amyloidosis conditions such as Alzheimer's disease. (UF ¶55 ("Because these transgenic mice 'spontaneously' develop Alzheimer's disease pathology later in life, it is not possible to conclude whether the Alzheimer's disease brain acted as an infectious agent or as an accelerator of a process that was genetically programmed to occur")). The information in this exhibit, however, is consistent with the Petition which argues only that foie gras "*may* cause health effects" (AR21-22) and the evidence "*raises the possibility* that AA fibrils, such as those in foie gras, may lead to the development of other amyloid diseases, including Alzheimer's disease." (UF ¶40). FSIS apparently agreed, concluding that additional research was required to determine potential health effects. (UF¶40).

The record before the agency did not support the Denial. The explanations proffered "ran counter to the evidence" and, as a result, the Denial should be set aside.  *See Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994).

## VI.    **CONCLUSION**

For the reasons detailed above, the Court should set aside the Denial and remand the matter to Defendants with instructions to initiate rulemaking condemning force-fed foie gras. *See Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 7 (D.C. Cir. 1987) (remanding with instructions to institute rulemaking after

finding that agency had not provided sufficient reasons for its denial of a petition for rulemaking).

STEPTOE & JOHNSON LLP

By:      /s/ Morgan L. Hector
         Morgan L. Hector
         Attorneys for Plaintiffs


ANIMAL LEGAL DEFENSE FUND


By:      /s/ Carter Dillard
         Carter Dillard
         Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **SIGNATURE ATTESTATION**

All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content, and have authorized the filing.

STEPTOE & JOHNSON LLP


By:    /s/ Morgan L. Hector
_____
      Morgan L. Hector
      Attorneys for Plaintiffs

MOTION FOR SUMMARY JUDGMENT
Case No. 12-04028-ODW

## __CERTIFICATE OF SERVICE__

F.R.C.P. 5

I hereby certify that on October 24, 2012, I electronically filed the foregoing: NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

***PLEASE SEE ATTACHED SERVICE LIST.***

Executed at Los Angeles, California, this 24th day of October 2012.

STEPTOE & JOHNSON LLP


By:  ___/s/ Morgan L. Hector___
     Morgan L. Hector
     Attorneys for Plaintiffs

## **SERVICE LIST**

Daniel E Bensing
U S Department of Justice
Civil Division
20 Massachusetts Avenue, N W
Room 6114
Washington, DC 20001
202-305-0693
Email: Daniel.Bensing@USDOJ.gov
Attorneys for DEFENDANTS


Carter Dillard
John Melia
170 East Cotati Avenue
Cotati, CA 94931
707-795-2533
Fax: 707-795-7280
Email: wcromwell@aldf.org
        jmelia@aldf.org
Attorneys for PLAINTIFFS

MOTION FOR SUMMARY JUDGMENT
Case No. 12-04028-ODW