Morgan Hector, Cal. Bar. No. 246573
mhector@steptoe.com
STEPTOE & JOHNSON, LLP
633 West Fifth Street, Suite 700
Los Angeles CA 90071
213.439.9400 / 213.439.9599 (fax)

Carter Dillard, Cal. Bar No. 206276
cdillard@aldf.org
ANIMAL LEGAL DEFENSE FUND
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280 (fax)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation; et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, and the Honorable TOM VILSACK, its Secretary; et al., <br><br> Defendants. | Case No. 12-cv-04028-ODW(PJWx) <br><br> Hon. Otis D. Wright II <br><br> NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF <br><br> [Separate Statement of Uncontroverted Facts and Conclusions of Law, Supporting Evidence, and Proposed Statement of Decision Submitted Concurrently Herewith] <br><br> Date:  June 13, 2016 <br> Time:  1:30 p.m. <br> Place:  Courtroom 11 – Spring Street <br> Pretrial Conference:  N/A <br> Trial Date:  N/A |

## NOTICE OF MOTION AND MOTION

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  Per this Court's February 3, 2016 Order Following Issuance of Mandate (ECF 60),

**PLEASE TAKE NOTICE** that at 1:30 p.m. on Monday, June 13, 2016, in Courtroom 11 of the United States Courthouse located at 312 N. Spring St., Los Angeles, CA 90012, Plaintiffs Animal Legal Defense Fund, Sarah Evans, Michelle Schurig, Caroline Lee, Farm Sanctuary, Compassion Over Killing, and Animal Protection and Rescue League,[1] will and hereby do move for summary judgment against Defendants United States Department of Agriculture, and the Honorable Tom Vilsack, its Secretary, and Food Safety Inspection Service, and the Honorable Alfred V. Almanza, its Administrator, pursuant to Federal Rule of Civil Procedure 56, on their sole claim for relief under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  Specifically, Plaintiffs request the Court enter: (i) a declaration that the Defendants' 2009 denial of a 2007 petition for rulemaking to exclude force-fed foie gras from the food supply was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (ii) an order setting aside the denial; and (iii) an order requiring USDA, through FSIS, to initiate rulemaking consistent with 5 U.S.C. § 706(2)(A).  This Motion is made following the conferences of counsel pursuant to L.R. 7-3 which took place on August 27, 2012 and January 27, 2016. The hearing date is scheduled for Plaintiffs' Motion for Summary Judgment as well as Defendants' Cross-Motion for Summary Judgment.

This Motion is made on the grounds that, based on the Administrative Record, as a matter of law Defendants' denial of the petition for rulemaking was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[1] Plaintiff Daniel Stahlie was dismissed from this action on Feb. 3, 2016 (ECF 60).  Regal Vegan, Inc. dismissed its appeal of the District Court's prior judgment (ECF 51) which therefore remains final as to it.

the law, that there is no genuine issue of any material fact, and, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Plaintiffs are entitled to judgment in their favor as a matter of law. This Motion is supported by Plaintiffs' Memorandum of Points & Authorities, the Separate Statement of Uncontroverted Facts and Conclusions of Law, the concurrently filed declarations of Sarah Evans, Caroline Lee, Michelle Schurig, Erica Meier, and Stephen Wells, the previously filed declarations of Bruce Friedrich (ECF 22-3) and Bryan Pease (ECF 22-7), the Administrative Record previously submitted by Defendants (ECF 18), the Court's file in this matter, and upon such other and additional evidence as the Court may consider.

Date:  March 8, 2016                    STEPTOE & JOHNSON LLP


                                        By:     /s/ Morgan L. Hector
                                        _____
                                                Morgan L. Hector
                                                Attorneys for Plaintiffs

# <u>TABLE OF CONTENTS</u>

Page

I.   INTRODUCTION ..................................................................1

II.  STATEMENT OF FACTS .......................................................2

  A.  The USDA and FSIS .......................................................2

  B.  Statutory Framework and Regulations Governing Foie Gras. ........2

  C.  The 2007 Petition for Rulemaking. ....................................3

    1.   Force-Feeding Induces Liver Disease in Ducks and Geese. .........4

    2.   Force-Feeding Causes Other Serious Conditions. ..................4

    3.   Ducks Removed From Foie Gras Facilities Are Diseased. ...........6

    4.   Force-feeding Is Fatal. ..............................................6

    5.   Consumption of Foie Gras Carries Serious Health Risks. ..........6

  D.  Defendants' 2009 Denial of the Petition for Rulemaking. ............7

  E.  The Administrative Record and 2008 Letter from HVFG. .............8

  F.  The Current Action. .......................................................9

III.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS .......10

  A.  Subject Matter Jurisdiction Is Proper. ................................10

  B.  Individual Plaintiffs Have Standing. ...................................10

    1.   Defendants' Denial Has Caused Plaintiffs Injury-in-Fact. .........11

    2.   Knowledge of the Potential Harm from Consuming Force-Fed Foie Gras Does Not Eliminate Standing. ..................................13

  C.  The Plaintiff Organizations Have Standing. ...........................14

  D.  Plaintiffs' Claims Meet the Zone of Interests Test. ..................16

i

IV.    LEGAL STANDARD UNDER APA ...........................................................18

   A.  Summary Judgment Based Upon the Record Is Appropriate. .......................18

   B.  Standard of Review of Agency Action.............................................................18

V.   ARGUMENT.........................................................................................................19

   A.  The Denial Was Arbitrary and Capricious Because It Failed to Offer a
       Rational Explanation for the Denial. ....................................................................19

   B.  The FSIS Completely Ignored the Voluminous Evidence Showing Force-
       Feeding Leads to an Adulterated Food Product. ...........................................21

   C.  The Denial Runs Counter to the Evidence Showing Force-Fed Foie Gras Is
       Adulterated and Presents Possible Health Risks. .............................................23

VI.    CONCLUSION ...............................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987)...................20, 21

*ALDF v. Great Bull Run, LLC*, No. 14-CV-01171, 2014 WL 2568685
   (N.D. Cal. June 6, 2014) ......................................................................14

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003)......................................................11

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994)...........................18, 21, 22, 23

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657
   F.3d 936 (9th Cir. 2011) ......................................................................14

*Covington v. Jefferson County*, 358 F.3d 626 (9th Cir. 2004) ...............................11

*Cutler v. Kennedy*, 475 F.Supp. 838 (D.D.C. 1979) .................................................13

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ...................................12

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ...............15

*Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) ...........................14

*Federal Communications Comm'n v. ITT World Communications, Inc.*, 466
   U.S. 463 (1984)...................................................................................18

*Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp.*, 204 F.3d 149
   (4th Cir. 2000) ...................................................................................11

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)........................................14

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...................................................................9

*Kenney v. Glickman*, 96 F.3d 1118 (8th Cir. 1996) ...............................................20

*Koehler v. Litehouse, Inc.*, No. 12-cv-04055, 2012 WL 6217635
   (N.D. Cal. Dec. 13, 2012)...................................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377
   (2014) ..........................................................................................16, 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................10, 13

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ....................................................13, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................18, 19, 21, 22

*Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co.*,
    522 U.S. 479 (1998)........................................................................................16

*NRDC v. EPA*, 658 F.3d 200 (2d Cir. 2011)....................................................11, 18

*NRDC v. FDA*, 710 F.3d 71 (2d Cir. 2013) ...........................................................14

*Occidental Eng'g Co. v. Immigration & Naturalization Serv.*,
    753 F.2d 766 (9th Cir. 1985) ..........................................................................18

*Organized Village of Kake v. U.S. Dept. of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) ..........................................................................17

*Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147 (9th Cir. 2015) .............16

*Stauber v. Shalala*, 895 F.Supp. 1178 (W.D. Wis. 1995).......................................11

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) ...........10, 14, 15

*Wooden v. Bd. Of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1280
    (11th Cir. 2001) ...............................................................................................11


STATE CASES

*ALDF v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270 (2015) .........................15


FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

7 C.F.R. § 2.53 ..........................................................................................................2

9 C.F.R.§ 311.16 ......................................................................................................20

9 C.F.R.§ 381.7 ..........................................................................................................3

9 C.F.R. § 381.76 ........................................................................................................3

iv

9 C.F.R. § 381.78 ...................................................................................2

9 C.F.R. § 381.83 ...............................................................................3, 22

9 C.F.R. § 381.85 ...................................................................................3

9 C.F.R. § 381.86 ...............................................................................3, 22

5 U.S.C. § 702 .....................................................................................17

5 U.S.C. § 706 ................................................................................passim

21 U.S.C. § 451 ...............................................................................2, 21

21 U.S.C. § 452 ....................................................................................2

21 U.S.C. § 453 ....................................................................................3

21 U.S.C. § 455 .................................................................................2, 3

21 U.S.C. § 458 ...................................................................................21

21 U.S.C. § 460 ...............................................................2, 3, 17, 21, 22

21 U.S.C. § 463 ....................................................................................2

28 U.S.C. § 1331 .................................................................................10

28 U.S.C. § 1346 .................................................................................10

28 U.S.C. § 1391(e) .............................................................................10

Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ....................................passim

Declaratory Judgment Act, 28 U.S.C. § 2201-2 ................................................10

Poultry Products Inspection Act, 21 U.S.C. § 451 *et seq.* ................................passim

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiffs bring this action for review on an administrative record under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, challenging Defendants' August 27, 2009 denial (the "Denial") of Plaintiffs' petition for rulemaking (the "Petition") to exclude force-fed foie gras from the human food supply. Defendants' Denial was arbitrary, capricious, and an abuse of discretion, because:

- There is no rational connection between the Denial and the agency's inconsistent finding that the livers of force-fed birds are abnormal and exhibit hepatic lipidosis;

- There is no rational connection between the Denial and the agency's conclusion that "additional research is *needed* on the potential human health effects associated with the consumption of foie gras" (emphasis added);

- The agency inexplicably failed to consider and address voluminous evidence that, in violation of the Poultry Products Inspection Act and its implementing regulations, force-fed foie gras comes from poultry that: suffer from inflammation; are in an abnormal physiologic state; are dying and disabled; and suffer from toxemia and septicemia; and

- The proffered explanations for the Denial ran counter to the evidence before the agency and did not provide a rational connection between the facts found and the choice the agency made.

The Denial must therefore be set aside by this Court.  Plaintiffs request the Court enter: (i) a declaration that the Denial was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (ii) an order setting aside the Denial; and (iii) an order requiring Defendants to initiate rulemaking consistent with their obligations under 5 U.S.C. § 706(2)(a).

## II.   STATEMENT OF FACTS

### A.   The USDA and FSIS

The United States Department of Agriculture ("USDA") is responsible for developing and executing federal government policy on farming, agriculture, and food. (Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law ("UF"), ¶1). Its current Secretary is Defendant Tom Vilsack. (UF ¶2). Among USDA's many duties is to assure food safety, served in part through the Food Safety & Inspection Service ("FSIS"), an agency within USDA responsible for the safety of the nation's supply of meat, poultry, and egg products. (UF ¶3). FSIS's Administrator is Defendant Alfred Almanzo. (UF §4).

### B.   Statutory Framework and Regulations Governing Foie Gras.

Among the most important responsibilities of USDA is to prevent food products made from "dead, dying, disabled or diseased" poultry from entering the food supply. 21 U.S.C. § 460(d). The PPIA provides that "[i]t is essential … that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome [and] *not adulterated* … ." 21 U.S.C. § 451 (emphasis added). Thus, the goal of the PPIA is "to provide for the inspection of poultry and poultry products and … *to prevent the movement or sale … of poultry products which are adulterated* … ." 21 U.S.C. § 452 (emphasis added); *see also* 9 C.F.R. § 381.78(a) ("… each carcass, or any part thereof, which is found to be adulterated shall be condemned …"). The Act provides that "[a]ll poultry carcasses and parts thereof and other poultry products found to be adulterated shall be condemned," and hence not sold to the public, 21 U.S.C. § 455(c), and it gives FSIS responsibility to promulgate rules and regulations as "necessary to carry out the provisions" of the statute. 21 U.S.C. § 463(b); *see also* 7 C.F.R. § 2.53(a)(2)(i) (delegating from USDA to FSIS "the functions of the Secretary of Agriculture contained in the [PPIA]"). Put simply, FSIS's mandate is to ensure there is a healthy animal from farm to table.

The term "adulterated" applies to any poultry product that "consists in whole or part of any filthy, putrid, or decomposed substance or *is for any other reason, unsound, unhealthful, unwholesome, or otherwise unfit for human consumption*." 21 U.S.C. § 453(g)(3) (emphasis added). Pursuant to the PPIA, USDA and FSIS have the responsibility to inspect poultry carcasses and products and to condemn those that are adulterated or otherwise fall within the above categories. *Id*.; 21 U.S.C. § 455; 9 C.F.R. §§ 381.7, 381.76, *et seq.*

Demonstrating the arbitrary and capricious nature of the agency's action here, the PPIA and FSIS's own regulations prohibit the sale of products that are:

- the product of "dead, dying, disabled, or diseased poultry." 21 U.S.C. § 460(d).

- "for any … reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." 21 U.S.C. § 453(g)(3).

- "affected by an inflammatory process," independently or in combination with evidence of "a general systemic disturbance." 9 C.F.R. § 381.86.

- affected by "any septicemic or toxemic disease." 9 C.F.R. § 381.83.

- affected by an "abnormal physiologic state." 9 C.F.R. § 381.83.

- carrying any "organisms or toxins dangerous to the consumer." 9 C.F.R. § 381.85.

## C.    The 2007 Petition for Rulemaking.

On November 28, 2007, several of the current Plaintiffs, in addition to others, petitioned USDA and FSIS under the APA to promulgate regulations establishing that foie gras created by force feeding poultry renders it "adulterated" within the meaning of the PPIA, 21 U.S.C. § 453(g)(3). (UF ¶6). The Petition included voluminous scientific evidence demonstrating that the force-feeding process necessarily induces disease in ducks and geese, including a condition called hepatic lipidosis, and also threatens the safety of those who consume force-fed foie gras. Administrative Record, ECF 18 ("AR"), 1-1150; (UF ¶¶6-8). The

Petition is 23 pages long, and is accompanied by over one thousand pages of supporting exhibits that prove force-fed foie gras violates every one of the statutory and regulatory standards cited above. (UF ¶8).

### 1. Force-Feeding Induces Liver Disease in Ducks and Geese.

The Petition explained that, during force-feeding, ducks are manually restrained, usually by the neck, while an inflexible, unlubricated tube is forcibly inserted into their esophagi. Within seconds, a large volume of nutritionally deficient corn mash is delivered through this ten-inch tube directly into the birds' stomachs. (UF ¶¶9-10). This process is repeated two or three times daily for three to four weeks immediately preceding slaughter. *Id*. The bird is slaughtered shortly before it would die from its diseased state, once the fatty, diseased liver has reached maximum size. (UF ¶¶11).

The force-feeding of ducks and geese is intended to cause a disease known as hepatic lipidosis, which is the condition of having an enlarged, fatty, and degenerate liver. (UF ¶¶12). The accumulation of lipids, or fats, in the liver, is induced in ducks and geese through "over-feeding with a carbohydrate-rich diet." (UF ¶13). Hepatic lipidosis is also known as hepatic steatosis. (UF ¶14-15).

Hepatic lipidosis is widely considered pathological, *i.e.*, caused by disease, despite the fact that it is influenced by diet and environment, and may in some instances be reversible. (UF ¶¶16-18).  As one veterinary pathologist stated:

> The liver steatosis caused by "gavage" is a pathological process that shows itself first by a fatty degeneration of the hepatic cells and then by necrosis. … The fatty liver cannot be seen as normal. It is a categorical sign of a state of illness with clinical symptoms.

UF ¶ 16.

### 2. Force-Feeding Causes Other Serious Conditions.

The Petition also explained that force-feeding, in part by disabling the liver, causes other severe ailments in addition to and as a result of hepatic lipidosis. Each

of these conditions further destroys the health of force-fed ducks and geese, reducing the quality and wholesomeness of food products made from these birds.

### a.  Secondary Effects of Hepatic Lipidosis.

Basic side effects of hepatic lipidosis include morbid obesity, depression, loss of appetite, diarrhea, and poor feathering. (UF ¶19). Obesity in turn contributes to extreme respiratory distress and causes blood vessel compression, leading to severe circulatory problems. (UF ¶20).

Attacking the liver, hepatic lipidosis also impairs its ability to filter toxins from the body. Left unfiltered, toxins accumulate in the circulatory system. (UF ¶21). Toxin accumulation in the central nervous systems leads to a fatal condition called hepatic encephalopathy, which impairs brain function and results in seizures, lack of coordination, muscle tremors, stupor, coma, and death. (UF ¶22).

### b.  Toxemia and Septicemia.

Impaired liver function also contributes to the development of toxemia, or toxicity of the blood, one of the "many and varied" "accidents and illnesses" that occur during the course of force-feeding. (UF ¶23). Signs of toxemia include "petechial (pinpoint) hemorrhages on the heart, liver, kidneys, muscles, and serous membranes." (UF ¶24) (FSIS Poultry Slaughter Inspection Training Manual).

Septicemia, defined by FSIS as a "syndrome of septic bacterium accompanied by fever, hemorrhage, and severe systemic illness associated with the presence and persistence of pathogenic microorganisms or their toxin in the blood," (UF ¶25), is common in force-fed ducks (UF ¶26). Necropsies of ducks removed from foie gras facilities in 2005 indicated heavy growth of dangerous bacteria including *Serratia species*, *Escherichia coli* (*E. Coli*). (UF ¶26).

### c.  Inflammatory Disease.

Inflammatory conditions are yet another side-effect of force-feeding. (UF ¶29). Necropsies performed on force-fed ducks taken from foie gras facilities confirm the presence of inflammatory disease, including (1) inflammation of the

liver and kidneys; (2) "inflammatory changes … in the portal tracts and in the lungs"; and (3) inflammatory lesions in the liver and lungs that ranged from congestion to pneumonia. (UF ¶27). Cholangiohepatisis is also found, caused by a bacterial infection that results in inflammation of the liver and bile ducts. (UF ¶28). Enteritis, an inflammation of the small intestine that usually appears at the end of the first week of force-feeding, is also common. (UF ¶29).

### 3. Ducks Removed From Foie Gras Facilities Are Diseased.

The Petition also included necropsies and examinations of force-fed ducks removed from foie gras facilities that confirmed the presence of this litany of diseases and ailments. (UF ¶30). Clinical examinations of purchased foie gras revealed similar pathologies. (UF ¶31).

### 4. Force-feeding Is Fatal.

The Petition included extensive evidence that force-feeding is associated with an increased mortality rate. (UF ¶¶32-36). A European survey found that, before slaughter, force-fed ducks had a mortality rate ten to twenty times higher than that of ducks that were not force-fed. (UF ¶32). The owner of Sonoma Foie Gras, a foie gras facility in California, stated in a 2004 television interview that he limited force feeding to three to four weeks – periods over *twice* as long as those in the European study – because the "ducks would become too ill and die soon after, if not slaughtered by then." (UF ¶33). In addition to the conditions described above, causes of death include nutritionally deficient feed, (UF ¶34), and respiratory distress, or dyspnea, related to hepatic lipidosis (UF ¶35).

### 5. Consumption of Foie Gras Carries Serious Health Risks.

Secondary amyloidosis, or AA amyloidosis, is a serious disease with a high mortality rate that affects humans. Secondary amyloidosis "leads to hepatomegaly (enlarged liver) and kidney failure, and is ultimately fatal." (UF ¶37). The Petition explained that commercially available foie gras contains a specific, soluble protein called serum amyloid A-related (SAA) protein which, in a 2007 study published in

the Proceedings of the National Academy of Sciences, served as "a potent" factor in enhancing the onset of secondary amyloidosis, even when ingested orally. (UF ¶38). The Petition included evidence from Dr. Alexander Whitehead, who has studied SAA for more than twenty-five years and concluded "to a reasonable degree of scientific certainty" that "the AA from duck foie gras would be able to survive in the human stomach . . . and ultimately form potential nucleation sites in major human organs." (UF ¶39). As a result, Dr. Whitehead concluded that the "avoidance of foods that may be contaminated with AA fibrils, such as duck foie gras, might be important for those who have an inflammatory disease, like rheumatoid arthritis, or who could develop an inflammatory disease in the future." *Id.* This is because "[s]uch individuals may be placed at an increased risk of developing Secondary (or AA) Amyloidosis from eating foie gras containing AA fibrils." *Id.*

Although the prevalence of secondary amyloidosis in the human population is unknown, the majority of cases occur in people with "sustained inflammatory processes, particularly rheumatoid and juvenile chronic arthritis." (UF ¶40). As a result, the authors of the 2007 study concluded that "it would seem prudent for children and adults with rheumatoid arthritis or other diseases who are at risk for this disorder to avoid foods that may be contaminated with AA fibrils." *Id.* Because the AA fibrils "that form potential nucleation sites may persist in the host and support the development of secondary amyloidosis when chronic inflammation occurs at a later date," consumers who may someday develop a chronic inflammatory disease are also at greater risk for contracting secondary amyloidosis after eating foie gras. (UF ¶41). The amyloids in foie gras may also support the development of other amyloid-associated disorders such as Alzheimer's disease or type II diabetes. (UF ¶42).

**D.    Defendants' 2009 Denial of the Petition for Rulemaking.**

FSIS denied the Petition on August 27, 2009 in a cursory two-page decision

DOC. # DC-8986610 V.2

that failed to cite a *single* study, article, expert, or exhibit in support of its denial (UF ¶¶43-44). In the Denial, FSIS conceded that the appearance of the enlarged and fatty livers of force-fed birds would be "considered abnormal" and that they "would be characterized as affected by hepatic lipidosis." (UF ¶45). Despite this, the Denial concluded hepatic lipidosis does not constitute adulteration because with force-feeding it has a physiological, rather than pathological, origin. (UF ¶46).

FSIS further conceded that amyloidosis is common in foie gras and that the 2007 study in the Proceedings of the National Academy of Sciences demonstrated a connection between the presence of amyloids and the onset of Secondary Amyloidosis. (UF ¶47). FSIS discounted the study, however, purportedly because amyloid could be present for reasons other than force-feeding, and because the study involved animals, not humans, under "experimental conditions." (UF ¶48). FSIS ultimately "concluded that additional research is *needed* on the potential human health effects associated with the consumption of foie gras." (UF ¶49) (emphasis added). The Denial failed to address any other portion of the Petition and its exhibits. (UF ¶50).

### E.    The Administrative Record and 2008 Letter from HVFG.

The AR consists primarily of the Petition, with Exhibits 1 through 65, the two-page Denial, and miscellaneous scientific studies included by Defendants. These scientific studies include (1) a background on hepatic lipidosis (UF ¶51); (2) an analysis of "Amyloids, prions and the inherent infectious nature of misfolded protein aggregates," which notes transgenic mice engineered to be susceptible to amyloidosis can "spontaneously" develop the condition (UF ¶¶52-53); and (3) additional background on hepatic lipidosis and amyloidosis (UF ¶54).

The AR also includes a February 26, 2008 letter from Congressman Maurice D. Hinchey to USDA, enclosing a letter from Marcus Henley, Operations Manager of Hudson Valley Foie Gras ("HVFG"), a producer of force-fed foie gras, with "material in rebuttal" to the Petition. (UF ¶55). These materials consist of

approximately ten exhibits, ranging from scientific studies and affidavits to court pleadings. (UF ¶¶56-79).

**F.    The Current Action.**

On May 17, 2012, Plaintiffs initiated this action, seeking an order declaring Defendants' Denial arbitrary, capricious, and an abuse of discretion, and setting it aside under the APA, 5 U.S.C. § 706(2). ECF 1.

On October 24, 2012, Plaintiffs filed a Motion for Summary Judgment on that basis. ECF 22. On November 28, 2012, Defendants filed a Motion for Judgment on the Pleadings and Cross-Motion for Summary Judgment. ECF 26. Defendants moved for judgment on the pleadings solely on the ground that Plaintiffs lacked standing. *Id*. Defendants sought summary judgment on the grounds that "the denial of the petition for rulemaking was a rational determination supported by the Administrative Record." *Id*. at Notice of Motion.

On March 22, 2013, the Court granted Defendants' Motion for Judgment on the Pleadings on the ground that the Denial was tantamount to a refusal to take enforcement action and hence, not reviewable under 5 U.S.C. §701(a)(2) and *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). ECF 45. The Court subsequently entered a final judgment pursuant to Federal Rule of Civil Procedure 58 on May 30, 2013. ECF 49.

Plaintiffs appealed (ECF 46), and on December 7, 2015, the Ninth Circuit issued a memorandum opinion reversing this Court's decision to dismiss the action under *Heckler*, holding that this Court "erred in finding FSIS's denial of the petition to be unreviewable." ECF 53 at 5.  The Ninth Circuit further held that it was remanding the action to the district court to evaluate Defendants' standing arguments in the first instance, noting that "the standing inquiry on remand will likely require considering the evidentiary support for Plaintiffs' standing allegations." *Id*. at 6.

District Judge Chhabria, sitting on the appellate panel by designation, issued

a concurring opinion addressing the issue of standing. Ninth Circuit Dkt. Entry 58-2. Judge Chhabria challenged whether an organizational plaintiff could demonstrate standing simply by "[*choosing*] to spend money to counteract challenged conduct germane to its missions" or whether "circuit precedent could be interpreted to require an organization plaintiff to show that the organization itself 'would have suffered some other injury if it had not diverted resources to counteracting the problem.'" *Id.*, citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013). Ultimately, Judge Chhabria's concurrence urged the organizational plaintiffs "to consider, on remand, whether they can present evidence of injury beyond the fact that they have chosen to spend money opposing foie gras rather than spending that money on some other issue." *Id.*

## III.   THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.   Subject Matter Jurisdiction Is Proper.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1346, because this action arises under the laws of the United States, including the APA, PPIA, and the Declaratory Judgment Act, 28 U.S.C. § 2201-2. Venue is also proper. 28 U.S.C. § 1391(e).

### B.   Individual Plaintiffs Have Standing.

To have standing, a plaintiff must show a concrete and particularized injury that is either actual or imminent, fairly traceable to the defendant, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). However, where a litigant has been "accorded a procedural right to protect his concrete interests" – here, the right to challenge agency action – the litigant "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-518 (2007) quoting *Lujan*, *supra*, 504 U.S. at 572, n.7. There need only be "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id*. Standing, after all,

"simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a federal court." *Wooden v. Bd. Of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001).

### 1.      Defendants' Denial Has Caused Plaintiffs Injury-in-Fact.

As set forth above, Plaintiffs' past and potential future consumption of force-fed foie gras has caused an increase in risks to their health. Section II.C.5, *supra*. This increased risk of harm is sufficient to establish an injury-in-fact.

The case of *Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003) is instructive. In *Baur*, the plaintiff sought judicial review of USDA's denial of his petition to ban the use of "downed livestock" (immobility associated with mad cow disease) as food for human consumption. USDA argued he lacked standing because the harm alleged was not an actual illness, only the increased risk of contracting an illness. The *Baur* court disagreed: "Like threatened environmental harm, the potential harm from exposure to dangerous food products or drugs 'is by nature probabilistic, yet an unreasonable exposure to risk may cause cognizable injury." *Id*. (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc)); *see also Covington v. Jefferson County*, 358 F.3d 626, 652-653 (9th Cir. 2004) (Gould, J. concurring) (finding sufficient standing due to the "small but increased risks of serious human maladies" from environmental degradation). The *Baur* court went on to hold that "[i]n the specific context of food and drug safety suits," "enhanced risk" injuries "are cognizable for standing purposes, where the plaintiff alleges exposure to potentially harmful products." *Id; see also NRDC v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (holding plaintiffs established credible threat of harm sufficient for standing from two pesticides allowed on the market by defendant EPA); *NRDC v. FDA*, 710 F.3d 71, 82 (2d Cir. 2013) (exposure to chemical was sufficient for standing, "notwithstanding the uncertainty as to triclosan's harmfulness to humans").

---

As long as Defendants refuse to declare force-fed foie gras "adulterated" under the PPIA, consumers of poultry products are at an increased risk of harm, from the exposure to pathogens, such as *E. coli.*, to the development of amyloid related illness, such as secondary amyloidosis, Alzheimer's, and type II diabetes. Section II.C.5, *supra*. Plaintiffs Evans and Schurig have submitted declarations stating that they have previously consumed force-fed foie gras. (UF ¶87). Plaintiff Evans now tries to avoid consuming force-fed foie gras,[2] but continues to eat duck and goose patés and other liver products, and is concerned she may inadvertently consume such a product produced by force feeding given repeated instances of restaurants' lack of knowledge regarding the origins of the duck and goose liver products she consumes. (UF ¶88).

Similarly, Plaintiffs Lee and Schurig try to avoid consumption of any duck or goose liver products, but also fear they may inadvertently consume force-fed foie gras. (UF ¶89). This risk is real: Ms. Lee recently ate at a restaurant serving a dish called "soy foie gras cherries," mistakenly identified by the server as a vegetarian soy dish. (UF ¶90).

Each of the individual Plaintiffs is concerned that she may contract serious medical illnesses as a result of eating force-fed foie gras or dishes made from it, and this substantial and imminent risk of injury remains as long as force-fed foie gras is allowed in the market.[3] (UF ¶91). Ms. Lee, in particular, falls squarely within the portion of the population most vulnerable to health risks caused by the

---

[2] At the time of and prior to the filing of Plaintiffs' prior motion for summary judgment, Ms. Evans was a consumer of force-fed foie gras.  *See* Evans Dec., ¶2, at Dkt. No. 22-2.
[3] The individual Plaintiffs' fear and anxiety of future harm, as well as preventative steps taken to avoid future harm, are also sufficient to satisfy Article III's injury-in-fact requirement.  UF 93; *see Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006) ("injury-in-fact may simply be the fear or anxiety of future harm"); *Stauber v. Shalala*, 895 F.Supp. 1178, 1187-88 (W.D. Wis. 1995) (inability to consume dairy because of increased risk of potential harm is injury-in-fact for standing purposes).

presence of amyloids in force-fed foie gras (UF ¶¶37-42) given a family history of inflammatory disease, including a son with secondary amyloidosis. (UF ¶92).

As in *Baur*, the individual Plaintiffs here have suffered an injury-in-fact caused by the Defendants' failure to follow a food safety consumer protection statute, here the PPIA.  Because the requested relief – setting aside the Denial and ordering rulemaking consistent with the APA – at the very least creates "some possibility" that Defendants will "reconsider the decision that allegedly harmed the litigant", Plaintiffs have satisfied Article III's standing requirements. *Massachusetts v. EPA*, 549 U.S. at 517-518, quoting *Lujan*, 504 U.S. at 572, n.7.

### 2.    Knowledge of the Potential Harm from Consuming Force-Fed Foie Gras Does Not Eliminate Standing.

Defendants have also regularly attacked Plaintiffs' standing on the ground that, since the individual Plaintiffs are aware of force-fed foie gras's health risks, *they* are the cause of any harm they may suffer, *not* Defendants' failure to prevent force-fed foie gras from entering the food supply. This argument fails for two reasons. First, it improperly conflates force-fed foie gras with non-force-fed foie gras and goose and duck liver products, generally. (UF ¶7). Ms. Evans in particular could find herself eating duck or goose liver products without knowing whether the duck or goose had been force-fed or naturally fed. It is not the law that she should have to forgo some larger category of food product to avoid the harm caused by Defendants' own misconduct, nor is it reasonable for her to do so. *See, e.g.*, *Cutler v. Kennedy*, 475 F.Supp. 838, 850 (D.D.C. 1979) (finding standing where plaintiff's injury was fear he would be exposed to product ingredients not been tested by FDA and that plaintiff could not track which products contained these ingredients). Second, this "coming to the harm" argument has been repeatedly rejected in the context of a consumer who is aware of and has suffered harm from violations of a consumer protection statute, and seeks prospective relief to prevent future harm from those same violations. *See, e.g.*, *Koehler v. Litehouse, Inc.,* Case

No. 12-cv-04055, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012) (holding to find lack of standing "would eviscerate the intent of the California legislature in creating consumer protection statutes because it would effectively bar any consumer who avoids the offending product from seeking injunctive relief."); *NRDC v. FDA*, 710 F.3d 71, 85 (2nd Cir. 2013) (holding plaintiff's exposure to harmful chemical in soap not self-inflicted "because triclosan would not be available on the market but for FDA's failure to finalize its regulation").  Since only a plaintiff aware of the health risks would have the information to bring the suit in the first place, to hold otherwise would effectively bar any legal challenge.

### C.    The Plaintiff Organizations Have Standing.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982) (holding that practices frustrating an organization's mission and causing it to divert resources confer Article III standing). "An organization has direct standing to sue when it shows a drain on its resources from both a diversion of its resources and frustration of its mission." *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quotation omitted); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding fair housing organization had standing to sue where resources were diverted to efforts to combat discrimination); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (finding injury-in-fact where challenged policy frustrated organization's goals and required expenditure of resources); *ALDF v. Great Bull Run, LLC*, No. 14-CV-01171, 2014 WL 2568685, at *4 (N.D. Cal. June 6, 2014) ("… Plaintiffs can establish that Defendants' acts perceptibly impair Plaintiffs' outreach and education efforts by diverting resources from these efforts to counteract Defendants' allegedly unlawful acts.").

Here, the agency action denying the Petition and allowing force-fed foie gras into the food supply has frustrated the core missions of ALDF, Compassion Over

Killing, APRL, and Farm Sanctuary ("Organizational Plaintiffs"), namely to keep certain products that are injurious to animal health, such as force-fed foie gras, out of the food supply, and to advocate for human health in regards to these products. As these entities have described their missions:

- "ALDF is heavily involved in the protection, health, and wellbeing of animals used and sold in commercial enterprises, including agriculture, and in the broad social and human health consequences of intensive animal agriculture, in particular." (UF ¶94).

- "Compassion Over Killing's purpose is to protect all animals from abuse through the use of consumer education and advocacy campaigns aimed at educating people and encouraging change based on animal protection, human health, and environmental principles; investigations; and legal and rulemaking actions and education." (UF ¶95).

*See also* (UF ¶96 (APRL); UF ¶97 (Farm Sanctuary)). In furtherance of their missions, each has diverted substantial resources in investigating and combatting Defendants' failure to declare force-fed foie gras "adulterated," and in taking remedial steps with consumers, such as education, social media campaigns, lobbying, and other outreach. (UF ¶98).

While Judge Chhabria's concurrence on appeal questioned whether the mere choice to divert resources was sufficient,[4] the issue is somewhat beside the point because here the Organizational Plaintiffs *have* demonstrated more than a simple

---

[4] On this point, the concurrence (pp.1-2) cites to *Valle del Sol Inv. V. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) and *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc). *Valle del Sol* states only that standing cannot be "manufactured" by "choosing to spend money fixing a problem *that otherwise would not affect the organization at all*", not the case here. 732 F.3d at 1018 (emphasis added, quotation omitted). In *Comite*, while the court found the ordinance had "forced" the organization to divert resources, it did not hold that was the applicable standard. *Compare ALDF v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1283-84 (2015) ("Where the economic injury is diversion of resources, the proper focus of the inquiry is not the 'voluntariness or involuntariness' of the expenditures" (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)).

"choice" to divert resources to combatting force-fed foie gras. ALDF, for example, has expended substantial resources – from social media campaigns to the filing of administrative petitions – precisely because failing to do so would have resulted in a loss of credibility, support, and organizational goodwill among its donors, peers, and the legal community, which expect ALDF to combat the worst forms of animal cruelty (*i.e.*, force-fed foie gras) and to ensure that the law protects animal health and welfare to the fullest extent possible. (UF ¶99). Indeed, "[i]gnoring the terrible animal welfare consequences and threats to public health posed by force-fed foie gras, and sitting idly by while USDA continued approving this diseased product for human consumption, was simply not an option for ALDF." *Id*. COK has submitted similar evidence. (UF ¶100).

This unavoidable diversion of resources in furtherance of the Organizational Plaintiffs' missions constitutes injury-in-fact for Article III purposes. And this injury is the direct result of Defendants' allowing force-fed foie gras into the food supply. (UF ¶101). If USDA and FSIS were to initiate rulemaking to remove force-fed foie gras from the marketplace as an "adulterated" product under the PPIA, the resources the Organizational Plaintiffs are diverting in response could be directed to other projects, including efforts to protect other animals in furtherance of their overall missions. *Id*. Article III standing is satisfied.

### D.    Plaintiffs' Claims Meet the Zone of Interests Test.

Once Article III standing has been satisfied, as part of a "zone-of-interests" analysis, a court must determine whether a "legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387 (2014) (citations omitted); *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1156 (9th Cir. 2015). The "zone of interests" test requires the court to discern whether a plaintiff's interests are among those "arguably to be protected" by the statute. *Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 492 (1998).

The Supreme Court has recently emphasized, "in the APA context, that the test is not especially demanding", and that the "conspicuous" inclusion of the word "arguably" in the test indicates "that the benefit of any doubt goes to the plaintiff". *Lexmark*, 134 S.Ct. at 1389. The zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id. Lexmark* explicitly held that this "lenient approach" "is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Id.*; *see also Organized Village of Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 964 (9th Cir. 2015) (same).

Here, Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  As set forth above in demonstrating Plaintiffs' Article III standing, Plaintiffs' have all been aggrieved and adversely affected because of Defendants' Denial. They thus fall squarely within the zone of interests of the APA.

Plaintiffs' claims also fall within the zone of interests of the PPIA. The individual Plaintiffs are past, present, and potential future consumers of poultry products, and the PPIA is designed, after all, to protect consumers. The Organizational Plaintiffs also satisfy the test. A statute that prohibits the "buying, selling, or transporting in commerce, or importing, dead, dying, disabled, or diseased poultry" is aimed at ensuring animal health, which in turn ensures human health. 21 U.S.C. § 460. The Organizational Plaintiffs' concern with the human health consequences of consuming force-fed foie gras, along with their corresponding concern with animal health, that brings them within the PPIA's zone of interests.

## IV.    LEGAL STANDARD UNDER APA

### A.    Summary Judgment Based Upon the Record Is Appropriate.

The district "court is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). "Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* Thus, "[i]n reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g*, 753 F.2d at 769-70). The Court's review of the administrative record "must be searching and careful." *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011).

### B.    Standard of Review of Agency Action.

Refusals to engage in requested rulemaking constitute final agency action reviewable under the APA. *Federal Communications Comm'n v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984).  A final agency action may be set aside "if the decision was 'arbitrary and capricious' within the meaning of the [APA]." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994). Such is the case where an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* (quotation omitted).

The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In addition, the

18

1  agency's proffered reasoning must not "rest[] on reasoning divorced from the
2  statutory text." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). The reviewing
3  court "may not consider reasons for agency action which were not before the
4  agency," and may not "infer an agency's reasoning from mere silence or where the
5  agency failed to address significant objections and alternative proposals." *Id.*
6  (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). "Rather, 'an agency's action must
7  be upheld, if at all, on the basis articulated by the agency itself.'" *Id.*, at 1073-74
8  (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 50).

9  ## V.  ARGUMENT

10 ### A.  The Denial Was Arbitrary and Capricious Because It Failed to
11 ### Offer a Rational Explanation for the Denial.

12     The Petition asked Defendants to initiate rulemaking under the PPIA to
13 address the existence of diseased force-fed foie gras in the human food supply. (UF
14 ¶7). In FSIS's two-page Denial it found that (1) the presence of fatty change in a
15 duck or goose liver used to produce foie gras does not by itself render the foie gras
16 adulterated or otherwise unfit for human food; and (2) additional research is
17 needed on the potential human health effects associated with the consumption of
18 foie gras. (UF ¶¶43-44). Regarding the former, FSIS stated that it had "considered
19 the condition of the livers of ducks and geese used to produce foie gras" and
20 acknowledged "that the appearance of the livers of these birds would be
21 characterized as affected by hepatic lipidosis," and would be considered "abnormal
22 . . . both grossly and microscopically." (UF ¶45).

23     FSIS went on to state, however, that the condition cannot be considered to
24 be a "disease" because it is "due to a physiologic condition," *i.e.*, "overwhelming
25 of the hepatocyte's ability to process and export fat, rather than disease." (UF ¶46).
26 Thus, FSIS urges that a distinction between the cause of the abnormality
27 (physiologic versus pathologic, *i.e.*, force-feeding versus pathogen), not the
28 abnormality itself, is the beginning and the end of its required analysis. This is

1    nonsensical and irrational, and contradicts FSIS's own regulations which require

2    condemnation of any poultry product "showing evidence of an *abnormal*

3    *physiologic state*." 9 CFR § 381.83 (emphasis added).

4            The argument is also inconsistent with USDA's claims in a parallel

5    regulation for meat that a "fatty and degenerated liver" is diseased under the FMIA

6    and needs to be condemned. *See* 9 C.F.R. § 311.16(a)(7) ("All carcasses of animals

7    so infected that consumption of the products thereof may give rise to food

8    poisoning shall be condemned. This includes all carcasses showing signs of …

9    fatty and degenerated liver …"). Given that previous courts have found that the

10   FMIA and PPIA should be regulated similarly, USDA has acted arbitrarily and

11   capriciously by distinguishing foie gras' hepatic lipidosis as non-diseased despite

12   its abnormal physiological state. *See Kenney v. Glickman*, 96 F.3d 1118, 1125 (8th

13   Cir. 1996) ("The relevant definitions of 'adulterated' and 'misbranded' are

14   identical under the PPIA and FMIA."). No such distinction is made for other fatty

15   liver conditions in other animal food products and, indeed, USDA has stated that a

16   fatty and degenerated liver in livestock is *per se* a diseased state.

17           This case is comparable to *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812

18   F.2d 1, 6 (D.C. Cir. 1987), where the D.C. Circuit pointed out that that there was

19   "nothing ambiguous in the [Horse Protection] Act's treatment of soring methods,"

20   *i.e.*, the practice of deliberately injuring show horses to improve their performance,

21   and that the Act was "clearly designed to end soring." The court held that certain

22   administrative decisions that viewed the then-existing regulations as allowing

23   soring with devices not specifically listed by the agency as improper "[did] not

24   demonstrate that the [agency] ha[d] adopted a reasonable interpretation of the Act"

25   and remanded for the agency to consider the validity of the new evidence

26   indicating that horses were injured by chains weighing less than those specifically

27   prohibited in the statute. *Id.* at 7-8. Specifically, the court felt there was an absence

28   of in-depth reasoning: "The two conclusory sentences quoted above are

insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decision-making." *Id.* at 6. The same can – and should – be said of the two-page response from FSIS.

There is nothing ambiguous about the PPIA. It mandates that Defendants condemn any poultry product that is "adulterated" or from "diseased" poultry. 21 U.S.C. §§ 458, 460(d). Nowhere does the PPIA state that the *cause* of the disease is determinative, or even a relevant consideration. Nor could it be. If a human practice leads to the same abnormal physiological state as would a pathogen, as FSIS concedes here, there is no rational basis to allow such "diseased" material into the food supply, irrespective of cause. (UF ¶16). Both are "adulterated" under the PPIA, and the arbitrary distinction FSIS drew "[does] not demonstrate that the [agency] has adopted a reasonable interpretation of the Act." *Am. Horse*, 812 F.2d at 6-7. Nor is there a rational connection between the conclusion that "additional research is needed on the potential health effects" of consumption and the Denial.  *See* 21 U.S.C. § 451 (stating goal of the PPIA is "that the health and welfare of consumers be protected by assuring that poultry products are wholesome [and] not adulterated.").

FSIS failed to offer a "satisfactory explanation" for its position, and the reasons FSIS did give for denying the Petition are unmoored from the governing statute, not in accordance with law, and the Denial should be vacated.

**B.    The FSIS Completely Ignored the Voluminous Evidence Showing Force-Feeding Leads to an Adulterated Food Product.**

Agency action must also be set aside where the agency has failed to "examine the relevant data" or "entirely failed to consider an important aspect of the problem." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, despite Plaintiffs' voluminous Petition and exhibits, FSIS decided to address, however briefly, only two issues in its Denial: (1) whether the

accumulation of lipids in the liver itself from force-feeding render the liver "adulterated" or "diseased" under the PPIA; and (2) whether the presence of amyloids in foie gras presents a risk to human health. (UF ¶50). The Denial thus ignored substantial evidence showing that the birds used in foie gras production fall squarely within the other conditions that mandate the condemnation of foie gras. Specifically, the Denial ignored the facts that these animals:

- exhibit systemic inflammatory processes including arthritis and bacterial infections as proscribed by 9 C.F.R. § 381.86 (UF ¶¶27-30);

- suffer from an abnormal physiologic state, as proscribed by 9 C.F.R. § 381.83, caused by the liver expanding to 6 to 10 times its original size, restricting the birds' ability to move and breathe (UF ¶11, 19-20, 22);

- are disabled, under 21 U.S.C. § 460(d), *i.e.*, unable to walk due to liver enlargement and use of nutritionally deficient feed (UF ¶19-21);

- are dying, as proscribed by 21 U.S.C. § 460(d), and that many do in fact die, because of the ailments caused by force-feeding (UF ¶¶32-34);

- suffer from septicemia, as proscribed by 9 C.F.R. § 381.83, including due to the presence of *E. Coli* and other bacteria (UF ¶26); and

- suffer from toxemia, as proscribed by 9 C.F.R. § 381.83, *i.e.*, the presence toxins in the blood due to the failing liver (UF ¶¶23-24).

Each of these conditions could have independently formed the basis for FSIS to grant the Petition under the PPIA and its own implementing regulations, yet none were addressed in the Denial. FSIS thus "entirely failed to consider an important aspect of the problem." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (holding Court may not "infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals"). For this reason as well, the Denial should be set aside.

C.     **The Denial Runs Counter to the Evidence Showing Force-Fed Foie Gras Is Adulterated and Presents Possible Health Risks.**

Finally, agency action must be set aside where the agency "offered an explanation for its decision that runs counter to the evidence before the agency." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)).

Here, even on the points for which the agency did offer an explanation – (1) whether the increase in lipids in the liver rendered it diseased or adulterated and (2) whether the presence of amyloidosis constituted a risk to human health – the explanation ran counter to the evidence before it. As described above, Section II.C, force-feeding causes serious liver impairment due to the pathological, diseased state of hepatic lipidosis. The Petition also presented evidence that amyloids in foie gras present risks to human health, including secondary amyloidosis and related diseases such as Alzheimer's. The Denial was counter to this evidence.

The additional evidence included in the AR does nothing to alter this conclusion. For example, the studies submitted by HVFG that argue the "reversibility" of the damage caused by force-feeding means the organ is not "adulterated" or "diseased," (UF ¶58), do not address or are dismissive of the simple fact that the process is lethal when continued and increases mortality rates. (UF ¶¶32-34). These studies were also conducted under unrealistically ideal conditions. (UF ¶¶61, 65-66). They are also based on a two week force-feeding period, in contrast to the industry standard three to four weeks in the U.S. (*Compare* UF ¶33 with UF ¶63).

Similarly, articles HVFG submitted lauding the historical significance and lineage of foie gras (UF ¶¶60, 74) are irrelevant to the determination required under the PPIA and FSIS's regulations. Arguments that enlargement of the liver is a genetic predisposition and part of the natural pre-migratory behavior of the birds (UF ¶¶59, 69) similarly fail. The birds currently used for foie gras production are

23

predominantly not migratory and, in any event, the pre-migratory gorging has a significantly different effect on the liver, which never grows to more than double its normal size in the wild. (UF ¶¶ 80-86).

Studies purporting to show the animals are not disturbed by force-feeding (UF ¶¶70-71, 76) are similarly irrelevant in determining whether the liver is fit for human consumption. They are also impossible to reconcile with the miserable physical conditions which frequently kill or disable the birds. (UF ¶¶19-36).

The additional studies included by Defendants in the AR are similarly unavailing. Exhibit 5 to the AR is merely a background on hepatic lipidosis.  It states that cell damage caused by hepatic lipidosis is "not always lethal," but notes that the cells affected by hepatic lipidosis "are injured and cannot adequately carry out their normal functions." (UF ¶51). It also concludes that, "[a]s a result of lipidosis, the animal may show signs of clinical illness." *Id*.

A second article addressing hepatic lipidosis also fails to support the Denial. (UF ¶¶52-53). Its focus is on the distinction between physiologic and pathologic hepatic lipidosis and is therefore presumably part of the AR to support FSIS's conclusion that "foie gras is the result of a physiologic condition [and] [t]hus, the condition of the foie gras liver is not a 'disease.'" (UF ¶46). The article does no such thing. It does not address force-fed poultry, so its significance must be severely discounted. It also defines "physiologic fatty liver" as that which "occurs in late pregnancy and heavy lactation" (UF ¶54), so it cannot be assumed that any conclusions the article reaches would apply to the livers of force-fed poultry. Finally, to the extent the article argues for a physiologic-pathologic distinction, it does so functionally, arguing that physiologic lipidosis reflects "otherwise normal hepatocytes" while pathologic lipidosis would include some "degenerative change in hepatocytes" *Id*.  FSIS failed to make this analysis or draw these conclusions, instead focusing solely on the cause of the lipidosis, and ignoring the degenerative changes to the liver amply demonstrated by the Petition (*E.g.*, UF ¶¶16, 31).

The third article addresses amyloidosis and the study cited in the Petition, Exhibit 44, showing a link between foie gras and the onset of secondary amyloidosis conditions such as Alzheimer's disease. (UF ¶52-53). The information in this exhibit, however, is consistent with the Petition which argues only that foie gras "*may* cause health effects" (AR21-22) and that the evidence "*raises the possibility* that AA fibrils, such as those in foie gras, may lead to the development of other amyloid diseases, including Alzheimer's disease." (UF ¶38 (emphasis added)). FSIS apparently agreed, concluding that additional research was required to determine potential health effects. (UF ¶44).

The explanations Defendants proffered ran counter to the evidence and, as a result, the Denial should be set aside.

## VI.   <u>CONCLUSION</u>

For the reasons detailed above, the Court should set aside the Denial and remand the matter to Defendants with instructions to initiate rulemaking consistent with the APA.

Dated:  March 8, 2016                         STEPTOE & JOHNSON LLP


                                              By:      /s/ Morgan L. Hector
                                                     Morgan L. Hector
                                                     Attorneys for Plaintiffs

MOTION FOR SUMMARY JUDGMENT
Case No. 12-cv-04028-ODW                         DOC. # DC-8986610 V.2