Morgan Hector, Cal. Bar. No. 246573
mhector@steptoe.com
STEPTOE & JOHNSON, LLP
633 West Fifth Street, Suite 700
Los Angeles CA 90071
213.439.9400 / 213.439.9599 (fax)

Carter Dillard, Cal. Bar No. 206276
cdillard@aldf.org
ANIMAL LEGAL DEFENSE FUND
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280 (fax)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation; et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, and the Honorable TOM VILSACK, its Secretary; et al., <br><br> Defendants. | Case No. 12-cv-04028-ODW(PJWx) <br><br> Hon. Otis D. Wright II <br><br> PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW <br><br> Date:  June 13, 2016 <br> Time:  1:30 p.m. <br> Place:  Courtroom 11 – Spring Street <br> Pretrial Conference:  N/A <br> Trial Date:  N/A |

Plaintiffs Animal Legal Defense Fund ("ALDF"), Sarah Evans, Michelle Schurig, Caroline Lee, Farm Sanctuary, Compassion Over Killing ("COK"), and Animal Protection and Rescue League ("APRL") ("Plaintiffs") submit the following Statement of Uncontroverted Facts and Conclusions of Law in Support of their Motion for Summary Judgment.

## **PRELIMINARY STATEMENT**

Judicial review of agency action under the Administrative Procedures Act ("APA") is generally limited to a review of the administrative record. *See* 5 U.S.C. § 806; *Southwest Ctr. For Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996). In ruling on summary judgment in an APA case, the court does not premise its decision on findings of undisputed material facts, but rather determines as an issue of law whether the agency's decision, based on the administrative record, was arbitrary or capricious, or not in accordance with law. *See* 5 U.S.C. § 706; *Fla. Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985).

As stated by the District Court in *Environment Now! v. Espy*, 877 F.Supp. 1397 (E.D. Cal. 1994), overruled on other grounds in *Inland Empire Public Lands Council v. United States*, 88 F.3d 754, 760 n.6 (9th Cir. 1996):

> When the Court reviews an agency decision ... [t]he question is not whether there is a genuine issue of material fact, but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.

*Id*. at 1421, citing *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979); *see also Cal. R.S.A. No. 4 v. Madera County*, 332 F.Supp.2d 1291, 1301 (E.D. Cal. 2003) (holding that the usual summary judgment analysis does not apply in reviewing action of administrative agency). Nonetheless,

Plaintiffs recognize that a statement of facts may assist the court to highlight significant portions of the record. Facts contained in the administrative record will be referred to as "AR," followed by the bates number of the particular document cited. Because the AR has already been submitted to the Court by Defendants (at ECF 18), it is not being re-filed with Plaintiffs' Motion, but a courtesy hard copy will be included with the mandatory chambers copy provided to the Court.

In addition, various facts regarding Plaintiffs' standing to bring this action are set forth below, based upon the concurrently filed declarations of Sarah Evans, Caroline Lee, Michelle Schurig, Erica Meier, and Stephen Wells, as well as the previously filed declarations of Bruce Friedrich (ECF 22-3) and Bryan Pease (ECF 22-7). The sections addressing standing are identified by heading below.

## UNCONTROVERTED FACTS

| | |
|---|---|
| 1.    The United States Department of Agriculture ("USDA") is the federal executive department responsible for developing and executing federal government policy on farming, agriculture, and food. | 7 U.S.C. §§ 2201, 2204; 7 C.F.R. § 2.1 |
| 2.    USDA's current Secretary is Defendant Tom Vilsack. | Complaint (ECF 1) ¶ 59; Answer (ECF 6) ¶ 59. |
| 3.    Among the USDA's many duties is to assure food safety, served in part through the Food Safety & Inspection Service ("FSIS"), an agency within the USDA responsible for the safety of the nation's supply of meat, poultry, and egg products. | Complaint ¶ 1; Answer ¶ 1; 21 U.S.C. §§ 451-452, 463(b); 9 C.F.R. § 300.2(b)(2); 7 C.F.R. § 2.53(a)(2)(i). |
| 4.    The FSIS Administrator is Defendant Alfred | Complaint ¶ 60; |

| | |
|---|---|
| Almanzo. | Answer ¶ 60. |
| 5.      The USDA is responsible for preventing unsafe poultry products from entering the American food supply. | 21 U.S.C. §§ 451-452. |
| 6.      On November 28, 2007, two of the current Plaintiffs, Farm Sanctuary and Animal Legal Defense Fund, as well as the Humane Society of the United States, NYU Student Animal Legal Defense Fund, Jessica Gorman, and Doris Booth ("Petitioners"), petitioned the USDA and FSIS to promulgate regulations condemning force-fed foie gras in order to prevent it from entering the human food supply. | Administrative Record, Dkt. No. 18 ("AR"), 1-31 (the "Petition" or "Pet.", AR Ex. 1). |
| 7.      The Petition explained that the force-feeding process necessarily induces disease, including a condition called hepatic lipidosis, in ducks and geese, and also threatens the safety of those who consume force-fed foie gras.  The Petition noted that force-fed foie gras is an indistinguishable subset of foie gras and goose and duck liver products, generally. | AR1-31; AR4-5, n.1 (Petition). |
| 8.      The Petition was 23 pages long, and was accompanied by over one thousand pages of exhibits providing support. | AR1-1150 (Petition and Exhibits 1 through 65 thereto). |
| 9.      The Petition explained and submitted evidence establishing that that, during force-feeding, ducks and geese are manually restrained, usually by the neck, while an inflexible, unlubricated tube is forcibly inserted into the esophagus. Within seconds, a large volume of nutritionally deficient corn mash is delivered through this ten-inch tube directly into the birds' stomachs. | AR33-34 (Petition). |

3

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 10.     The Petition stated that the force-feeding process is repeated two or three times daily for three to four weeks immediately preceding slaughter, and an article attached to the Petition stated that, at HVFG, "workers feed nearly 30,000 ducks three times a day by inserting tubes down their throats." | AR1-31 at 14 (Petition); AR115-119 at 118 (Pet. Ex. 12). |
| 11.     Studies included with the Petition concluded that once the fatty liver has reached its maximum size, approximately 6-10 times its original mass, the bird is slaughtered. | AR4; AR32-43 at 34 (Petition); AR 120-213 (Pet. Ex. 13). |
| 12.     The Petition explained, and studies included with the Petition concluded, that force-feeding of ducks and geese for the production of foie gras is intended to and does create a condition known as hepatic lipidosis, which is the condition of having an enlarged, fatty, and degenerate liver. | AR12-21 (Petition); AR32-43 (Pet. Ex. 1); AR120-213 (Pet. Ex. 13); AR246-258 (Pet. Ex. 15); AR481-497 (Pet. Ex. 32); AR511-813 (Pet. Exs. 35-37). |
| 13.     The Petition and studies included with the Petition describe hepatic lipidosis as the accumulation of lipids, or fats, in the liver, which is induced in ducks and geese through "over-feeding with a carbohydrate-rich diet." | AR15-16 (Petition); AR32-43 (Pet. Ex. 1); AR120-213 (Pet. Ex. 13); AR246-258 (Pet. Ex. 15); AR481-497 (Pet. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| | Ex. 32); AR511-813 (Pet. Exs. 35-37). |
| 14.    Studies included with the Petition indicate that hepatic lipidosis is also known as hepatic steatosis. | AR409-424 at 412 (Pet. Ex. 26); AR511-532 at 514 (Pet. Ex. 35); AR814-850 at 816 (Pet. Ex. 38). |
| 15.    Studies included with the Petition indicate that hepatic lipidois and hepatic steatosis are also referred to as fatty degeneration or fatty infiltration. | AR409-424 at 411 (Pet. Ex. 26); AR511-532 at 516 (Pet. Ex. 35). |
| 16.    The Petition explained and attached studies concluding that hepatic lipidosis is generally, and should be, considered a pathology.  As one veterinary pathologist stated: "The liver steatosis caused by "gavage" is a pathological process that shows itself first by a fatty degeneration of the hepatic cells and then by necrosis. . . . The fatty liver cannot be seen as normal. It is a categorical sign of a state of illness with clinical symptoms." | AR12-21 (Petition); AR511-897 (Pet. Exs. 35-43); AR214-245 at 234 (Pet. Ex. 14); AR764-769 at AR767 (Pet. Ex. 37). |
| 17.    The Petition included evidence from the European Union Scientific Committee on Animal Health and Animal Welfare which similarly concluded that "because normal liver function is seriously impaired in birds with the hypertrophied liver which occurs at the end of force feeding this level of steatosis should be considered pathological." | AR14-15 (Petition); AR120-213 at 165 (Pet. Ex. 13). |

5

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 18.     The European Union Scientific Committee on report also states that "environmental factors can precipitate the development of a disease process in the absence of a specific pathogen." | AR14-15 (Petition); AR120-213 at 128 (Pet. Ex. 13). |
| 19.     The Petition and attached studies indicate basic side effects of hepatic lipidosis include obesity, depression, loss of appetite, diarrhea, and poor feathering, as well as difficulty in basic movement and breathing due to the liver expanding 6 to 10 times its original size. | AR14-19 (Petition); AR33-43 at 34 (Pet. Ex. 1); AR354-357 (Pet. Ex. 21); AR400-403 (Pet. Ex. 25); AR456-472 (Pet. Exs. 28-29); AR814-850 at 816 (Pet. Ex. 38); AR973-979 (Pet. Exs. 49-50). |
| 20.     The Petition and attached studies indicate that obesity in turn contributes to respiratory distress and causes blood vessel compression, leading to circulatory problems. | AR33-34 (Petition); 706-813 at 787 (Pet. Ex. 37). |
| 21.     Another study attached to the Petition concluded in surveying scientific literature that hepatic lipidosis from force-feeding also impairs the ability of the liver to filter toxins from the body and that, left unfiltered, toxins accumulate in the birds' circulatory system. | AR214-245 at 234 (Pet. Ex. 14). |
| 22.     The Petition and attached studies indicate that toxin accumulation in the central nervous systems in turn leads to | AR15-16 (Petition); AR214- |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| a serious condition called hepatic encephalopathy, which impairs brain function and results in seizures, lack of coordination, muscle tremors, stupor, coma, and death. | 245 at 234 (Pet. Ex. 14); AR334-335 at 334 (Pet. Ex. 18); AR533-705 at 573 (Pet. Ex. 36); AR814-850 at 816 (Pet. Ex. 38). |
| 23.    A study attached to the Petition concluded that impaired liver function also contributes to the development of toxemia, or intoxication of the blood, one of the "many and varied" "accidents and illnesses" that can occur during the course of force-feeding. | AR286-332 at 309 (Pet. Ex. 17). |
| 24.    According to the USDA, signs of toxemia include "petechial (pinpoint) hemorrhages on the heart, liver, kidneys, muscles, and serous membranes." | AR1453-1530 at 1466 (AR Ex. 9). |
| 25.    Septicemia is defined by the FSIS as a "syndrome of septic bacterium accompanied by fever, hemorrhage, and severe systemic illness associated with the presence and persistence of pathogenic microorganisms or their toxin in the blood." | AR1338-1452 at 1346 (AR Ex. 8). |
| 26.    Studies attached to the Petition show septicemia is common in force-fed ducks and that necropsies of ducks removed from foie gras facilities in 2005 indicated heavy growth of dangerous bacteria including *Serratia species*, *Escherichia coli* (*E. Coli*), as well as the growth of *Streptococcus species*, and *Staphylococcus* bacteria. | AR396-408 at 403 (Pet. Ex. 25); AR455-467 at 465 (Pet. Ex. 28). |
| 27.    Studies attached to the Petition also show | AR372-382 (Pet. |

7

| | |
|---|---|
| inflammatory conditions are yet another side-effect of force-feeding.  Necropsies performed on force-fed ducks taken from foie gras facilities confirm the presence of inflammatory disease, including inflammation of the liver and kidneys; "inflammatory changes . . . in the portal tracts and in the lungs"; and inflammatory lesions in the liver and lungs that ranged from congestion to pneumonia. | Ex. 23); AR511-532 at 518 (Pet. Ex. 35). |
| 28.     Studies attached to the Petition also show that cholangiohepatisis is also found, caused by a bacterial infection that results in inflammation of the liver and bile ducts. | AR511-532 at 518 (Pet. Ex. 35). |
| 29.     Studies attached to the Petition also show that enteritis, an inflammation of the small intestine that usually appears at the end of the first week of force-feeding, is also common. | AR286-332 at 309 (Pet. Ex. 17); AR706-813 at 803 (Pet. Ex. 37). |
| 30.     The Petition also included substantial evidence of necropsies and examinations of force-fed ducks removed from foie gras facilities that consistently confirmed the presence of a litany of diseases and ailments. | AR468-473 at 472 (Pet. Ex. 29); AR396-408 at 400-403 (Pet. Ex. 25); AR373-382 (Pet. Ex. 23); AR482-497 (Pet. Ex. 32); AR354-357 (Pet. Ex. 21); AR456-467 (Pet. Ex. 28); AR972-974 (Pet. Ex. 49); AR975- |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| | 979 (Pet. Ex. 50). |
| 31.   Also attached to the Petition were clinical examinations of foie gras livers purchased from Hudson Valley Foie Gras and LaBelle Farms Foie Gras that revealed pathologies including lipidosis, abnormal hepatocyctes, impaired cellular function, diffuse swelling, vacuolation of hepatocytes, and "scattered small red foci." | AR814-850 at 816-817, 841 (Pet. Ex. 38). |
| 32.   The Petition included extensive evidence that force-feeding is associated with an increased mortality rate. A European survey found that, before slaughter, force-fed ducks had a mortality rate of two to four percent, which was ten to twenty times higher than the mortality rate of ducks that were not force-fed, with 12-15 day force-feeding periods. | AR120-213 at 143, 165 (Pet. Ex. 13); AR814-850 at 809 (Pet. Ex. 38). |
| 33.   An article attached to the Petition included a statement from the owner of Sonoma Foie Gras, a foie gras production facility in California, from a 2004 television interview, that he limited force feeding to three to four weeks because the "ducks would become too ill and die soon after, if not slaughtered by then." | AR334-335 ( Pet. Ex. 18). |
| 34.   The Petition included evidence that a contributing factor to death caused by force-feeding is the nutritionally deficient feed used by foie gras producers. | AR396-408 at 406-408 (Pet. Ex. 25); AR409-424 at 412-413 (Pet. Ex. 26). |
| 35.   Other causes of death reported by this evidence included respiratory distress, or dyspnea, related to hepatic lipidosis. | AR706-813 at 786-787, 793 (Pet. Ex. 37); AR286-332 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| | (Pet. Ex. 17). |
| 36.     The Petition included photos taken at the foie gras production facilities in the U.S. that showed dozens of birds exhibiting illness and the corpses of birds that likely died as a result of force-feeding. | AR426-454 (Pet. Ex. 27). |
| 37.     The Petition explained and included evidence showing that secondary amyloidosis, or AA amyloidosis, is a serious disease with a high mortality rate that affects humans. Secondary amyloidosis "leads to hepatomegaly (enlarged liver) and kidney failure, and is ultimately fatal." | AR21-24 (Petition); AR904-937 at 908 (Pet. Ex. 45). |
| 38.     The Petition explained that commercially available foie gras contains a specific, soluble protein called serum amyloid A-related (SAA) protein which, in a 2007 study published in the Proceedings of the National Academy of Sciences, served as "a potent" factor in enhancing the onset of secondary amyloidosis, even when ingested orally. The Petition concluded that foie gras "may cause health effects" and that the evidence "raises the possibility that AA fibrils, such as those in foie gras, may lead to the development of other amyloid diseases, including Alzheimer's disease." | AR21-24 (Petition); AR899-902 (Pet. Ex. 44). |
| 39.     The Petition included evidence from Dr. Alexander Whitehead, who has studied SAA for more than twenty-five years, and who concluded "to a reasonable degree of scientific certainty" that "the AA from duck foie gras would be able to survive in the human stomach … and ultimately form potential nucleation sites in major human organs."  Dr. Whitehead also concluded:  "Therefore, avoidance of foods | AR21-24 (Petition); AR903-937 at 905-908, 911 (Pet. Ex. 45). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| that may be contaminated with AA fibrils, such as duck foie gras, might be important for those who have an inflammatory disease, like rheumatoid arthritis, or who could develop an inflammatory disease in the future. Such individuals may be placed at an increased risk of developing Secondary (or AA) Amyloidosis from eating foie gras containing AA fibrils." | |
| 40.     A separate study attached to the Petition concluded that, although the prevalence of secondary amyloidosis in the human population is unknown, the majority of cases occur in people with "sustained inflammatory processes, particularly rheumatoid and juvenile chronic arthritis." As a result, the authors of this 2007 study concluded that "it would seem prudent for children and adults with rheumatoid arthritis or other diseases who are at risk for this disorder to avoid foods that may be contaminated with AA fibrils." | AR21-24 (Petition); AR898-902 at 901 (Pet. Ex. 44). |
| 41.     A separate study attached to the Petition concluded that, because the AA fibrils "that form potential nucleation sites may persist in the host and support the development of secondary amyloidosis when chronic inflammation occurs at a later date," consumers who may someday develop a chronic inflammatory disease are also at greater risk for contracting secondary amyloidosis after eating foie gras. | AR21-24 (Petition); AR913-914 (Pet. Ex. 45). |
| 42.     A separate study attached to the Petition concluded that the amyloids in foie gras may also support the development of other amyloid-associated disorders such as Alzheimer's disease or type II diabetes. | AR23-24 (Petition); AR901 (Pet. Ex. 44). |

| | |
|---|---|
| 43.   FSIS denied the Petition on August 27, 2009 in a two-page decision that failed to cite a single study, article, expert, or exhibit in support (the "Denial"). | AR1547-1548 (the "Denial," AR Ex. 11). |
| 44.   FSIS' two-page Denial was based explicitly on two conclusions: (1) "the presence of fatty change in a duck or goose liver used to produce foie gras alone does not render the foie gras adulterated or otherwise unfit for human food"; and (2) "additional research is needed on the potential human health effects associated with the consumption of foie gras. Therefore, we are denying your petition." | AR1547 (AR Ex. 11). |
| 45.   In the Denial, FSIS stated that it had "considered the condition of the livers of ducks and geese used to produce foie gras" and acknowledged "that the appearance of the livers of these birds would be characterized as affected by hepatic lipidosis," and would be considered "abnormal . . . both grossly and microscopically." | AR1547 (AR Ex. 11). |
| 46.   The FSIS went on to state, however, that hepatic lipidosis cannot be considered to be a "disease" because it is "due to a physiologic condition," *i.e.*, "overwhelming of the hepatocyte's ability to process and export fat, rather than disease." | AR1547 (AR Ex. 11). |
| 47.   FSIS further conceded that amyloidosis is common in foie gras, that it was "not surprising to find that the foie gras in the study contained amyloid enhancing factor," and that the 2007 study in the Proceedings of the National Academy of Sciences demonstrated a connection between the presence of amyloid and the onset of Secondary Amyloidosis. | AR1547-1548 (AR Ex. 11). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 48.    FSIS discounted the study, however, asserting that amyloid "is fairly common in ducks in general," and because the study involved mice, not humans, under "experimental conditions." | AR1548 (AR Ex. 11). |
| 49.    The FSIS ultimately "concluded that additional research is needed on the potential human health effects associated with the consumption of foie gras." | AR1547 (AR Ex. 11). |
| 50.    The Denial failed to address any portion of the Petition and exhibits other than (1) whether hepatic lipidosis alone renders foie gras diseased; and (2) whether the Solomon article (Petition Ex. 44) established there was a risk to human health from consuming amyloid contained in foie gras. | AR1547-1548 (AR Ex. 11). |
| 51.    Exhibit 5 to the AR is a textbook excerpt presenting background on hepatic lipidosis. It states that cell damage caused by hepatic lipidosis is "not always lethal," but notes that cells affected by hepatic lipidosis "are injured and cannot adequately carry out their normal functions." It also notes that "[l]ipidosis is sometimes an expression of cell injury and, when it is, may be preceded or accompanied by cell swelling. In addition, lipidosis can occur as an expression of injury in cells that are destined to die. . . . Presumably, many of the cells containing lipids are severely injured and destined to die."  The article also concludes that, "[a]s a result of lipidosis, the animal may show signs of clinical illness." | AR1317-1322 at 1319-1321 (AR Ex. 5). |
| 52.    Exhibit 6 to the AR is a study presenting an analysis | AR1323-1328 (AR |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| of "Amyloids, prions and the inherent infectious nature of misfolded protein aggregates." | Ex. 6). |
| 53.   This study addresses the study cited in the Petition (Pet. Ex. 44) arguing there is a link between the amyloids found in foie gras and the onset of secondary amyloidosis conditions such as Alzheimer's disease. Specifically, this study states that "[b]ecause these transgenic mice 'spontaneously' develop Alzheimer's disease pathology later in life, it is not possible to conclude whether the Alzheimer's disease brain acted as an infectious agent of as an accelerator of a process that was genetically programmed to occur." | AR1323-1328 at 1325-1326 (AR Ex. 6). |
| 54.   Another article included by Defendants as Exhibit 7 to the AR addresses hepatic lipidosis generally, as well as the distinction between physiologic and pathologic hepatic lipidosis, arguing that physiologic lipidosis reflects "otherwise normal hepatocytes" while pathologic lipidosis would include some "degenerative change in hepatocytes". This article does not analyze or address force-fed poultry and defines "physiologic fatty liver" as that which "occurs in late pregnancy and heavy lactation." | AR1329-1337 at 1332 (AR Ex. 7). |
| 55.   On February 26, 2008 Congressman Maurice D. Hinchey sent a letter to the USDA, enclosing a letter from Marcus Henley, Operations Manager of a Hudson Valley Foie Gras & Duck Products, a producer of force-fed foie gras, to Lori DuBord of the Office of Congressman Hinchey. | AR1151-1152 (AR Ex. 2). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 56.    Congressman Hinchey's letter includes HVFG's "material in rebuttal" to the Petition, which consists of nine exhibits, ranging from scientific studies and affidavits to court pleadings. In the letter, Congressman Hinchey states that HVFG is an "integral component of the economy of Sullivan County, New York." | AR1151-1315 at 1152 (AR Exs. 2-3, including nine attachments to AR Ex. 3). |
| 57.    The enclosed letter from HVFG purports to address "liver enlargement in waterfowl and claims made by Dr. Alan Solomon." | AR1153 (AR Ex. 3). |
| 58.    Exhibit 1 to the HVFG Letter argues that "there is no disease" in force-fed livers because "[t]he liver in this situation contains abundant triglyceride stores by the histology is consistent with simple steatosis (fatty liver) indicating . . . reversibility." | AR1156-1162 at 1157 (AR Ex. 3-1). |
| 59.    The exhibit also states: "[C]yclical fatty liver is commonly observed in nature. Thus, it can hardly be called a disease state in and of itself. . . . The ability to store fat in the liver can be considered as an adaptive mechanism to feast and famine conditions. In palmipedes, it appears to be a natural pre-migration process . . .  In other words, prior to long migrations, the animal turns on certain pathways which facilitate storage of fat for energy needs – the liver is a crucial depot for this process." | AR1156-1162 at 1158 (AR Ex. 3-1). |
| 60.    The author of Exhibit 1 to the HVFG Letter is "not a veterinarian," and states that the "ancient practice" of force-feeding is "thousands of years old." | AR1156-1162 at 1158 (AR Ex. 3-1). |
| 61.    The author of Exhibit 1 to the HVFG Letter observed | AR1156-1162 at |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| ducks under very controlled conditions, specifically, the "carbohydrate loaded ducks" he viewed "at 12 and 18 days" were tube fed twice per day for 1 minute each and were otherwise "running around in an open pen." | 1157-58 (AR Ex. 3-1). |
| 62.    Exhibit 2 to the HVFG Letter is a response to a critique by plaintiff Farm Sanctuary to a particular article published by Dr. Guemene regarding foie gras that is not part of the Administrative Record. | AR1164-1167 (AR Ex. 3-2). |
| 63.    Exhibit 3 to the HVFG Letter is a study where force-fed ducks were "subjected to 3 cycles of two-week periods of force-feeding followed by four weeks of normal feeding." | AR1169-1187 at 1169 (AR Ex. 3-3). |
| 64.    Exhibit 3 to the HVFG Letter stated that "[t]he hepatomegaly following a two-week period of force-feeding was associated with reduced blood purification capabilities." | AR1169-1187 at 1169 (AR Ex. 3-3). |
| 65.    Exhibit 3 to the HVFG Letter is a study of force-feeding "conducted following professional standards, under a [sic] artisan's working conditions," purporting to conclude that, while two week periods of force-feeding result in reduced blood purification capabilities, arthritis, callosities and widened esophagi, these specific negative effects were reversible following a four week period of "rest." | AR1169-1187 at 1178 (AR Ex. 3-3). |
| 66.    The study concluded that, "when carried out according to professional standards and on a small scale, force-feeding does not induce diet-related pathological changes, as the steatosis is totally reversible. It is therefore possible to create acceptable conditions preserving the animal welfare." | AR1169-1187 at 1169 (AR Ex. 3-3). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 67.    Exhibit 4 to the HVFG Letter is a study illustrating the significant effect of a genetic predisposition to hepatic lipidosis by comparing two breeds with a similar base metabolism level. | AR1189-1206 (AR Ex. 3-4). |
| 68.    Exhibit 4 to the HVFG Letter states that "hepatic steatosis is an undesirable situation, even pathological," but that the "only exception" is "among waterfowl, the controlled induction of a hepatic steatosis as the source of foie gras production." The study also states that "the fatty liver of force-fed waterfowl is the expression of a hepatic steatosis of nutritional origin, hypertrophic and reversible." | AR1189-1206 at 1196-1197 (AR Ex. 3-4). |
| 69.    Exhibit 4 states that "the force-feeding's hepatic steatosis is very different from steatosis found in mammals and even among birds such as the 'hemorrhagic foie gras' syndrome in the laying hen, which is a true pathology. In fact, in the case of waterfowl rearing, the force-feeding exploits the maximum liver lipid storage capacity found in migratory birds. In these species, physiological hepatic steatosis, even though moderate, allows the supply of energy during the migration days. This lipid metabolism's natural adaptation capability helps explain at the same time the intensity of force feeding hepatic steatosis and its reversibility, only under clear extra physiological conditions but not pathological ones." | AR1189-1206 at 1197-1198 (AR Ex. 3-4). |
| 70.    HVFG Letter, Exhibit 5 is a study setting forth "experimental data" to "the ethical debate on the practice of force-feeding," purporting to conclude that one cannot say | AR1207-1220 at 1214 (AR Ex. 3-5). |

17

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| "with certainty that the practice seriously impairs the welfare of waterfowl, in the sense that it is a major cause of stress or fear, pain and even injury and pathology." | |
| 71.    HVFG Letter, Exhibit 5 purports to analyze whether force-feeding is "painful," noting that "[p]ain and suffering are difficult to evaluate in animals because they involve emotional and psychological components." | AR1207-1220 at 1209 (AR Ex. 3-5). |
| 72.    HVFG Letter, Exhibit 5 states that "the increase in the amount of lipids in the liver does not signal pathology, but corresponds to a nutritional steatosis" because "it is completely reversible." | AR1207-1220 at 1212-1213 (AR Ex. 3-5). |
| 73.    HVFG Letter, Exhibit 6 is an article discussing the "past, present and future of force-feeding and 'foie gras' production." | AR1222-1234 (AR Ex. 3-6) |
| 74.    HVFG Letter, Exhibit 6 states that "[f]orce-feeding is a very old practice, first recorded in ancient Egypt" and gives "a brief historical review of production." | AR1222-1234 (AR Ex. 3-6) |
| 75.    HVFG Letter, Exhibit 6 purports to survey various scientific studies and states that "steatosis is fully reversible, after a short period both for geese and mule ducks, even after 3 successive force-feeding periods." | AR1222-1234 (AR Ex. 3-6) |
| 76.    HVFG Letter, Exhibit 6 purports to survey various scientific studies and states that force-feeding does not "induce any significant increase in plasma corticosterone levels when ducks are kept in individual cages," but that "slight symptoms [of pain] were observed in a few ducks by the end of the force-feeding period, probably due to | AR1222-1234 at 1229-1230 (AR Ex. 3-6). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| moderate inflammation." | |
| 77.    HVFG Letter, Exhibit 7 is an affidavit from a Dr. Detwiler disputing a number of claims made by Dr. Whitehead in Petition Exhibit 44, including that AA Amyloidosis is a "prion disease" and that prion and amyloid diseases can be transmitted to humans from affected animals that enter the food chain, due to an absence of conclusive evidence. | AR1236-1248 at 1236-1238 (AR Ex. 3-7). |
| 78.    HVFG Letter, Exhibit 8 is an excerpt of an interview in which Muriel Eliaszewicz of the "French food safety agency" states that it would be "premature" to conclude that foie gras is unsafe in light of the study linking the consumption of foie gras to the onset of amyloidosis in mice. | AR1248-1250 (AR Ex. 3-8). |
| 79.    The remaining exhibit 9 to the HVFG Letter consists of pleadings from a legal action which cover essentially the same material and arguments set forth in Exhibits 1 through 8 to the HVFG Letter, and legal argument in the specific, limited procedural context (e.g., motion to dismiss) of a separate action. | AR1251-1315 (AR Ex. 3-9). |
| 80.    The Petition included an article stating that birds currently used for foie gras production "have lost their migratory instinct," and that male mallard ducks, the most commonly used birds for producing foie gras, "have never been migratory." | AR286-332 at 297 (Pet. Ex. 17). |
| 81.    The article also states that muscle and adipose tissue, not the liver, are the natural storage regions for fats, and that | AR286-332 at 297-300 (Pet. Ex. 17). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| the accumulation of fats in the liver of force-fed birds is due to a "defect in lipid transport" caused by force-feeding and exacerbated by the nutritionally deficient nature of the feed used. | |
| 82.    The Petition also included an article that states: "Defenders of foie gras production sometimes argue force-feeding replicates a natural behavior of wildfowl before migration: Ducks and geese increase their food intake in order to produce fat to fuel their long flights. However, wild ducks and geese go through a very specific set of annual physiological adaptations triggered by changes in day length in order to adjust for increased fat metabolism at this time. Even if they were to be physiologically prepared for migration during the force-feeding period, birds do not eat larger-than-normal meals as the assimilate energy reserves for migratory flights; rather they eat many small meals throughout the day." | AR32-43 at 34-35 (Pet. Ex. 1). |
| 83.    This article further states that "the Muscovy duck, from which most ducks raised for foie gras are derived, does not migrate" and therefore does not have "such a potential for food." | AR32-43 at 35 (Pet. Ex. 1). |
| 84.    This article further states that "normally, fat is not stored in the liver but synthesized in the organ and then stored in adipose tissue and muscles." | AR32-43 at 35 (Pet. Ex. 1). |
| 85.    The article further states that "[t]he livers of migrating birds never more than double in size." | AR32-43 at 35 (Pet. Ex. 1). |
| 86.    The Petition included a study from the European | AR120-213 at 148- |

| | |
|---|---|
| Union Scientific Committee on Animal Health and Animal Welfare which stated that "by far the most common type of bird used for the purpose of 'gavage' is the male hybrid between the Muscovy ducks and domestic ducks. The Muscovy duck . . . [is] not migratory. Hence, whilst the domestic goose might well be adapted to store food before migration, it is less likely that a cross between the domestic duck and the Muscovy duck, the Mulard, has such a potential for food." | 150 (Pet. Ex. 13). |

### UNCONTROVERTED FACTS RE PLAINTIFFS' STANDING

| | |
|---|---|
| 87. Individual Plaintiffs Evans and Schurig (the "Consumer Plaintiffs") are past consumers of foie gras. | Declaration of Michelle Schurig ("Schurig Dec.") ¶2; Declaration of Sarah Evans ("Evans Dec.") ¶¶2. |
| 88. Plaintiff Evans tries to avoid consuming force-fed foie gras, but continues to eat duck and goose patés and other liver products, and is concerned she may inadvertently consume such a product produced by force feeding given repeated instances of restaurants' lack of knowledge regarding the origins of the duck and goose liver products she consumes. | Evans Dec., ¶¶2, 7-9. |
| 89. Plaintiffs Lee and Schurig try to avoid consumption of any duck or goose liver products, but also fear they may | Declaration of Caroline Lee ("Lee |

| | |
|---|---|
| inadvertently consume force-fed foie gras. | Dec.") ¶¶8-9; Schurig Dec., ¶6. |
| 90.    Ms. Lee recently ate at a restaurant serving a dish called "soy foie gras cherries," mistakenly identified by the server as a vegetarian soy dish. | Lee Dec., ¶8 and Ex. A (restaurant menu). |
| 91.    Each of the individual Plaintiffs is concerned that she may contract serious medical illnesses as a result of eating force-fed foie gras or dishes made from it, and this substantial risk of injury remains as long as force-fed foie gras continues to be allowed in the market. | Lee Dec., ¶¶5-6, 9, Schurig Dec., ¶¶4, 7, Evans Dec., ¶¶4-5, 9. |
| 92.    Ms. Lee has a family history of inflammatory disease, including a son with secondary amyloidosis. | Lee Dec., ¶5. |
| 93.    The individual Plaintiffs have suffered a fear and anxiety of future harm, and have taken preventative steps to avoid future harm. | Lee Dec., ¶¶3, 8-9; Evans Dec., ¶¶2, 6-9; Schurig Dec., ¶¶2, 6. |
| 94.    ALDF's mission includes being "heavily involved in the protection, health, and wellbeing of animals used and sold in commercial enterprises, including agriculture, and in the broad social and human health consequences of intensive animal agriculture, in particular." | Declaration of Stephen Wells ("Wells Dec."), ¶4. |
| 95.    COK's mission "is to protect all animals from abuse through the use of consumer education and advocacy campaigns aimed at educating people and encouraging change based on animal protection, human health, and environmental principles; investigations; and legal and rulemaking actions and education." | Declaration of Erica Meier ("Meier Dec."), ¶2. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 96.    APRL's mission is "to document and expose animal cruelty, educate[] the public on animal issues," including "the animal welfare and health consequences of factory farming," and "work[] with policymakers and legislators to implement humane changes." | Declaration of Bryan Pease ("Pease Dec.") (ECF 22-7), ¶¶3, 5. |
| 97.    Farm Sanctuary "is a non-profit charitable organization dedicated to protecting animals raised in the food industry and raising awareness of the effects on human health of abusive animal practices in the food industry." | Declaration of Bruce Friedrich ("Friedrich Dec.") (ECF 22-3), ¶3. |
| 98.    In furtherance of their missions, each has diverted substantial resources in investigating and combatting the Defendants' failure to declare force-fed foie gras "adulterated," and in taking remedial steps with consumers, such as education, social media campaigns, lobbying, and other outreach. | Wells Dec., ¶¶4-11; Meier Dec., ¶¶6-8; Pease Dec., ¶¶3-8; Friedrich Dec., ¶¶7-10. |
| 99.    ALDF, for example, has expended substantial resources – from social media campaigns to the filing of administrative petitions – precisely because failing to do so would have resulted in a loss of credibility, support, and organizational goodwill among its donors, peers, and the legal community, which expect ALDF to combat the worst forms of animal cruelty (*i.e.*, force-fed foie gras) and to ensure that the law protects animal health and welfare to the fullest extent possible. Indeed, "[i]gnoring the terrible animal welfare consequences and threats to public health posed by force-fed foie gras, and sitting idly by while USDA continued approving this diseased product for human | Wells Dec., ¶¶12-14. |

23

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | | |
|---|---|---|
| consumption, was simply not an option for ALDF." | | |
| 100.   COK has expended resources investigating, educating, and campaigning about foie gras because its mission is advocacy to expose and campaign against the worst abuses to animals, and not continuing to campaign against foie gras would cuase a loss of goodwill and support from COK's donor and support base. | | Meier Dec., ¶9. |
| 101.   The organizational Plaintiffs' diversion of resources is the result of Defendants' allowing force-fed foie gras into the food supply, and if USDA and FSIS were to initiate rulemaking to remove force-fed foie gras from the marketplace as an "adulterated" product under the PPIA, the resources they are diverting in response could be directed to other projects. | | Wells Dec., ¶¶15-17; Meier Dec., ¶¶10-12; Pease Dec., ¶¶9-10; Friedrich Dec., ¶¶11-12. |

## **CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| 1.      The Poultry Products Inspection Act of 1957 ("PPIA") specifically empowers and requires the USDA to regulate the production and sale of poultry, explaining that "[i]t is essential . . . that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome [and] not adulterated." | | 21 U.S.C. § 451. |
| 2.      The goal of the PPIA is "to provide for the inspection of poultry | | 21 U.S.C. § 452; 9 C.F.R. § 381.78. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| and poultry products and . . . to prevent the movement or sale . . . of poultry products which are adulterated . . . ." | |
| 3.     The responsibility to promulgate rules and regulations under the PPIA has been delegated to the FSIS and its Administrator. | 21 U.S.C. 463(b); 7 C.F.R. § 2.53(a)(2)(i). |
| 4.     The PPIA and FSIS regulations prohibit the sale of and require condemnation of products that are the product of "dead, dying, disabled, or diseased poultry." | 21 U.S.C. § 460(d). |
| 5.     The PPIA and FSIS regulations prohibit the sale of and require condemnation of products that are "for any . . . reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." | 21 U.S.C. § 453(g)(3). |
| 6.     The PPIA and FSIS regulations prohibit the sale of and require condemnation of products that are "affected by an inflammatory process," independently or in combination with evidence of "a general systemic disturbance." | 9 C.F.R. § 381.86. |
| 7.     The PPIA and FSIS regulations prohibit the sale of and require | 9 C.F.R. § 381.83. |

| | |
|---|---|
| condemnation of products that are affected by "any septicemic or toxemic disease." | |
| 8.    The PPIA and FSIS regulations prohibit the sale of and require condemnation of products that are affected by an "abnormal physiologic state." | 9 C.F.R. § 381.83. |
| 9.    The PPIA and FSIS regulations prohibit the sale of and require condemnation of products that are carrying any "organisms or toxins dangerous to the consumer." | 9 C.F.R. § 381.85. |
| 10.    Pursuant to the PPIA, the USDA and FSIS have the responsibility to inspect poultry carcasses and products and are required to condemn all carcasses or products found to be adulterated or otherwise falling within the above categories. | 21 U.S.C. § 455; 9 C.F.R.§ 381.76. |
| 11.    The district "court is not required to resolve any facts in a review of an administrative proceeding." | *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir.1985). |
| 12.    "Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a | *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir.1985). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| matter of law the evidence in the administrative record permitted the agency to make the decision it did." | |
| 13.     Thus, "[i]n reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" | *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g*, *supra*, 753 F.2d at 770). |
| 14.     The Court's review of the administrative record "must be searching and careful." | *Natural Res. Def. Council (NRDC) v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011). |
| 15.     Refusals to engage in requested rulemaking constitute final agency action reviewable in accordance with the APA. | *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 723 (D.C. Cir. 1984); *Federal Communications Comm'n v. ITT World Communications, Inc.*, 466 U.S. 463, 468, 104 S.Ct. 1936, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984). |
| 16.     A final agency action may be set aside "if the decision was 'arbitrary and capricious' within the meaning of the [Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.]" | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994); 5 U.S.C. § 706(2). |
| 17.     Such is the case where an agency "has relied on factors which Congress has not intended it to consider, entirely | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.* |

| | |
|---|---|
| failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." | *Ins. Co.*, 463 U.S. 29, 44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006). |
| 18.    The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994), quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). |
| 19.    In addition, the agency's proffered reasoning must not "rest[] on reasoning divorced from the statutory text." | *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). |
| 20.    The reviewing court "may not consider reasons for agency action which were not before the agency," and may not "infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals." | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994), quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. |
| 21.    "Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" | *Beno v. Shalala*, 30 F.3d 1057, 1073-1074 (9th Cir. 1994), quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. |
| 22.    Agency action must be set aside where the agency has failed to "examine the relevant data and articulate a satisfactory explanation for | *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| its action, including a rational connection between the facts found and the choice made." | |
| 23.     In addition, the agency's proffered reasoning must not "rest[] on reasoning divorced from the statutory text." | *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). |
| 24.     The FSIS's position that the cause of the abnormality, physiologic versus pathologic (*i.e.*, force-feeding versus pathogen), rather than the abnormality itself, controls is nonsensical and irrational, and contradicts the FSIS's own regulations which require condemnation of any poultry product "showing evidence of an abnormal physiologic state." | 9 C.F.R. § 381.83. |
| 25.     If a deliberative process leads to the same result as a given "disease" would, as FSIS concedes here, there is no basis to allow one into the food supply while banning the other. | *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). |
| 26.     FSIS failed to offer a "satisfactory explanation" for its position, which is contradicted by the FSIS's own regulations, and the Denial should be set aside as a result. | *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 27.     There is no "rational connection" between the FSIS's conclusion that there might be potential health risks associated with foie gras and its refusal to exclude foie gras from the food supply. | *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); 21 U.S.C. § 451. |
| 28.     Agency action must also be set aside where the agency has failed to "examine the relevant data" or "entirely failed to consider an important aspect of the problem." | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). |
| 29.     The FSIS "entirely failed to consider an important aspect of the problem" by ignoring that force-fed ducks and geese:<br><br>•     exhibit systemic inflammatory processes including arthritis and bacterial infections as proscribed by 9 C.F.R. § 381.86;<br><br>•     suffer from an abnormal physiologic state, as proscribed by 9 C.F.R. § 381.83, caused by the liver expanding to 6 to 10 times its original size, restricting the birds' ability to move and breathe;<br><br>•     are disabled, as proscribed by 21 U.S.C. § 460(d), *i.e.*, unable to walk, | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994); 9 C.F.R. §§ 381.86, 381.83; 21 U.S.C. § 460(d). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| due to the enlargement of their livers and the force-feeding of nutritionally deficient feed; <br><br>• are dying, as proscribed by 21 U.S.C. § 460(d), and that many do in fact die, because of the ailments caused by force-feeding; <br><br>• suffer from septicemia, as proscribed by 9 C.F.R. § 381.83, including due to the presence of E. Coli and other bacteria; and <br><br>• suffer from toxemia, as proscribed by 9 C.F.R. § 381.83, *i.e.*, the presence toxins in the blood due to the failing liver. | |
| 30.   Agency action must also be set aside where the agency "offered an explanation for its decision that runs counter to the evidence before the agency." | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). |
| 31.   Even on the points for which the agency did offer an explanation in the Denial – (i) whether the increase in lipids in the liver rendered it diseased or adulterated and (ii) whether the presence of amyloidosis constituted a risk to human health – the explanation | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)); AR1-1458. |

31

| | |
|---|---|
| ran counter to the evidence before it. | |
| 32.    The Denial was unexplainably counter to evidence that the force-feeding used to produce foie gras creates a liver whose function is "seriously impaired" due to steatosis (i.e., swelling), a condition which "should be considered pathological," *i.e.*, a disease. | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)); AR1-1458. |
| 33.    The Denial was unexplainably counter to evidence that the presence of amyloids in foie gras presents risks to human health, including the onset of secondary amyloidosis and related diseases such as Alzheimer's. | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)); AR1-1458. |
| 34.    The Denial was thus "counter to the evidence" before the agency and must be set aside. | *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)); AR1-1458. |
| 35.    The relief sought in the Petition, namely rulemaking "to exclude force-fed foie gras from the human food supply," is within the FSIS's jurisdiction under the PPIA, which includes the power of ante-mortem inspection and condemnation of poultry "[f]or the purpose of preventing the entry into or flow or movement in | AR1-31 at 23; 21 U.S.C. §§ 451-452, 455(a). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| commerce of, or the burdening of commerce by, any poultry product which is capable of use as human food and is adulterated . . ." | |
| 36. The Denial should be set aside. | 5 U.S.C. § 706(2)(A). |
| 37. The Court should enter an order declaring the Denial to be in violation of the APA. | *Geller v. FCC*, 610 F.2d 973, 980 (D.C. Cir. 1979) (vacating denial of petition for rulemaking to repeal cable television rules and remanding for reconsideration); *RTNDA II*, 229 F.3d at 272; *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420–21 (1971) (holding that if an agency provides reasons insufficient to permit a court to review its rationale, the proper remedy is to remand to the agency for additional investigation or explanation); *see also American Horse Protection Ass'n*, 812 F.2d at 7–8. |
| 38. The Court should order Defendant to initiate rulemaking consistent with the APA. | *Geller v. FCC*, 610 F.2d 973, 980 (D.C. Cir. 1979) (vacating denial of petition for rulemaking to repeal cable television rules and remanding for reconsideration); *RTNDA II*, 229 F.3d at 272; *see also Pension Benefit Guar.* |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| | *Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420–21 (1971) (holding that if an agency provides reasons insufficient to permit a court to review its rationale, the proper remedy is to remand to the agency for additional investigation or explanation); *see also American Horse Protection Ass'n*, 812 F.2d at 7–8. |

## CONCLUSIONS OF LAW RE PLAINTIFFS' STANDING

| | |
|---|---|
| 39.    To have standing, generally a plaintiff must show a concrete and particularized injury that is either actual or imminent, fairly traceable to the defendant, and likely to be redressed by a favorable decision. | U.S. Const., Article III, Sec. 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) |
| 40.    Where a litigant has been "accorded a procedural right to protect his concrete interests,"—here, the right to challenge agency action unlawfully withheld – the litigant "can assert that right without meeting all the normal standards for redressability and immediacy." | *Massachusetts v. EPA*, 549 U.S. 497, 517-518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572, n. 7. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| 41.    There need only be "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." | *Massachusetts v. EPA*, 549 U.S. 497, 517-518 (2007); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572, n. 7. |
| 42.    Plaintiffs were "vested with a procedural right"— the right to petition FSIS pursuant to 9 C.F.R. §§ 392.1-392.9 and challenge the agency's decision under 21 U.S.C. § 702. | 9 C.F.R. §§ 392.1-392.9; 21 U.S.C. § 702; *Massachusetts v. EPA*, *supra*, 549 U.S. at 518. |
| 43.    The redressability prong of the standing inquiry is met since "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." | *Massachusetts v. EPA*, *supra*, 549 U.S. at 518. |
| 44.    Individual Plaintiffs Evans, Schurig, and Lee have Article III standing. | *Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006); *Staub v. Shalala*, 895 F.Supp. 1178, 1187-88 (W.D. Wis. 1995); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). |
| 45.    "[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." | *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19, 102 S.Ct. 1114, 71 L.Ed.2d 214 (citing *Warth v. Seldin*, |

| | |
|---|---|
| | 422 U.S. 490 (1975)). |
| 46.  "An organization has direct standing to sue when it shows a drain on its resources from both a diversion of its resources and frustration of its mission." | *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (citation omitted); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding fair housing organization had standing to sue where resources were diverted to efforts to combat discrimination); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (finding injury-in-fact where challenged policy frustrated organization's goals and required expenditure of resources); *ALDF v. Great Bull Run, LLC*, No. 14-CV-01171, 2014 WL 2568685, at *4 (N.D. Cal. June 6, 2014) ("… Plaintiffs can establish that Defendants' acts perceptibly impair Plaintiffs' outreach and education efforts by diverting resources from these efforts to counteract Defendants' allegedly unlawful acts."). |
| 47.  Here, the agency action denying the Petition and allowing foie gras into the food supply has frustrated the | *Id.* |

36

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW

| | |
|---|---|
| missions of ALDF, COK, APRL, and Farm Sanctuary. | |
| 48.     Plaintiffs' claims fall within the zone of interests of the PPIA and APA. | *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387 (2014) (citations omitted); *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1156 (9th Cir. 2015). |

Respectfully submitted,

Date:  March 8, 2016                    STEPTOE & JOHNSON LLP


By:        /s/ Morgan L. Hector
           Morgan L. Hector
           Attorneys for Plaintiffs

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
Case No. 12-04028-ODW