BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
EILEEN M. DECKER
United States Attorney
ERIC WOMACK
DANIEL BENSING
D.C. Bar No. 334268
Attorneys, United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Rm. 6114
Washington D.C. 20530
Telephone: (202) 305-0693
Facsimile:  (202) 616-8460
Daniel.Bensing@USDOJ.gov

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, *et al*., | )  No. CV12-04028 ODW (PJWx) |
| | ) |
| Plaintiffs, | )  Hon. Otis D.Wright II |
| | ) |
| v. | ) |
| | )  Date:  July 18, 2016 |
| UNITED STATES DEPARTMENT OF | )  Time: 1:30 p.m. |
| AGRICULTURE, *et al*., | )   Place: Courtroom 11 – Spring St. |
| | ) |
| Defendants. | ) |
| _____ | ) |

**NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on July 18, 2016, or as soon thereafter as the matter may be heard, defendants the United States Department of Agriculture, <u>et al</u>., will move for summary judgment on all of plaintiffs' claims. This motion is made following the conferences of counsel pursuant to L.R. 7-3 which took place on August 27, 2012 and January 27, 2016.

This motion is made on two alternative grounds. First, each of the eight plaintiffs lacks standing and hence the Court should enter summary judgment on their claims pursuant to Fed. R. Civil P. 56. In the alternative, and assuming one or more plaintiffs have standing, the Court should enter summary judgment for defendants because the denial of the petition for rulemaking was a rational determination, supported by the Administrative Record and so satisfied the requirements of the Administrative Procedure Act, 5 U.S.C. § 706.

This motion is supported by defendants' Memorandum of Points and Authorities, the Declarations of Alice Thaler, Dkt. 26-1, and Scott Hafner, Dkt. 26-2 and the Administrative Record, Dkt. 18, previously filed with the Court by defendants.

Respectfully submitted,

BENJAMIN C. MIZER
Principle Deputy Assistant Attorney
General

EILEEN M. DECKER
United States Attorney

ERIC WOMACK
*/s/ Daniel Bensing*
DANIEL BENSING
D.C. Bar No. 334268
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Rm. 6114
Washington, D.C. 20530
Telephone: (202) 305-0693
Telefacsimile: (202) 616-8460
Daniel.Bensing@USDOJ.gov

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

INTRODUCTION...............................................................................................1

BACKGROUND.................................................................................................1

I.   Statutory and Regulatory Background ...........................................................1

II.  Factual Background ....................................................................................2

III. Procedural History .....................................................................................4

ARGUMENT .....................................................................................................5

I.   All Of The Plaintiffs Lack Standing To Bring This Actoin, Either Under
     Article III Or By Virtue of Prudential Standing Principles............................5

     A. Principles of the Standing Doctrine Relevant to this Action. ...................5
     B.  The Individual Plaintiffs Do Not Satisfy Article III Standing
         Requirements.......................................................................................6
         1.  The Individual Plaintiffs' Allegations of Harm are Far Too
             Speculative to Support Their Standing. ............................................7
         2.  Plaintiffs' Own Conduct Is the Cause of Any Injury Alleged..............9
     C. The Organizational Plaintiffs Do Not Satisfy Either Article III Or
         Prudential  Standing Requirements. ......................................................12
         1.  The Organizational Plaintiffs Lack Constitutional Standing. ............ 13
         2.  The Organizational Plaintiffs Lack Prudential Standing. ..................15

II.  USDA Did Not Act Arbitrarily Or Capriciously In Denying The
     Petition For Rulemaking............................................................................17

     A. Summary Judgment is the Proper Procedural Vehicle to Resolve a
         Merits Motion in an APA Case. ...........................................................17
     B.  Judicial Review of an Agency's Decision Not to Institute
         Rulemaking In an Area Requiring Significant Technical Expertise
         Is Highly Deferential ..........................................................................18
     C. FSIS Acted Reasonably in Denying he Petition to Initiate
         Rulemaking to Ban Foie Gras. .............................................................20
         1.  Plaintiffs Misconstrue the PPIA and Relevant Regulations. ............ 21
         2.  The Solomon Study Does Not Support Plaintiffs' Petition. ..............23
         3.  The Legal Standard for "Adulterated" Poultry under the PPIA
             Does Not Permit FSIS to Ban Foie Gras Based on One
             Questionable Study..........................................................................25

CONCLUSION ...............................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ALDF v. USDA*,
   2015 WL 8057176 (9th Cir. Dec. 7, 2015) ...........................................14

*Allen v. Wright*,
   468 U.S. 737 (1984) .......................................................................7

*Am. Horse Prot. Ass'n v. Lyng*,
   812 F.2d 1 (D.C. Cir. 1987) ....................................................... 19, 26

*Animal Legal Defense Fund, Inc. v. Espy*,
   29 F.3d 720 (D.C. Cir. 1994) .........................................................13

*Ariz. Cattle Growers v. U.S. Fish & Wildlife*,
   273 F.3d 1229 (9th Cir. 2001).........................................................19

*Arkansas Power & Light v. ICC*,
   725 F.2d 716 (D.C. Cir. 1984) .......................................................19

*Ashley Creek Phosphate Co. v. Norton*,
   420 F.3d 934 (9th Cir. 2005).........................................................16

*Bauer v. Veneman*,
   352 F.3d 625 (2d Cr. 2003) ...........................................................9

*Cactus Corner v. USDA*,
   450 F.3d 428 (9th Cir. 2006).........................................................19

*Castillo v. County of Los Angeles*,
   959 F. Supp. 2d 1255 (C.D. Cal. 2013).............................................14

*Cellnet Commc'n, Inc. v. FCC*,
   965 F.2d  1106 (D.C. Cir. 1992) .....................................................18

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...................................................................25

*Clapper v. Amnesty Int'l USA*,

   133 S. Ct. 1138  (2013) .......................................................... 6, 7, 8, 10

*Clarke v. Sec. Indus. Ass'n*,

   479 U.S. 388 (1987) ..........................................................................5

*Coal. For Mercury-Free Drugs v. Sebelius*,

   671 F.3d 1275 (D.C. Cir. 2012) .......................................................10

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,

   657 F.3d 936 (9th Cir. 2001)..................................................... 13, 14

*Desert Citizens Against Pollution v. Bisson*,

   231 F.3d 1172 (9th Cir. 2000)..........................................................6

*Diamond v. Charles*,

   476 U.S. 54 (1986) .........................................................................10

*Fla. Audubon Soc'y v. Bentsen*,

   94 F.3d 658 (D.C. Cir. 1996) ...........................................................8

*Fla. Power & Light Co. v. Lorion*,

   470 U.S. 729 (1985) .......................................................................27

*Food & Water Watch, Inc. v. Vilsack*,

   808 F.3d 905 (D.C. Cir. 2015) .......................................... 8, 9, 10, 12

*Geller v. FCC*,

   610 F.2d 973 ..................................................................................27

*Humane Soc'y of the U. S. v. Brennan*, Index No. 7704-06

   (N.Y. Sup. Ct. Mar. 18, 2008), AR 1252-.......................................16

*ITT World Commc'ns, Inc. v. FCC*,

   699 F.2d 1219 (D.C. Cir. 1983) .......................................................19

*Jackson v. Calif. Dept. of Mental Health*,

   399 F.3d 1069 (9th Cir. 2005)..........................................................14

*Kenney v. Glickman*,

   96 F.3d 1118 (8th Cir. 1996)...........................................................27

*Lands Council v. McNair,*
  629 F.3d 1070 (9th Cir. 2010)........................................................20

*Lexmark Int'l v. Static Control Components,*
  134 S.Ct. 1337 (2014) ..................................................................6

*Love v. Thomas,*
  858 F.2d 1347 (9th Cir. 1988) .....................................................18

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................ 5, 6, 8

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ...................................................................20

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...................................................................19

*Mcgee v. Diamond Foods, Inc.,*
  2016 WL 816003 (S.D. Cal. 2016) ...............................................7

*Natural Resources Defense Council, Inc. v. SEC,*
  606 F.2d 1031 (D.C. Cir. 1979) ..................................................19

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,*
  522 U.S. 479 (1998) ....................................................... 5, 16, 17

*Nat'l Customs Brokers & Forwarders Assn. of Am., Inc. v. United States,*
  883 F.2d 93 (D.C. Cir. 1989) ......................................................19

*Occidental Eng'g Co. v. INS,*
  753 F.2d 766 (9th Cir. 1985)........................................................17

*Paul v. Davis,*
  424 U.S. 693 (1976) ...................................................................14

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ...................................................................10

*Pub. Power Council v. Johnson,*
  674 F.2d 791 (9th Cir. 1982)........................................................18

*Public Citizen v. Foreman,*
   631 F.2d 969 (D.C. Cir. 1980) ........................................................10

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007) .......................................................8

*Ranchers Cattlemen Action Legal Fund v. USDA,*
   415 F.3d 1078 (9th Cir. 2005)................................................. 19, 20

*Redondo Beach v. City of Redondo Beach,*
   657 F.3d 936 (9th Cir. 2001)..........................................................13

*Schmier v. U.S. Ct. of Appeals for the Ninth Circuit,*
   279 F.3d 817 (9th Cir. 2002)...........................................................8

*Sierra Club v. Morton,*
   405 U.S. 727 (1972) ........................................................................7

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) ..........................................................................9

*Smith v. Pac. Properties and Dev. Corp.,*
   358 F.3d 1097 (9th Cir. 2004).......................................................13

*Starbuck v. City & Cnty. of San Francisco,*
   556 F.2d 450 (9th  Cir. 1977)..........................................................8

*Summers* v. *Earth Island Inst.,*
   555 U.S. 488 (2009) ........................................................................6

*United States v. Richardson,*
   418 U.S. 166 (1974) ........................................................................6

*United Transp. Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) .......................................................8

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
   435 U.S. 519 (1978) ......................................................................19

*Warth v. Seldin,*
   422 U.S. 490 (1975) ........................................................................5

*Washington Envtl. Council v. Bellon*,

   732 F.3d 1131 (9th Cir. 2013) .............................................................5, 6

*Whitmore v. Arkansas*,

   495 U.S. 149 (1990) ...............................................................................6, 8

*Wild Fish Conservancy v. Jewell*,

   730 F.3d 791 (9th Cir. 2013) ....................................................................5

**Statutes**

21 U. S.C. § 451 ................................................................. 1, 2, 20, 25

21 U.S.C. § 452 ............................................................................ passim

21 U.S.C. § 453(g)(3) ...................................................... 1, 2, 26

21 U.S.C. § 455 .............................................................................2

21 U.S.C. § 455(c) .........................................................................2

21 U.S.C. § 460(d) .......................................................................22

21 U.S.C. § 603 .............................................................................2

5 U.S.C. § 553 ...............................................................................3

5 U.S.C. § 701(a)(2) .....................................................................5

5 U.S.C. § 706 .........................................................................4, 18

5 U.S.C. § 706(2)(A) ...............................................................1, 19

7 U.S.C. §§ 1901 – 1906 ...............................................................2

**Rules**

Fed. R. Civ. P. 56 ..........................................................................1

**Regulations**

9 C.F.R. pt. 381 ................................................................. 2, 3, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

### <u>Introduction</u>

The United States Department of Agriculture ("USDA"), acting through the Food Safety and Inspection Service ("FSIS"), denied a petition, submitted by some of the plaintiffs in this action, requesting that it initiate a rulemaking proceeding to ban foie gras as an adulterated food product under the authority of the Poultry Product Inspection Act ("PPIA" or "Act"), 21 U. S.C. § 451, <u>et seq.</u>  As there was no evidence suggesting that foie gras, a product that has been consumed for centuries, is adulterated or "otherwise unfit for human food," 21 U.S.C. § 453(g)(3), FSIS denied the petition by letter of August 27, 2009.  Administrative Record ("AR") 1547 - 1548.

The Court can grant judgment for defendants on two alternative grounds.  First, none of the eight plaintiffs (four individuals who consume or may consume foie gras and four animal rights organization) has standing to pursue these claims and hence the Court should grant defendants summary judgment pursuant to Fed. R. Civ. P. 56.  If the Court concludes that some or all plaintiffs have standing, it should grant summary judgment for defendants because the denial of the petition was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" under the Administrative Procedure Act ("APA")  5 U.S.C. § 706(2)(A).  Plaintiffs' petition requesting a rule banning foie gras was not supported by "scientific fact, information or criteria," 21 U.S.C. § 452, demonstrating that foie gras is a threat to "health and welfare of consumers," 21 U.S.C. § 451, and hence FSIS had no basis to grant their petition under the PPIA.  Accordingly, the Court should grant summary judgment for defendants.

### BACKGROUND

### 1. Statutory and Regulatory Background

The requirement that FSIS conduct inspections of poultry, defined as any domesticated bird, and poultry products, (such as foie gras), sold in interstate commerce, is derived from the PPIA, 21 U.S.C. §§ 451 - 472.  That statute requires, to

1

the extent deemed necessary by the Secretary, that inspectors conduct ante-mortem inspection prior to slaughter.  21 U.S.C. § 455.  The Act further requires that after slaughter, inspectors conduct inspections of all poultry carcasses and parts thereof, as well as an inspection of poultry products derived from the slaughter process. *Id*.

The overriding purpose of the PPIA is to protect the public from the immediate, negative health effects of consuming "adulterated" poultry products.  *See* 21 U.S.C. § 451 ("It is essential in the public interest that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled and packaged.").  Under the Act, FSIS must condemn poultry products found to be "adulterated." 21 U.S.C. § 455(c).  A poultry product is "adulterated" "if it consists in whole or in party of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." 21 U.S.C. § 453(g)(3).

FSIS, the component of USDA which administers the PPIA, has promulgated detailed regulations to assist in implementation of the Act, 9 C.F.R. Part 381.  But in all cases, when "poultry products are condemned, because of disease, the reason for condemnation in such instances shall be supported by scientific fact, information, or criteria . . ." 21 U.S.C. § 452.

The PPIA is wholly silent on the treatment of farm animals, (including feeding procedures) or methods of slaughter for poultry.  There are, however, other federal statutes that govern the treatment and slaughter of other animals, *e.g.* the Humane Methods of Slaughter Act, 7 U.S.C. §§ 1901 – 1906, incorporated in the Federal Meat Inspection Act, 21 U.S.C. § 603.

## 2.  Factual Background

FSIS is responsible for the inspection of a wide range of food products, including all manner of domesticated birds.  Declaration of Alice Thaler ("Thaler Decl."),  Dkt. 26-1, ¶ 5.  FSIS inspectors perform ante-mortem and post-mortem inspections of poultry pursuant to the authority of the PPIA and regulations promulgated at 9 C.F.R.

Part 381.  Thaler Decl. ¶¶ 5; 8 – 10.  When conducting ante-mortem inspections, inspectors look for obvious physical signs of disease.  Thaler Decl. ¶ 12; 9 C.F.R. § 381.71.  Post-mortem inspections are performed on a bird-by-bird basis with the inspectors using his or her senses (mostly visual) to assess each carcass for signs of abnormal conditions.  Thaler Decl. ¶19; 9 C.F.R. § 381.78.  FSIS performs its inspections at the slaughter facility; it has no authority to regulate the care or feeding of birds prior to their arrival at the slaughter facility.  Thaler Decl. ¶¶ 6 – 7.

The petition for rulemaking at issue, AR 1 - 31, was filed with FSIS on November 28, 2007 by several organizations and individuals,[1] three of whom, Farm Sanctuary, Animal Legal Defense Fund and Daniel Stahlie, are also plaintiffs in this action.  That petition requested that FSIS initiate a rulemaking proceeding under 5 U.S.C. § 553 to develop a rule that would "prohibit the introduction of force-fed foie gras[2] into the human food supply."  AR 1.  The petition was accompanied by extensive documentation (62 separate exhibits) almost all of which discussed animal welfare concerns rather than danger to human health from foie gras consumption.

By letter dated August 27, 2009, FSIS Assistant Administrator Philip S. Derfler wrote to Peter J. Petersen of the Humane Society, denying the petition and explaining that "FSIS  has determined that the presence of fatty change in a duck or goose liver used to produce foie gras alone does not render the foie gras adulterated or otherwise unfit for human food."  AR 1547.  The letter noted that the livers of birds used for foie gras production can be "characterized as affected by hepatic lipidosis," i.e. fat build-up in the liver, but that "the fatty changes are exactly those that would be expected due to the altered physiologic state of the bird."  Id.  Consequently, the letter concluded that

---

[1]  The Humane Society of the United States, Farm Sanctuary, Inc., Animal Legal Defense Fund, NYU Student Animal Legal Defense Fund, Jessica Gorman, Doris Booth and Daniel Stahlie.
[2]  Foie gras is a poultry product derived from the livers of ducks or geese that have been deliberately forced to consume excessive feed (a process known as gavage) for several weeks. Thaler Decl. ¶ 40.  This results in a build-up of fatty tissue in the liver which gives the produce its distinctive taste.

Motion for Summary Judgment (Case No. 12-4028)

the condition of the foie gras liver did not render them diseased or justify condemnation.

The letter also addressed a study by Dr. Alan Solomon that was referenced in the petition that discussed potential adverse effects on human health from foie gras consumption.[3] In that study, mice that were genetically susceptible to develop amyloidosis[4] were fed or injected with amyloid extracted from foie gras, after which a majority developed amyloid deposits in various internal organs. FSIS concluded that the Solomon study did not add any new information as it is widely known that poultry livers are a source of amyloid proteins. The agency further concluded that the study did not provide a link to human disease and that additional study would be necessary to establish any such link. AR 1548. Nearly three years after receiving the denial letter, three of the parties submitting the petition, along with six other plaintiffs, initiated this civil action.[5]

**3. Procedural History**

Plaintiffs initiated this action on May 17, 2012, and defendants answered and filed the Administrative Record. Pursuant to a stipulated briefing schedule, plaintiffs filed a Motion for Summary Judgment on October 24, 2012, Dkt. 22, and defendants filed a Motion for Judgment on the Pleadings or for Summary Judgment on November 28, 2013, Dkt. 26. Defendants argued then, as here, that the Court should grant judgment on the pleadings on the ground that plaintiffs lacked standing or, in the alternative, grant summary judgment on the merits.

On March 22, 2013, the Court granted defendants' Motion for Judgment on the Pleadings on the ground that the denial of plaintiffs' rulemaking petition was equivalent to a refusal to take enforcement action, a determination that is committed to agency

---

[3] Alan Solomon, MD, *et al*, *Amyloidogenic Potential of Foie Gras*, 104 PROC. NAT'L ACAD. SCI. 10998 (2007), AR 899 - 902.

[4] Amyloidosis refers to a variety of conditions in which amyloid proteins are deposited in abnormal amounts in tissues or organs, potentially causing a variety of adverse health effects.

[5] One of the original plaintiffs, Regal Vegan, dismissed its claim on appeal.

discretion and hence unreviewable under 5 U.S.C. § 701(a)(2).  Dkt. 49.   Plaintiffs
appealed, and on December 7, 2015 the Court of Appeals reversed the order of
dismissal and remanded.

## ARGUMENT

**I.      All Of The Plaintiffs Lack Standing To Bring This Action, Either
        Under Article III Or By Virtue Of Prudential Standing Principles.**

### A. Principles of the Standing Doctrine Relevant to this Action

The doctrine of Article III standing, an essential aspect of the case-or-
controversy requirement, demands that a plaintiff have "a personal stake in the outcome
of the controversy [so] as to warrant his invocation of federal-court jurisdiction."  *Warth
v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotations omitted).  At its "irreducible
constitutional minimum," the doctrine requires satisfaction of three elements:  (1) a
concrete and particularized injury-in-fact, either actual or imminent, (2) a causal
connection between the injury and defendants' challenged conduct, and (3) a likelihood
that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 560 (1992); *Washington Envtl. Council v. Bellon*, 732 F.3d
1131, 1139-40 (9th Cir. 2013).

Whereas Article III standing turns on the connection between the alleged injury
and the challenged government action, prudential standing (also known as "zone of
interests standing" or "APA standing") turns on the connection between the alleged
injury and the type of legal claim asserted.  To demonstrate prudential standing, a party
must show that its interest in the litigation falls "arguably within the zone of interests to
be protected or regulated by the statute in question."  *Nat'l Credit Union Admin. v. First
Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998); *Wild Fish Conservancy v. Jewell*,
730 F.3d 791, 796-97 (9th Cir. 2013).  The "essential inquiry is whether Congress
intended for a particular class of plaintiffs to be relied upon to challenge agency
disregard" of the statute they seek to enforce.  *Clarke v. Sec. Indus. Ass'n*, 479 U.S.
388, 399 (1987) (citation, internal quotations and brackets omitted).  In *Lexmark Int'l*

*v. Static Control Components,* 134 S.Ct. 1337 (2014), the Supreme Court explained that in making such zone of interests rulings, courts were actually determining, using traditional tools of statutory interpretation, "the scope of the private remedy" created by Congress and the "class of persons" who can maintain a claim under the statute. *Id.* at 1386-87.

A party cannot establish standing merely by virtue of the fact that it filed a petition for rulemaking under the APA. As the Supreme Court has held, "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also, e.g., Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000) ("an individual may enforce procedural rights 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing'" (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.8)). [6]

## B. The Individual Plaintiffs Do Not Satisfy Article III Standing Requirements.

To establish an injury-in-fact for purposes of Article III standing – the first prong of the Article III standing test – plaintiffs must show that FSIS's policy of permitting foie gras to enter the food supply affects them in a "personal and individual way," *see Defenders of Wildlife*, 504 U.S. at 560 n.1, rather than in some generalized way common to the public at large, *see United States v. Richardson*, 418 U.S. 166, 176 (1974). They must show more than a "possible future injury"; they must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013) ("respondents theory of standing, which relies on a highly attenuated chain

---

[6]  Notably, five of the eight plaintiffs have suffered no procedural injury since they did not petition USDA to initiate a rulemaking on foie gras.

of possibilities, does not satisfy the requirement that threatened injury must be certainly impending"). The requirement of a concrete, individualized injury rightly prevents litigation by "organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972). The second prong of the Article III standing test – the concept of traceability or causation – "examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Such connection, however, must be attributed to the conduct of the defendants, rather than plaintiffs' own actions. *Clapper*, 133 S.Ct. at 1148.

### 1. The Individual Plaintiffs' Allegations of Harm are Far Too Speculative to Support Their Standing

The argument of the four individual plaintiffs (Sarah Evans, Michelle Schurig, Caroline Lee and Daniel Stahlie) in support of injury-in-fact appears to be that they may "contract[] a food-borne illness" from consuming foie gras, Complaint ("Compl.") ¶ 43,[7] and as a result, they may then become ill with some unspecified "amyloid-associated disorders." *Id.* But, critically, nowhere in the Complaint is there an allegation that any plaintiff, or indeed anyone at all, has ever developed any type of illness from consuming foie gras. Thus, plaintiffs' mere subjective fear that the consumption of foie gras will make them contract a food-borne illness is far too speculative to establish standing. *See Mcgee v. Diamond Foods, Inc.*, 2016 WL 816003 at *6 (S.D. Cal. 2016).

But even if there were some potential risk of harm from consuming foie gras, that risk is not "certainly impending," *Clapper*, 133 S.Ct. at 1147, and so the individual plaintiffs would still lack standing. "[T]he Supreme Court has flatly rejected the contention . . . that an injury occurring 'some day' can satisfy the injury-in-fact

---

[7] Plaintiffs' attempt to maintain a distinction between force-fed foie gras and non-force fed foie gras is untenable as any product labeled "foie gras" is almost certainly the product of a force-feeding process. Hence any person fearing food-borne illness from the consumption of "force-fed" foie gras should avoid products labeled foie gras and similar products.

Motion for Summary Judgment (Case No. 12-4028)

requirement of the standing doctrine." *Schmier v. U.S. Ct. of Appeals for the Ninth Circuit*, 279 F.3d 817, 822 (9th Cir. 2002), *citing Defenders of Wildlife*, 504 U.S. at 564, and *Whitmore v. Arkansas*, 495 U.S. at 157; *see also Starbuck v. City & Cnty. of San Francisco*, 556 F.2d 450, 459 (9th Cir. 1977). Courts have consistently recognized that "[t]he greater the number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996); *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("[W]e may reject as overly speculative those links which are predictions of future events[.]"), *cert. denied*, 497 U.S. 1024 (1990). Similarly, in *Clapper*, the Supreme Court rejected a theory of standing that "rest on speculation about the decisions of independent actors." 133 S.Ct. at 1150.

In a recent decision, the D. C. Circuit ruled on the standing of similarly-situated individual plaintiffs who also brought suit under the PPIA contending that a new FSIS program for inspection of poultry products increased the risk of food-borne disease. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ("*FWW*"). The court held that increased-risk-of-harm cases "implicate the requirement that an injury be actual or imminent" because otherwise "all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury," *FFW*, 808 F.3d at 914, thereby allowing litigation of what are no more than generalized grievances. The analytical framework for such risk-of-harm claims is to first consider the ultimate harm alleged (e.g. death or illness) as the physical injury and then "determine whether the increased risk of such harm makes injury to the individual . . . sufficiently 'imminent' for standing purposes." *Id.* at 915, *quoting Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007). Applying that standard, the *FWW* Court held that the individual plaintiffs failed to "plausibly allege that the NPIS [inspection system] taken as a whole substantially increases the risk of foodborne illness as a result of unwholesome, adulterated poultry." 808 F.3d at 915.

8

The final agency decision in this matter clearly explained the lack of any evidence of risk to human health was the basis for its decision of denial.  AR 1548. The decision letter noted that in the Solomon study, mice are genetically susceptible to develop amyloidosis, and that amyloidosis is fairly common in ducks in general.  *Id.*  The rejection letter  concludes that the only evidence of risk to human health presented by plaintiffs' Solomon study "does not present any data to establish a link between the presence if (sic) amyloid in foie gras and the development of human disease."  *Id.*

Plaintiffs' reliance on *Bauer v. Veneman,* 352 F.3d 625 (2d Cr. 2003), involving the possible risk of contracting "mad cow" disease from the entry of "downed" (i.e. injured) cattle into the human food chain, is easily distinguished. The *Bauer decision,* (decided on a motion to dismiss, not summary judgment), stressed that "[s]ignificantly, the USDA itself  . . . recognized that downed cattle are especially susceptible to" mad cow infection . . ."  *Id.* at 637-38.  Here, by contrast there is effectively no evidence whatever that foie gras poses any threat to human health.  *See* 20-27, *infra*.  *See also FWW,* 808 F.3d at 918, n. 7 ("Baur's approach to increased-risk-of harm cases is not without controversy.")  Of course, no inspection regime can eliminate risk entirely.  But plaintiffs' hypothetical concerns about possible illness amount to nothing more than "unadorned speculation" that "will not suffice to invoke the federal judicial power."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

### 2. Plaintiffs' Own Conduct Is the Cause of Any Injury Alleged.

Apart from the impermissibly speculative nature of their purported injury-in-fact, the four individual plaintiffs cannot satisfy the causation prong of the Article III standing test for an additional reason.  Quite simply, plaintiffs persist in eating a product that they believe to be "adulterated" and therefore inherently unsafe (or related products that may contain foie gras) and thus they are the cause of their own alleged injury.  This defect is equally fatal to their claims.

Courts have repeatedly recognized that a plaintiff's asserted injury is not traceable to the defendant when the plaintiff's own conduct caused the injury, regardless of whether the challenged action could also be deemed a "but for" cause of the harm. *See, Clapper*, 133 S. Ct. at 1151 ("respondents cannot manufacture standing merely by inflicting harms on themselves based on their fears of future harm that is not certainly impending"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand."); *Diamond v. Charles*, 476 U.S. 54, 70 (1986) (plaintiff's alleged injury – liability for attorney fees – is "a consequence of Diamond's decision to intervene but it cannot fairly be traced to the Illinois Abortion Law"). Here, too, these individual plaintiffs cannot seek relief against defendants when the alleged harm can be easily prevented by simply avoiding the consumption of foie gras or duck and goose products generally, or even all poultry products.

In this situation, the critical standing inquiry is whether an alternative diet is "readily available at a reasonable price." *Public Citizen v. Foreman,* 631 F.2d 969, 974, n. 12 (D.C. Cir. 1980); *see also Coal. For Mercury-Free Drugs v. Sebelius,* 671 F.3d 1275, 1281 (D.C. Cir. 2012). Here, there can be no doubt that a goose and duck-free diet, or even a poultry-free diet is readily available at any grocery store and without any significant difference in cost compared to a diet that included periodic consumption of foie gras. *See FWW,* 808 F.3d at 922 (Henderson, J. concurring).

Plaintiffs attempt to remedy this fundamental defect in their standing in two ways. Plaintiffs' Motion for Summary Judgment ("Pl. MSJ") at 13-14. First, plaintiffs assert that the individual plaintiffs should not have to forgo an entire category of food products – presumably all goose and duck liver, or all products named 'foie gras' – to avoid the harm that they allege. *Id.* at 13. But, to the contrary, if plaintiffs can avoid a possible harm by following a "readily available" alternative – in this case, a more restrictive diet, or perhaps even elect to "stay

away from poultry altogether," *FFW* at 922, they should do so.  Plaintiffs' failure to follow such common sense advice compels the conclusion that any risk of harm that plaintiffs experience is solely due to their own actions.

Second, plaintiffs assert that the "coming to harm" argument does not apply where "a consumer who is aware of and has suffered harm from violations of a consumer protection statute . . . seeks prospective relief to prevent future harm from those same violations."  Pl. MSJ at 13.  That may be a valid statement of standing in that specific context, but it does not support plaintiffs' standing here for two fundamental reasons.  First, unlike a consumer who has suffered harm in the past, plaintiffs' assertion here of actual injury to health from the consumption of foie gras is highly speculative.  Moreover, plaintiffs' argument assumes that the harm stemmed from "violations of a consumer protection statute."  But here there is no law banning the production and sale of foie gras, only a petition asking the agency to begin a rulemaking proceeding to consider imposing such a ban.

Plaintiffs Sarah Evans and Michelle Schurig are identically situated, as both plaintiffs freely admitted at the time the complaint was filed that they currently consume foie gras and "will continue to purchase and consume duck and goose liver products in the future."  Compl. ¶ 41 (Evans), ¶ 43 (Schurig).[8]  Thus, these plaintiffs lack Article III standing for the fundamental reason that their own actions in deliberately consuming foie gras,  or foie gras-like products, are the direct and proximate cause of any injury that they might sustain.

Plaintiffs Caroline Lee and Daniel Stahlie are also similarly situated for standing purposes.  Both prefer to avoid eating foie gras due to their concerns about food safety issues, Compl. ¶¶ 45-46 (Lee), ¶¶ 48-49 (Stahlie).  However, both are concerned that they "may have unknowingly consumed adulterated foie gras in the past as a food

---

[8]  Since this lawsuit has been filed, plaintiff Evans asserts that she has changed her diet and now seeks to avoid eating foie gras, but continues to eat duck and goose pates and other liver products.  Pl. MSJ at 12, Evans Declaration, Dkt. 61-3 at 2.

Motion for Summary Judgment (Case No. 12-4028)

ingredient, or may do so in the future." *Id.* at ¶ 46 (Lee), ¶ 48 (Stahlie).  Again, any possible injury from consuming foie gras can be avoided if Ms. Lee and Mr. Stahlie will merely inquire of their host or food server about the contents of the food being served, as would any individual with a food question or allergy.  In the event that a food server is unaware of the "origin of foie gras items on menus," as Ms. Evans has found on occasion, Evans Decl. ¶7, the obvious course is to error on the side of caution and avoid the item.[9]  Or, in further erring on the side of caution, plaintiffs could "stay away from poultry altogether," as Judge Henderson suggested in *FWW*, 808 F.3d at 922.

* * *

In sum, because the individual plaintiffs' alleged injury is both (1) wholly speculative and (2) attributable to their own dietary choices, they do not have standing under Article III.

### C.  The Organizational Plaintiffs Do Not Satisfy Either Article III Or Prudential Standing Requirements.

The remaining four plaintiffs are all animal rights organizations dedicated to preventing actions that they contend constitute cruelty to animals.  For example, plaintiff Animal Legal Defense Fund ("ALDF") is committed to "preventing animal cruelty and advancing the protection of the interest of animals through the legal system." Compl. ¶ 51.  Its fellow organizational plaintiffs share similar objectives. *See id.* at ¶ 53 (Farm Sanctuary); ¶ 55 (Compassion Over Killing); ¶ 58 (Animal Protection and Rescue League ("APRL")).  ALDF, Farm Sanctuary, and APRL also claim to have "expended substantial organizational resources to educate the public concerning the animal welfare and health consequences of factory farming, including foie gras production" *see id.* at ¶¶ 52, 54, 58.  These interests and claimed injuries do not satisfy the requirements of either Article III or the prudential standing doctrine.

---

[9] Unlike a food allergy to a commonly-used ingredient in food, it strains credulity to assert that restaurants are hiding a luxury and high cost food such as foie gras in their dishes.  The mere fact that plaintiffs resort to such unadorned speculation about future injury confirms that they have failed to establish injury in fact.

Motion for Summary Judgment (Case No. 12-4028)

## 1.  The Organizational Plaintiffs Lack Constitutional Standing

For purposes of constitutional standing, organizational plaintiffs must satisfy the same Article III requirements as individual plaintiffs.  They can do so by two different means: (i) on their own behalf, by asserting an injury to their own organizational interests; or (ii) in a representational capacity, by asserting an injury to one or more of their members.  *See, e.g., Smith v. Pac. Properties and Dev. Corp.*, 358 F.3d 1097, 1101-02 (9th Cir. 2004).  Here, a review of plaintiffs' Complaint, makes clear that the organizational plaintiffs have asserted only the first type of standing.

The fact that the plaintiff organizations oppose cruelty to animals and voluntarily choose to expend resources to "educate the public" about foie gras, Pl. MSJ at 15, does not give them standing to challenge USDA's decision not to initiate rulemaking to ban foie gras from the human food supply.  If the rule were otherwise, any individual or group that crusades against a particular social custom or practice would automatically have standing to challenge an agency's decision to take action, or decline to take action, that touches on that practice.  That is not the law.  Such an injury is a classic generalized grievance; it is insufficiently "particularized" and thus "falls short of the article III injury threshold."  *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 724 (D.C. Cir. 1994).

To show that an organization has experienced a sufficient injury for Article III standing, it may demonstrate that the agency action "frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,* 657 F.3d 936, 943 (9th Cir. 2001) (en banc).   Judge Chhabria's concurring opinion in the Court of Appeals decision explained this standard well.  While pointing out that the case law in this area is somewhat unsettled, he noted that –

> even under current precedent it might not be enough merely to choose to divert resources: <u>current precedent might be understood to require the organization to</u>

Motion for Summary Judgment (Case No. 12-4028)

<u>show that it was "forced" to divert resources to avoid or counteract an injury to
its own ability to function."</u>   (emphasis added).

Chhabria, V., concurring at 1-2, *ALDF v. USDA,* C.A. No. 13-55868, 2015 WL
8057176, at *3 (9th Cir.  December 7, 2015), *citing Redondo Beach.*  In other words, as
the standard itself elucidates, an organization suffers Article III injury only when
government action requires the diversion of resources to prevent harm to its ability to
function.

 Plaintiffs attempt to respond to Judge Chhabria's argument by asserting that the
"Organizational Plaintiffs *have* demonstrated more than a simple 'choice' to divert
resources . . ."  Pl. MSJ at 15-16.  Plaintiffs then describe ALDF's motivations and
actions as follows:

> ALDF, for example, has expended substantial resources – from social media
> campaigns to the filing of administrative petitions -- precisely because failing to
> do so would have resulted in loss of credibility, support and <u>organizational</u>
> <u>goodwill</u> among its donors, peers, and the legal community, which expect ALDF
> to combat the worst forms of animal cruelty (*i.e.* force-fed foie gras) and to
> ensure that the law protects animal health and welfare to the fullest extent
> possible.  (emphasis added).

Pl. MSJ at 16; *see also* Wells Declaration, ¶ 12.[10]

 Even if the Court were to credit ALDF's speculation about the purported harm,
there would remain several reasons why such harm does not satisfy the requirements of
Article III.  The first, and foremost problem with plaintiffs argument is that  loss of
reputation (*i.e.* "organizational goodwill"), without an associated change in status is
insufficient to establish a liberty interest for purposes of demonstrating that the
organizational plaintiffs have standing.  *See Paul v. Davis,* 424 U.S. 693, 711 (1976);
*Jackson v. Calif. Dept. of Mental Health,* 399 F.3d 1069, 1075 (9th Cir. 2005)
(reputation is not a sufficient interest to confer standing); *Castillo v. County of Los
Angeles,* 959 F. Supp. 2d 1255, 1259 (C.D. Cal. 2013).

---

[10]  ALDF has provided the most detailed articulation of alleged organizational harm.  Hence, we
can assume that the other three organizational plaintiffs have suffered similar or lesser harms.

Motion for Summary Judgment (Case No. 12-4028)

Moreover, there is nothing in plaintiffs' Motion and supporting declarations to explain why ALDF can only demonstrate its organizational seriousness to its donors and peers through pursuing this particular rulemaking petition. There certainly are many other threats to animal welfare that ALDF and the other organizational plaintiffs could and do address to demonstrate their seriousness and resolve. *See e.g. ALDF.org* (ALDF website identifying the many animal welfare issues where ALDF is active). Thus, pursuing this particular activity is nothing more than a choice that ALDF and the other organizational plaintiffs elected to pursue and hence is insufficient to support the organizational plaintiffs' Article III standing.

## 2. The Organizational Plaintiffs Lack Prudential Standing

With respect to prudential standing, a review of the evidence pertaining to the interests of the four organizational plaintiffs confirms that the overwhelming organizational purpose of each of these four entities is to protect animal health and animal welfare – with concerns about food safety and human health either entirely absent or offered merely as a makeweight argument to support their true goals. *See* Compl. ¶¶ 51-52 (ALDF); ¶¶ 53-54 (Farm Sanctuary); ¶¶ 55-56 (Compassion Over Killing); ¶¶ 57-58 (APRL); Wells and Meier Declarations.

Farm Sanctuary, an organization that affirms that it is "dedicated to protecting animals raised in the food industry," Compl. at ¶ 53, also asserts in passing that, among its many activities, it "documents the effects of industrialized animal agriculture on . . . human health." *Id.* However, the information that Farm Sanctuary purports to "document" is irrelevant to its organizational *purpose* – which is animal health and welfare, not human health. Moreover, this lone assertion cannot undercut the fact that the overriding goal of Farm Sanctuary is "protecting animals raised in the food industry." Compl. ¶.

No doubt it is theoretically possible that the organizational plaintiffs might be within the zone of interests of a statute that has the protection of animal welfare as its fundamental purpose. But as this Circuit has recognized, different statutes have

15

different zones of interest for purposes of evaluating prudential standing. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 944 (9th Cir. 2005), *cert. denied*, 548 U.S. 903 (2006). And certainly animal welfare is not "arguably within the zone of interests to be protected" (*Nat'l Credit Union Admin.*, *supra*, 522 U.S. at 488) by the PPIA – a statute designed solely to protect human health and welfare, *see* 21 U.S.C. § 452.

Essentially these same issues were decided by a state court in New York that rejected a nearly identical claim brought by two of the present plaintiffs. Plaintiffs Farm Sanctuary and Caroline Lee, along with eight other plaintiffs, brought suit against the New York State Department of Agriculture and Markets seeking a declaratory ruling that "foie gras was the product of a diseased animal and thus an 'adulterated food product' as that term is defined" in New York state law. Decision, Order & Judgment in *Humane Soc'y of the U. S. v. Brennan*, Index No. 7704-06 (N.Y. Sup. Ct. Mar. 18, 2008), AR 1252-63.[11] In one of several alternative holdings in the case, the court held that under New York State law, plaintiffs lacked standing to pursue their claims. *See id.* at AR 1254-58.

As with the "zone of interests" restriction on federal standing, the state court also concluded that "the interests protected by the sections of the [state] Agriculture and Markets law relating to adulterated food products do not include the interests of the animals raised for slaughter." *See id.* at AR 1257. Because the New York statutes at issue were exclusively concerned with food safety, "in the absence of allegations of harm suffered by petitioners, they cannot establish standing through evidence of the harm befalling the subject animals." *Id*. The same reasoning applies under federal law to the federal statutes invoked by the organizational plaintiffs in the case at bar.

Finally, plaintiffs advance the novel argument that they satisfy the prudential standing argument because their claims "fall squarely within the zone of interests of the APA." Pl. MSJ at 17. This meritless argument would read the zone of

---

[11] That decision was affirmed by the New York Supreme Court, Appellate Division, Third Judicial Department on June 18, 2009 (No. 506189).

interests requirement out of the law entirely since nearly every statutory challenge to agency action would be brought under the APA to obtain the benefit of its waiver of sovereign immunity.  Instead, the proper inquiry in prudential standing is whether the plaintiff's interests in the litigation falls "within the zone of interests to be <u>protected or regulated</u> by the statute in question."  *Nat'l Credit Union Admin*, 522 U.S. at 488 (emphasis added).  The APA, as the procedural vehicle for obtaining judicial review, does not "protect or regulate" plaintiffs' alleged interest in preventing the spread of foodborne illness.  Instead , plaintiffs' purported interests are protected by the PPIA, and hence that statute must be examined in applying the zone of interests test.

* * *

In sum, each of the eight plaintiffs in this action lacks standing to pursue their claims.  The individual plaintiffs do not meet the standing requirements of Article III, as their alleged injuries are wholly speculative, and the proximate cause of any harm alleged is their personal choice about the food they consume.   And the four organizational plaintiffs also do not satisfy the requirements of Article III, nor are they within the zone of interests protected by the PPIA.

## II.   USDA Did Not Act Arbitrarily Or Capriciously In Denying The Petition For Rulemaking.

Assuming *arguendo* that plaintiffs have standing to bring this action, the government is entitled to summary judgment on the merits.  The record manifestly establishes that USDA did not act arbitrarily or capriciously in denying the petition for rulemaking.

### A .   Summary Judgment is the Proper Procedural Vehicle to Resolve a Merits Motion in an APA Case.

Summary judgment based on review of the administrative record is the appropriate vehicle for resolving an APA action such as this.  *See, e.g., Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  One of the narrow exceptions

17

to the principle that the reviewing court must decide solely on the basis of the administrative record, however, is in "highly technical areas" where "evidence is necessary as background to determine the sufficiency of the agency's consideration." *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989); *see also Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (supplementation of record acceptable when "necessary to permit explanation or clarification of technical terms").

Accordingly, USDA properly included in the district court record two such declarations (filed with the government's 2012 motion for summary judgment) by senior agency scientists – one by Dr. Alice Thaler, Senior Director for Program Services in the Office of Public Health Science of the Food Safety and Inspection Service ("Thaler Decl.," Dkt. 26-1), and the other by Dr. W. Scott Hafner, a Veterinary Medical Officer with FSIS ("Hafner Decl," Dkt. 26-2).[12]

**B.      Judicial Review of an Agency's Decision Not to Institute Rulemaking In an Area Requiring Significant Technical Expertise Is Highly Deferential.**

The denial of a petition for rulemaking constitutes final agency action, subject to review under the APA, 5 U.S.C. § 706.  Courts, however, have long recognized that "an agency's refusal to initiate a rulemaking is evaluated with deference so broad as to make the process akin to non-reviewability." *Cellnet Commc'n, Inc. v. FCC*, 965 F.2d 1106, 1111 (D.C. Cir. 1992).  In another leading case, the Court of Appeals observed that "[r]eview under the 'arbitrary and capricious' tag line, however, encompasses a range of levels of deference to the agency, and [*Heckler v.*] *Chaney* surely reinforces our frequent statements that an agency's refusal to institute rulemaking proceedings is at the high end of the range." *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir.

---

[12]  USDA affirms that the factual statements contained in these tow declarations continues to be accurate and complete.

1987) (citation omitted), *citing ITT World Commc'ns, Inc. v. FCC*, 699 F.2d 1219, 1245-46 (D.C. Cir. 1983), *rev'd*, 466 U.S. 463 (1984).[13]

The Supreme Court endorsed this well-established case law in *Massachusetts v. EPA*, 549 U.S. 497 (2007), where it recognized that review of an agency's refusal to promulgate a rule is "'extremely limited' and 'highly deferential.'" *Id.* at 527-28 (*quoting Nat'l Customs Brokers & Forwarders Assn. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)).   The Court further recognized that "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Id.* at 527; *see also Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1055-56 (D.C. Cir. 1979).[14]

Typically, judicial review of the denial of a rulemaking petition "is limited to ensuring that the agency has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record." *Arkansas Power & Light v. ICC*, 725 F.2d 716, 723 (D.C. Cir. 1984).   Under the APA's arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), which applies to the denial of a petition for rulemaking as it does to most agency action, *Massachusetts, supra*, 549 U.S. at 528, the "court must determine whether the agency articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001); *see also Ranchers Cattlemen Action Legal Fund v. USDA*, 415 F.3d 1078, 1093 (9th Cir. 2005); *Cactus Corner v. USDA*, 450 F.3d 428 (9th Cir. 2006). Further, "[a]s long as the agency decision was based on a consideration of relevant factors and there is no clear error of judgment," the action is reasonable and not subject to reversal as arbitrary and capricious. *Ariz. Cattle Growers,*  273 F.3d at 1236.

---

[13]  Plaintiffs' brief fails entirely to discuss the deferential standard of review governing agency action on petitions for rulemaking.  *See* Pl.MSJ at 18-19.

[14]  The Supreme Court has long recognized that agencies are "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543 (1978) (citations omitted).

Deference to the informed discretion of the responsible federal agencies is especially appropriate where, as here, "the agency's decision involves a high level of technical expertise." *Ranchers Cattlemen,* 415 F.3d at 1093; *see also Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) ("we generally must be 'at [our] most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise" (citation omitted and brackets in original)).

### C. FSIS Acted Reasonably in Denying the Petition to Initiate Rulemaking to Ban Foie Gras.

The basis for plaintiffs' position that FSIS should be required to initiate a rulemaking petition is essentially twofold: (1) concern for animal welfare – a patently irrelevant factor under the PPIA; and (2) one ambiguous study suggesting amyloid proteins from foie gras "may" contribute to the development of amyloid-related diseases in mice, AR 899-902. FSIS reasonably rejected the petition, and its statement of reasons, AR 1547-48, fully describes the basis for that decision.

At the outset, it bears noting that the fundamental obligation of FSIS under the Poultry Products *Inspection* Act (emphasis added) is just that: to inspect poultry, on a bird-by-bird basis whenever possible, and only condemn those birds that are a threat to the "health and welfare of consumers," 21 U.S.C. § 451. Plaintiffs' petition for an absolute ban by FSIS on foie gras – a product that has been consumed for centuries – is unprecedented, to FSIS's knowledge. Nevertheless, FSIS reviewed the relevant evidence submitted with the rulemaking petition (properly ignoring all evidence relating to animal welfare that was irrelevant to the agency's reasoning), discussed the very limited evidence related to public health, and explained its reasons for denying the

petition in its letter.  Those reasons are fully supported by the record and are consistent with the Act.

### 1.  Plaintiffs Misconstrue the PPIA and Relevant Regulations

Much of plaintiffs' argument consists of playing word games (with particular emphasis on the word "pathological") in describing the condition of ducks and geese during the foie gras forced-feeding process.  The agency properly acknowledged that "the appearance of the livers of these birds would be characterized as affected by hepatic lipidosis," AR 1547, also known as fatty liver.  The forced feeding of these birds results in the buildup of fat in their systems, which lodges primarily in their liver. *Id.* at AR 1331.  However, this condition is not abnormal; indeed it is to be expected. Consequently, it is not a pathological condition, the birds are not diseased in any sense, and there is no justification to condemn them or to halt the sale of foie gras.  There is no naturally occurring disease process at work, and hence no pathology.  Thus, FSIS's distinction between hepatic lipidosis caused by a physiologic condition (the forced feeding process) and a pathological condition (*i.e.*, one caused by disease) is entirely reasonable in light of the statutory and regulatory scheme  – and certainly not "nonsensical and irrational," as plaintiffs maintain, Pl. MSJ at 20.

Plaintiffs also misconstrue several provisions of the PPIA and FSIS regulations. Pl. MSJ at 22.  Plaintiffs are utterly wrong on all counts.   First, foie gras poultry do not exhibit systemic inflammation, *id.*, rather, the growth in the size of the liver is merely part of normal lipid or fat processing and storage.  As Dr. Thaler notes, "[n]ormal foie gras livers show no visible signs of inflammation, i.e., there is not accumulation of fibrin (protein fibers) on the liver surface, and there are no visible hemorrhages in the liver tissue."  Thaler Decl. ¶ 26.  Where the liver is inflamed, it is condemned, just as with any other bird; but plaintiffs offer no justification for a rule mandating the condemnation of all foie gras livers when the overwhelming majority are not showing signs of inflammation.

Second, ducks and geese being force-fed do not "suffer from an abnormal physiologic state," Pl. MSJ at 22, which might be a basis for condemning them under 9 C.F.R. § 381.83.  As Dr. Thaler notes, "[f]at storage is a liver function that is normal physiology.  When more calories are consumed than are needed, the liver transforms the calories into fat for storage so the organism can use those stores in lean times when food is scarce."  Thaler Decl. ¶ 40.  The physiologic state of these birds is exactly what is to be expected given their excessive food intake.

Third, foie gras ducks and geese are not "dead, dying, disabled, or diseased" within the meaning of 21 U.S.C. § 460(d), nor do they "die[] otherwise than by slaughter," *id.*, as plaintiffs contend.  Pl. MSJ at 22.  Section 460(d) applies to persons in the business of buying or selling diseased or dying birds that are sold for purposes other than as human food (such as use by renderers or pet food manufacturers).  Thaler Decl. ¶ 16.  Section 460(d) thus does not apply to foie gras producers.

Fourth, plaintiffs are also mistaken in asserting that an enlarged liver results in toxemia (toxins in the bloodstream) or septicemia (bacteria in the bloodstream).  *See* Pl. MSJ at 22; AR 1346, 1378.  These conditions, if present, would result in a marked change in the appearance of the bird, such as hemorrhages in the internal organs, hyperemic skin and muscle wasting.  *See* Thaler Decl. ¶ 29.  When these symptoms are identified by FSIS inspectors, the entire carcass is condemned.  The mere fact that the livers of foie gras ducks are enlarged does not automatically result in toxemia or septicemia.

If, in fact, there were any of the serious problems with all foie gras fowl that plaintiffs contend exist, FSIS inspectors would identify the problems in their inspections and condemn the birds.  That is the case-by-case process established by the PPIA.  But a review of condemnation rates at foie gras producers identifies no such problem.  For 2010, at the thirty-one non-foie gras duck processing plants, the condemnation rate was 2.1%.  At the two foie gras duck processing plants, the condemnation rate was 1.75%.  See Thaler Decl. ¶ 33.  Thus, plaintiffs' argument that

22

all foie gras ducks are diseased or dying, and so should be condemned, is premised on a fundamental mistake of fact.

### 2. The Solomon Study Does Not Support Plaintiffs' Petition

The *only* support for plaintiffs' assertion that foie gras is a threat to human health, Pl. MSJ at 6-7; 23-24, is a study by Dr. Alan Solomon and others titled *Amyloidogenic potential of foie gras*, published in 2007 ("Solomon Study").[15]  AR 899-902.  There are several significant aspects of the protocols used in the Solomon study that greatly limit its relevance as support for plaintiffs' argument that foie gras is an adulterated poultry product posing a threat to public health and so should be banned.

First, the Solomon study, like many such studies, uses two types of mice that are predisposed to develop amyloidosis.  *See* Hafner Decl. ¶ 4.  Consequently the use of these especially sensitive mice overstates the potential risk of mice – and humans – developing amyloidosis from consuming foie gras.  *Id.* at ¶ 10.  Second, Hafner notes that there is no basis for concluding that foie gras could contribute to diseases like diabetes and Alzheimer's (the "cross-seeding" hypothesis).  *Id.* at ¶¶ 13-14.  Third, there are many other proteins that humans are exposed to, from many sources, such as common bacteria, yeast and secretions from other humans that can have an amyloid-enhancing activity, as one of the co-authors of the Solomon study conceded in a later article.  *Id.* at ¶ 15.  Finally, the Solomon Study is a preliminary research study and so, by its very nature, does not provide definitive support of plaintiffs' theory that foie gras is an adulterated food product.  *Id.* at ¶ 12.

---

[15]  Dr. Alexander Whitehead, also cited by plaintiffs, Pl. MSJ at 6-7, explicitly relied heavily upon the Solomon study as the basis for his opinion.  *See* AR 912.  The Whitehead affidavit that was originally filed in the New York State court litigation, AR 904, essentially contains speculation – never tested through cross examination – based in large measure on the Solomon study.  All that Dr. Whitehead could bring himself to say, however, is that it "may be possible" for the consumption of foie gras to lead to the development of certain diseases, and that this view is "plausible" – but ultimately that "assessing its likelihood would require further study."  AR 914, ¶ 29.  In other words, Dr. Whitehead could only speculate about the disease potential in recommending further study.

For all of these reasons, the Solomon study provides at best only the most remote support for plaintiffs' assertion that foie gras is a threat to human health.  Indeed, the Solomon study itself is forthright about the limitations of its conclusions about health risk to humans about foie gras consumption, saying at most that it "may" pose a risk to human health.  AR 899.

The Solomon study, however, may arguably provide a limited and preliminary basis for concern about the long-term health risk of consumption of large quantities of foie gras.  Thus, FSIS's letter rejecting the petition sensibly called for additional research on this issue.  AR 1548.  But FSIS's authority under the PPIA is limited and certainly could not ban a product based merely on the results of one preliminary study – especially one with the substantial limitations as to risks to human health discussed above.  Clearly, the Solomon study alone falls far short of the "scientific fact, information or criteria," 21 U.S.C. § 452, required before FSIS can even consider banning a product, and FSIS therefore acted reasonably in denying the petition for rulemaking.

Nor does the passing reference in the denial letter to the prospect for additional research somehow undermine the agency's decision.  The Solomon study provided, at most, some very preliminary evidence that the consumption of foie gras may entail some health risks to a small number of consumers under a specific set of  circumstances.  The denial letter thus advised the petitioners that "[t]o establish any link between the two conditions [amyloidosis and hepatic lipidosis], or the potential effect on human health of consuming amyloid, will require additional scientific study."  AR 1548.  It was entirely appropriate for FSIS to conclude that, although the Solomon study raised some interesting questions, the petition was not supported by sufficient evidence to justify agency action – and to suggest that additional research might be in order.

Motion for Summary Judgment (Case No. 12-4028)

### 3. The Legal Standard for "Adulterated" Poultry under the PPIA Does Not Permit FSIS to Ban Foie Gras Based on One Questionable Study.

Plaintiffs' position – that FSIS should ban foie gras from the marketplace based on one ambiguous study suggesting that it "may" cause injury to public health – is squarely inconsistent with the statutory purposes of the PPIA.  The congressional declaration of policy in the PPIA, 21 U.S.C. § 452, specifically requires that when poultry products are condemned under the Act, "the reason for condemnation in such instances shall be supported by *scientific fact, information or criteria . . .*" *Id.* (emphasis added).  Plaintiffs' rulemaking petition did not present the required scientific basis for condemnation; hence, the decision of FSIS not to expend its scarce resources on such a rulemaking was not unreasonable.

This point is reinforced by the congressional statement of findings in the PPIA, 21 U.S.C. § 451, which do not reflect the single-minded focus on condemning a product whenever there is any arguable hint of a risk to human health, the position that plaintiffs appear to advocate.  Instead, the threefold goals of the statute are to "prevent and eliminate burdens upon . . . commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers." *Id.*

The PPIA does not require FSIS to ban a product solely on the basis of one preliminary study that provides only the most questionable evidence that foie gras presents a health risk.  Moreover, it is not the responsibility of FSIS to ban otherwise safe products that may cause adverse health effects if consumed in excess.  FSIS's interpretation of the PPIA on this point is entitled to deference by the courts under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Until and unless additional research provides the necessary "scientific fact, information or criteria" to support regulatory action, 21 U.S.C. § 452, FSIS is well within its discretion to deny a request for rulemaking to ban foie gras.

There are many food products that may pose a health risk to a small number of consumers, or which may pose a risk if consumed in excess. For example, nitrates are commonly used as a preservative, yet are also a proven carcinogen. Foods that are high in fat or sodium may also pose a health risk – if consumed to excess. And nuts are a known allergen. It is not the mandate of FSIS, however, to serve as some kind of "national nutritional police," banning every product that might conceivably have adverse health effects if consumed in excess, or consumed by particularly sensitive persons.

Instead, the mandate of FSIS is much simpler and more straightforward. FSIS is, *inter alia*, to condemn poultry that contains "any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." 21 U.S.C. § 453(g)(3) (partial definition of "adulterated"); *see also* AR 1342, (FSIS veterinarian training manual notes that "diseases and conditions that are of public health significance are a priority"). The rulemaking petition did not give FSIS any basis to conclude that foie gras – a product that has been on the market literally for centuries without any evidence of a significant health risk – comes anywhere close to satisfying the Act's definition of an adulterated poultry product.

Contrary to plaintiffs' assertion, Pl. MSJ at 20, this case is not "comparable to" *Am. Horse Prot. Ass'n, Inc. v. Lyng, supra,* as that case dealt with a totally different statutes and agency action that is highly specific to each statute. In *Am. Horse Prot. Ass'n, Inc.*, the D.C. Circuit questioned USDA's interpretation of the Horse Protection Act and the adequacy of the agency's reasoning in rejecting the petition for rulemaking on horse-soring, 812 F.2d at 6-8. Here, in contrast, FSIS evaluated the rulemaking petition, with its very vague and speculative evidence of risk to human health and welfare, against its eminently sound standard that it should not take action to condemn poultry products unless there is solid "scientific" evidence supporting such action. FSIS reasonably concluded that the petition did not justify opening a rulemaking docket on plaintiffs' proposal to ban foie gras.

Motion for Summary Judgment (Case No. 12-4028)

Finally, plaintiffs' invocation of *Kenney v. Glickman*, 96 F.3d 1118 (8th Cir. 1996), and the notion that "the FMIA and PPIA should be regulated similarly," *see* Pl. MSJ at 20, is equally misguided.  "Similarly" does not mean "identically," and  "[n]o such distinction is made [*i.e.,* between physiologic and pathological liver conditions] for other fatty liver conditions in other animal food products," *id.,* regulated under the FMIA precisely because foie gras is made exclusively from poultry.  Thus, the issue does not arise under the FMIA.

* * *

In sum, FSIS did not act arbitrarily or capriciously in denying the request to initiate rulemaking to ban foie gras.  Assuming the Court concludes that any plaintiff has standing, the FSIS's reasonable determination should be upheld by this Court.[16]

---

[16] Assuming *arguendo* that the Court were to find the agency's reasons insufficient, the proper course would not be to order USDA to initiate rulemaking proceedings (as plaintiffs maintain), but to remand the case to the agency for further consideration.  *See, e.g., Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  The agency would then be free either to grant the petition or to provide a more detailed explanation of its reasons for declining to do so.  Instead, if there is a remand here, the agency should be free to select the appropriate procedural vehicle to reconsider the petition for rulemaking – which need not necessarily consist of initiating a rulemaking docket.  <u>See</u> *Geller v. FCC*, 610 F.2d 973, 980 ("We do not mean to imply that this inquiry must necessarily be conducted in a new rulemaking proceeding as requested by Geller. . .").

Motion for Summary Judgment (Case No. 12-4028)

# CONCLUSION

Wherefore, the Court should grant summary judgment on the claims of all plaintiffs as they lack standing, or, in the alternative, grant summary judgment for defendants on the merits.

Respectfully submitted,

BENJAMIN M. MIZER
Principal Deputy Assistant Attorney
General

EILEEN M. DECKER
United States Attorney

ERIC WOMACK
*/s/ Daniel Bensing*
DANIEL BENSING
D.C. Bar No. 334268
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Rm. 6114
Washington, D.C. 20530
Telephone: (202) 305-0693
Facsimile: (202) 616-8460
Daniel.Bensing@USDOJ.gov

Motion for Summary Judgment (Case No. 12-4028)

Certificate of Service

     I hereby certify that on the 22nd day of April, 2016, I caused the forgoing Notice of Motion and Motion for Summary Judgment to be served on counsel for plaintiffs by filing with the court's electronic case filing system.

*/s/ Daniel Bensing*

Daniel Bensing

Motion for Summary Judgment (Case No. 12-4028)