Morgan Hector, Cal. Bar. No. 246573
mhector@steptoe.com
STEPTOE & JOHNSON, LLP
633 West Fifth Street, Suite 700
Los Angeles CA 90071
213.439.9400 / 213.439.9599 (fax)

Carter Dillard, Cal. Bar No. 206276
cdillard@aldf.org
ANIMAL LEGAL DEFENSE FUND
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280 (fax)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation; et al., | Case No. 12-cv-04028-ODW(PJWx) |
| | Hon. Otis D. Wright II |
| Plaintiffs, | PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT; REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, and the Honorable TOM VILSACK, its Secretary; et al., | |
| Defendants. | Date:   July 18, 2016 |
| | Time:  1:30 p.m. |
| | Place:  Courtroom 11 – Spring Street |
| | Pretrial Conference:  N/A |
| | Trial Date:  N/A |

## **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................ 1

II.  Defendants' Motion for Summary Judgment Should Be Denied Because Plaintiffs Do In Fact Have Standing. .................................................... 3

    A.  Plaintiffs' Allegations Establish Standing. ................................. 3

        1.  Standing Under the APA. ................................................... 3

        2.  The Individual Plaintiffs' Increase in Health Risks Is Not Speculative. 4

        3.  Knowledge of the Potential Harm from Consuming Force-Fed Foie Gras Does Not Eliminate Standing. ....................................... 7

        4.  The Organizational Plaintiffs Have Standing Because Their Missions Include Protecting Consumer Health. ................................... 10

        5.  Plaintiffs' Claims Satisfy the Zone-of-Interests Test. ......................... 12

III. Summary Judgment Should Be Granted in Favor of Plaintiffs and Defendants' Cross-Motion for Summary Judgment Should Be Denied. ......................... 15

    A.  Defendants' Interpretation of the PPIA Should Not Be Given *Chevron* Deference. ............................................................................ 15

    B.  The APA's Arbitrary and Capricious Standard. ...................................... 18

        1.  Contrary to the Defendants' Contention, Large Portions of the Petition Do Not Pertain Solely to Animal Welfare, But Demonstrate that Force-Fed Foie Gras Is Diseased, "Adulterated," and Presents Various Health Risks. .......................................................................... 19

        2.  The Solomon Study Demonstrates the Consumption of Force-Fed Foie Gras Constitutes a Potential Risk to Human Health and Is Therefore "Adulterated" and "Unfit for Human Consumption" Under the PPIA. ...................................................................... 22

IV. CONCLUSION ............................................................................. 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

FEDERAL CASES

*ALDF v. USDA*,
   632 Fed. Appx. 905 (9th Cir. 2015) ...................................................................16

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) ...........................................................................19

*Ariz. Cattle Growers v. U.S. Fish & Wildlife*,
   273 F.3d 1229 (9th Cir. 2001) ...........................................................................19

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150 (1970)...............................................................................................7

*Baur v. Veneman*,
   352 F.3d 625 (2nd Cir. 2003) ......................................................................4, 6, 7

*Beno v. Shalala*,
   30 F.3d 1057 (9th Cir. 1994) ..............................................................................21

*Cabral v. Supple, LLC*, Case No. 12-00085-MWF,
   2012 WL 4343867 (C.D. Cal. Sept. 19, 2012).....................................................9

*Cent. Delta Water Agency v. United States*,
   306 F.3d 938 (9th Cir. 2002) ................................................................................6

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ....................................................................... 16-19, 21, 24

*Clapper v. Amnesty Int'l USA*,
   133 S.Ct. 1138 (2014) ...........................................................................5-6, 7-8

*Coalition for Mercury-Free Drugs v. Sebelius*,
   671 F.3d 1275 (D.C. Cir. 2012)....................................................................... 9-10

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) (en banc) ........................................................ 11-12

*Cutler v. Kennedy*,
   475 F.Supp. 838 (D.D.C. 1979).........................................................................10

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................. 7

*Diamond v. Charles*,
  476 U.S. 54 (1986) ............................................................................... 8

*Equal Rights Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ........................................................ 12

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................. 6-7, 10

*Henderson v. Gruma Corp.*, No. CV 20-04173,
  2011 WL 1362188 (C.D. Cal. Apr.11, 2011)................................... 8-9

*Judulang v. Holder*,
  132 S.Ct. 476 (2011) ......................................................................... 19

*Kern County Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) .......................................................... 19

*Koehler v. Litehouse, Inc.*, No. 12-cv-04055,
  2012 WL 6217635 (N.D. Cal. Dec. 13, 2012) ................................ 8, 9

*Larsen v. Trader Joe's Co.*, No. C 11-05188 SI,
  2012 WL 5458396 (N.D. Cal. June 14, 2012) .................................... 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S.Ct. 1377 (2014)................................................................... 13-14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................................................. 3

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)....................................................................... 3, 21

*McGee v. Diamond Foods, Inc.*, No. 14cv2446,
  2016 WL 816003 (S.D. Cal. March 1, 2016) ................................. 4-5

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) ............................................... 16-17, 21

*Mellouli v. Lynch*,
   135 S.Ct. 1980 (2015) ....................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).............................................................19, 20, 24

*Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co.*,
   522 U.S. 479 (1998).......................................................................13

*NRDC v. FDA*,
   710 F.3d 71 (2d Cir. 2013) .............................................................9

*Organized Village of Kake v. U.S. Dept. of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) ........................................................14

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) .........................................................................8

*Public Citizen v. Foreman*,
   631 F.2d 969 (D.C. Cir. 1980) ................................................. 9-10

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .......................................................................18

*U.S. v. Bacto-Unidisk*,
   394 U.S. 784 (1969)................................................................. 21-22

*Valle Del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ......................................................11

*Virginia State Corp. Com'n v. F.E.R.C.*,
   468 F.3d 845 (D.C. Cir. 2006) .......................................................6

**STATE CASES**

*ALDF v. LT Napa Partners LLC*,
   234 Cal. App. 4th 1270 (2015).....................................................12

*Humane Soc. of U.S., Inc. v. Brennan*,
   Index No. 7704-06 (N.Y. Sup. Ct. March 18, 2008) .....................15

STATUTES

Administrative Procedure Act ("APA")
    5 U.S.C. § 701, *et seq.* ...................................................................*passim*

5 U.S.C. § 706.......................................................... 18-19, 22, 25

Poultry Products Inspection Act ("PPIA"),
    21 U.S.C. § 451, *et seq.* ...............................................................*passim*

21 U.S.C. § 451..........................................................9, 14, 24

21 U.S.C. § 452..........................................................22

21 U.S.C. § 453..........................................................17, 20

21 U.S.C. § 455..........................................................16

21 U.S.C. § 460..........................................................14, 20

CODE OF FEDERAL REGULATIONS

9 C.F.R. §§ 381.78..........................................................22

9 C.F.R. § 381.83.......................................................... 20-21

9 C.F.R. § 381.86..........................................................20

9 C.F.R. § 381.210..........................................................22

OTHER AUTHORITIES

Treatment of Live Poultry Before Slaughter,
    70 Fed. Reg. 56624 (Sept. 28, 2005) ...............................................17

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Plaintiffs hereby submit the following (1) Opposition to Defendants' Motion for Summary Judgment, and (2) Reply in Support of Plaintiffs' Motion for Summary Judgment, per the Court's ordered briefing schedule.

**I.    <u>INTRODUCTION</u>**

Defendants' argument that Plaintiffs' lack standing, on which they devote the majority of their memorandum, must be rejected. Although Defendants contend that the individual Plaintiffs' harms are "far too speculative" or are the individual Plaintiffs' own fault, and that all of the organizational Plaintiffs lack "injury in fact" and are outside the "zone of interests" of the Poultry Product Inspection Act, 21 U.S.C. § 451, *et seq.* ("PPIA"), it is just not true.

Plaintiffs do in fact have standing because Defendants' failure to initiate rulemaking has caused the following specific harms:

- The increased risk of amyloid-related disease from the consumption of force-fed foie gras;
- The increased risk of exposure to various pathogens, such as *E. coli*, from the consumption of force-fed foie gras; and
- The frustration of the organizational Plaintiffs' missions, and diversion of resources in response to work to prevent the entry of force-fed foie gras into the food supply and to educate consumers as to its health risks.

An increased risk of harm to a consumer of food products due to the government's failure to enact regulations consistent with its mandate is sufficient to constitute "injury in fact" for purposes of Article III standing. That some of the Plaintiffs are aware of the potential risk from force-fed foie gras does not eliminate standing to seek prospective relief.  Were it otherwise, no such relief could ever be sought. Consumers are not required to forego an entire category of food product because of Defendants' unlawful conduct.

Regarding the organizational Plaintiffs, Defendants are incorrect that their

1

diversion of resources in response to force-fed foie gras's presence in the food supply, which frustrates each of their missions, does not constitute injury in fact. Ignoring force-fed foie gras's presence in the food supply was simply not an option; their efforts were more than a voluntary "choice." Defendants also mischaracterize the organizational Plaintiffs as concerned only about animal welfare and thus outside the PPIA's "zone of interests." Each has as part of its mission the protection of the food supply from certain products and the education of consumers of the health risks associated with consuming these products, including force-fed foie gras. That a plaintiff may have multiple subjective interests, *e.g.*, animal welfare *and* food safety, does not deprive a plaintiff of standing should one such interest be sufficient to confer standing.  Defendants ought not be able unilaterally to decide and characterize Plaintiffs' interests and motivations for the purpose of depriving Plaintiffs of their day in court.

The merits section of Defendants' memorandum – which cites to only a few of the almost 1,600 pages in the administrative record – similarly lacks merit. Defendants' position can be distilled to two arguments, both incorrect and in conflict with the plain language of the PPIA and Congress's intent in passing the PPIA. First, Defendants argue the Petition for rulemaking was almost entirely devoted to concerns for animal welfare (it was not), and was thus "properly ignor[ed]" as "irrelevant evidence" without so much as a mention in the agency's denial letter. Second, ignoring large portions of the administrative record, Defendants argue that the "Solomon Study" is "[t]he only support for plaintiffs' assertion that foie gras is a threat to human health," which they contend was insufficient to support the Petition.

In fact, the record shows just the opposite on both points. There is substantial evidence that Defendants failed to consider showing force-fed poultry suffers from toxemia, septicemia, systemic inflammation, and other conditions rendering force-fed foie gras "adulterated" under the PPIA and Defendants' own

regulations. Thus, while Plaintiffs contend even the Solomon study alone was sufficient to support the requested rulemaking, it is simply false that the Solomon study was the Petition's only evidence of risks to human health. This record cannot fairly be seen as limited to "animal welfare." Plaintiffs' Motion should be granted, and Defendants' Cross-Motion denied.

## II. Defendants' Motion for Summary Judgment Should Be Denied Because Plaintiffs Do In Fact Have Standing.

### A. Plaintiffs' Allegations Establish Standing.

Defendants move for summary judgment on the ground that each of the seven remaining plaintiffs in this action lacks standing. Cross-Mot. at 5-17. Defendants specifically argue (1) the individual Plaintiffs' alleged increased risk of developing an illness is "far too speculative" to constitute "injury in fact"; (2) the individual Plaintiffs, knowledgeable of the risks, can simply avoid consuming force-fed foie gras; (3) the organizational Plaintiffs were not "forced" to divert resources addressing force-fed foie gras's presence in the food supply, instead these expenditures were voluntary and thus do not constitute injury in fact; and (4) the organizational Plaintiffs care only about animal welfare, and are therefore outside the "zone of interests" protected by the PPIA. *Id.*

### 1. Standing Under the APA.

To have standing, a plaintiff must show a concrete and particularized injury that is actual or imminent, fairly traceable to the defendant, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). However, where a litigant has been "accorded a procedural right to protect his concrete interests" – here, the right to challenge agency action unlawfully withheld – the litigant "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007) (quoting *Lujan*, *supra*, 504 U.S. at 572, n.7). There need only be "some possibility that the requested relief will prompt the injury-causing

party to reconsider the decision that allegedly harmed the litigant." *Id.* Further, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

### 2.   The Individual Plaintiffs' Increase in Health Risks Is Not Speculative.

As detailed in Plaintiffs' Motion, the evidence in the Administrative Record establishes that, by allowing force-fed foie gras into the food supply, Defendants place American consumers at risk of food-borne illness and other diseases. Mot. at 6-7, 11-14; UF[1] ¶¶37-42. As past consumers of foie gras (UF ¶87), and because of legitimate fears of inadvertent, future consumption (UF ¶89), the individual Plaintiffs have suffered injury in fact, and this risk of injury remains as long as foie gras continues to be allowed in the food supply (UF ¶91). Mot. at 11-13. These allegations of an increased risk of harm are sufficient to establish standing. *See Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003).

The primary argument in Defendants' Cross-Motion is that Plaintiffs' claimed injury in fact is "far too speculative." Cross-Mot. at 7-9. In so arguing, Defendants cite a number of cases, but they are ultimately distinguishable. The first is *McGee v. Diamond Foods, Inc.*, No. 14-cv-2446, 2016 WL 816003 (S.D. Cal. March 1, 2016), which Defendants cite for the assertion that the "mere subjective fear that the consumption of foie gras will make them contract a food-borne illness is far too speculative to establish standing." Cross-Mot. at 7. But *McGee* stands for no such broad proposition. The plaintiff in *McGee* had brought a claim under California's unfair competition law arguing popcorn products sold by defendant contained partially hydrogenated vegetable oil, which allegedly

---

[1] "UF" refers to "Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law" submitted concurrently with Plaintiffs' Motion for Summary Judgment, Docket No. 61-6.

contributed to cardiovascular disease, certain cancers, Alzheimer's disease, and cognitive decline. *Id*. at *1. The court ultimately concluded that plaintiff had "not allege[d] a credible threat of harm" because the injury had not "affect[ed] the plaintiff in a personal and individual way." *Id*. at *6 (quotation omitted). This was because the plaintiff had failed to present studies showing "how the TFAs found in Defendant's popcorn create a special susceptibility to contracting the variety of diseases to which Plaintiff alleges she is at risk." *Id*. at *5. The court also stressed that "no statutory mandate exists here to support Plaintiff's request for relief." *Id*.

Here, of course, to the contrary there is a statutory mandate, and the individual Plaintiffs have submitted evidence that force-fed foie gras specifically, by virtue of the force-feeding process and presence of amyloids, presents a direct increase in health risks. Mot. at 6-7, 10-14. It also affects Plaintiffs in a personal and individual way. Ms. Lee, for example, has a family history of inflammatory disease, including a son with secondary amyloidosis. "Such individuals may be placed at an increased risk of developing Secondary (or AA) Amyloidosis from eating foie gras containing AA fibrils." UF ¶39.

Defendants also rely on *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138 (2014) to argue that the harm from consuming foie gras is "not 'certainly impending'" (Cross-Mot. at 7), and that theories of standing cannot "'rest on speculation about the decisions of independent actors.'" Cross-Mot. at 8 (quoting *Clapper*, 133 S.Ct. at 1147, 1150). But *Clapper* involved a number of U.S. plaintiffs seeking a declaration that the federal government's foreign intelligence surveillance efforts under the Foreign Intelligence Surveillance Act (FISA) were unconstitutional. The Supreme Court concluded plaintiffs, who feared their communications with foreigners would be intercepted, lacked standing because of a chain of *five* "highly speculative" events that would have to occur for the plaintiffs to suffer any injury. Moreover, *Clapper* was not a food safety increased-risk-of-harm case and is therefore inapposite.

Defendants also cite to *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ("*FWW*"), in an attempt to narrowly construe the standing principles applicable to food safety, "increased-risk-of-harm cases[,]" contending they require a focus on the "requirement that an injury be actual or imminent" to avoid "litigation of what are no more than generalized grievances." Cross-Mot. at 8. *FWW* is largely inapplicable because it is a recitation of the D.C. Circuit's approach to such cases that is ultimately not binding here. *FWW*, 808 F.3d at 914 ("As a result, *this Court* has limited its jurisdiction over such [increased-risk-of-harm] cases …" (emphasis added)). The D.C. Circuit has acknowledged its approach is more restrictive than that of other circuits, including the Second and Ninth Circuits. *See Virginia State Corp. Com'n v. F.E.R.C.*, 468 F.3d 845, 848 (D.C. Cir. 2006) (noting a "conflict among the circuits" on how "substantial" a "probabilistic injury" need be to establish standing, citing *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003) and *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002) in contrast to the D.C. Circuit's approach).

*FWW* also was not, however, a typical food safety case, and the plaintiffs there were not "similarly-situated individuals" as Defendants argue (Cross-Mot. at 8). Here, Plaintiffs claim a particular food product they have consumed and may consume in the future is adulterated and unsafe; in contrast, the plaintiffs in *FWW* were challenging a change in FSIS's overall inspection procedures (the delegation of carcass by carcass inspection to non-FSIS personnel) applicable to young poultry slaughterhouses, which they claimed would cause an increase in food borne illnesses. *FWW*, 808 F.3d at 909. The D.C. Circuit rejected the argument, ultimately concluding that the plaintiffs had failed even "to allege that the [new inspection system] will produce significantly more adulterated, unwholesome chicken compared to the existing inspection systems." *Id*. at 915.

Defendants also argue *Baur* is distinguishable because there was direct evidence that "mad cow" disease could be contracted from downed livestock,

while here "there is effectively no evidence whatever that foie gras poses any threat to human health." Cross-Mot. at 9. This is false. *See* Mot. at 11-12. Even Defendants' Denial conceded research into health effects was warranted. UF ¶49.

In sum, Defendants' position is a misstatement of the law. Defendants cannot seriously contend that a plaintiff has no standing until he or she has actually been harmed as opposed to "merely" having accurately perceived a real risk of harm and wishing to avoid suffering that harm.[2] The individual Plaintiffs have sufficiently established injury in fact.

### 3. Knowledge of the Potential Harm from Consuming Force-Fed Foie Gras Does Not Eliminate Standing.

Defendants also attack the standing of the individual Plaintiffs on the grounds that, since these Plaintiffs are aware of force-fed foie gras's health risks, they themselves are the cause of any harm they may suffer, not Defendants' failure to prevent force-fed foie gras from entering the food supply. Cross-Mot. at 9-12. Again citing to non-binding D.C. Circuit precedent, Defendants also argue that if an alternative diet is "readily available," a plaintiff forced to forego a food product simply does not have standing.

Defendants' "coming to the harm" arguments fail. First, their authority is simply misplaced. Defendants again cite *Clapper*, but for the reasons stated above, *Clapper* is inapposite. The additional cases cited by Defendants (Cross-Mot. at 10) find no standing when the actions of the defendants are lawful and the plaintiffs' injuries are self-imposed in response to, or entirely disconnected from, that lawful activity. *See*, *e.g.*, *Pennsylvania v. New Jersey*, 426 U.S. 660, 664

---

[2]    As stated in Plaintiffs' Motion (at 12, n.3), the individual Plaintiffs' fear and anxiety from the increased risk of developing an amyloid-related disease and other health problems (UF ¶93) are also sufficient to confer standing. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006). As are "economic costs, such as … preventative steps; but aesthetic, emotional or psychological harms also suffice for standing purposes." *Id.* at 265 citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

1   (1976) (Pennsylvania's legislature had itself chosen to allow its residents a tax

2   credit for income taxes paid to other states, *i.e.*, a self-inflicting injury); *Diamond*

3   *v. Charles*, 476 U.S. 54, 70 (1986) (attorney's fee award not a sufficient "injury"

4   where not related to abortion law at issue, but rather stemmed from party's

5   intervening in litigation). Here, Plaintiffs' increased risk of harm stems directly

6   from the lack of regulation, mandated by Congress, declaring force-fed foie gras

7   to be adulterated. Plaintiffs are not required to cease *lawful* behavior to avoid

8   harm from Defendants' *unlawful* behavior. Indeed, if Defendants' reasoning were

9   taken to the extreme, USDA could stop regulating all food products it currently

10   regulates, and no plaintiff who "chose" to continue to consume food would have

11   standing to challenge USDA's action.

12          More on point is authority upholding standing in the context of a consumer

13   who is aware of and has suffered harm from past violations of a consumer

14   protection statute, and seeks prospective relief to prevent future harm from those

15   same violations. *See*, *e.g.*, *Koehler v. Litehouse, Inc.,* No. 12-cv-04055, 2012 WL

16   6217635, *6 (N.D. Cal. Dec. 13, 2012) (holding to find lack of standing "would

17   eviscerate the intent of the California legislature in creating consumer protection

18   statutes because it would effectively bar any consumer who avoids the offending

19   product from seeking injunctive relief."); *Henderson v. Gruma Corp*., No. CV 20-

20   04173, 2011 WL 1362188, at *7 (C.D. Cal. Apr.11, 2011) (holding "[i]f the Court

21   were to construe Article III standing … as narrowly as Defendant advocates … a

22   plaintiff who had been injured would always be deemed to avoid the cause of the

23   injury thereafter ... and would never have Article III standing.");[3] accord *Larsen v.*

24   *Trader Joe's Co*., No. C 11-05188 SI, 2012 WL 5458396, at *3-4 (N.D. Cal. June

25

26   _____

27   [3] Defendants argue these cases are distinguishable because they involve consumer protection
     statutes (Cross-Mot. at 11), but that is not so. Both were analyzing the existence of standing
28   under Article III, and Defendants cite to no authority that the injury in fact requirement is
     somehow lesser in that context than an APA challenge involving food safety claims.

14, 2012); *Cabral v. Supple, LLC*, Case No. 12-00085-MWF, 2012 WL 4343867, at *2 (C.D. Cal. Sept. 19, 2012). Similarly, in *NRDC v. FDA*, 710 F.3d 71 (2d Cir. 2013), the Second Circuit found that the plaintiff's exposure to the allegedly harmful chemical triclosan in soap was not self-inflicted because "NRDC's evidence shows that FDA's conduct contributes to Owens's triclosan exposure *because triclosan would not be available on the market but for FDA's failure to finalize its regulation*." *Id*. at 85 (emphasis added).

As a result, here, even were the individual Plaintiffs successfully able to avoid consuming foie gras, they would still have standing under the reasoning in *Koehler* and *Henderson*. As with the consumer protection statutes in those cases, the purpose of the PPIA, in conjunction with the APA, is to ensure USDA, through FSIS, is properly regulating poultry products to ensure "adulterated" poultry products do not end up in the food supply. *See* 21 U.S.C. § 451. Holding that a judicial action such as Plaintiffs' could not be brought by any plaintiff who is aware of the health risks associated with the particular poultry product at issue would effectively be to hold that no suit could *ever* be brought to challenge a denial of rulemaking, since only a plaintiff aware of the health risks would have the information to bring the suit in the first place. That is not the law, and Defendants' argument on this ground must be rejected.

Defendants' contention that an alternative diet is "readily available" and therefore bars Plaintiffs' claims similarly lacks merit. Cross-Mot. at 10, citing *Public Citizen v. Foreman*, 631 F.2d 969, 974, n. 12 (D.C. Cir. 1980), *Coalition for Mercury-Free Drugs v. Sebelius,* 671 F.3d 1275, 1281 (D.C. Cir. 2012), and a concurring opinion from *FWW*, 808 F.3d at 922 (Henderson, J. concurring).

First, Defendants fail to cite any authority that this standard is the law in the Ninth Circuit. Second, Defendants' own D.C. Circuit authority stands for no such broad statement. *Public Citizen v. Foreman* addresses standing in a single footnote, and holds only that the plaintiffs there *did* have standing because "the

nitrite-free bacon they seek is *not* readily available at a reasonable price." 631 F.2d at 974, n. 12 (emphasis added). This holding does not mean the opposite is true, and the court did not purport to hold that was the case, rejecting the argument that plaintiffs should simply "abstain from eating bacon entirely". *Id*.

*Coalition for Mercury-Free Drugs v. Sebelius* does not even involve a food product. Plaintiffs there were challenging FDA's approval of vaccines containing thimerosal. 671 F.3d at 1281. After reciting the standard that "[t]his Court has permitted consumers of a product to challenge agency action that prevented the consumers from purchasing a desired product", the court concluded that plaintiffs had not alleged "that FDA's approval of thimerosal-preserved vaccines prevents them from purchasing thimerosal-free vaccines" because "plaintiffs conceded that mercury-free versions are available." *Id*. This case does not stand for the proposition that a "readily available alternative diet" defeats standing. To the contrary, it supports Plaintiffs' position because here they are forced to forego an entire food product – foie gras, which because of the force-feeding process involved presents health risks to consumers. While Defendants argue Plaintiffs could simply stop eating poultry products altogether, it is *not* the law that a plaintiffs must forgo some larger category of food product to avoid the harm caused by Defendants' own misconduct (nor is it reasonable for them to do so). *See Cutler v. Kennedy*, 475 F. Supp. 838, 850 (D.D.C. 1979) (finding that standing existed where plaintiff based his injury on his fear that he would be exposed to product ingredients that had not been tested by the FDA and that plaintiffs could not track which products contained these ingredients).

### 4. The Organizational Plaintiffs Have Standing Because Their Missions Include Protecting Consumer Health.

As detailed in Plaintiffs' Motion, the organizational Plaintiffs here have Article III standing because the Denial of their petition for rulemaking has frustrated their core missions and forced them to divert resources combatting

force-fed foie gras's presence in the food supply. Mot. at 14-16. In Defendants' Cross-Motion, they argue Article III standing is absent because the organizational Plaintiffs' expenditures are entirely voluntary, not "required" by the Denial as Defendants' interpretation of Ninth Circuit precedent would mandate. Cross-Mot. at 13-15. This argument must be rejected.

Under Ninth Circuit precedent, an organizational plaintiff may demonstrate standing by establishing "a drain on its resources from both a diversion of its resources and frustration of its mission." *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quotation omitted). Quoting Judge Chhabria's concurring opinion on appeal, Defendants argue the expenditure of resources must be "'forced' … to avoid or counteract an injury to [the organizational plaintiff's] own ability to function." Cross-Mot. at 13-14 (added emphasis removed), citing Chhabria, J., concurring at 1-2, *ALDF v. USDA*, C.A. No. 13-55868, 2015 WL 8057176, at *3 (9th Cir. Dec. 7, 2015). Judge Chhabria, however, was merely stating how "current precedent *might* be understood" (*id*. (emphasis added)) – no Ninth Circuit opinion has adopted this language. The authority Judge Chhabria cites is *Valle del Sol Inv. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) and *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc). *Valle del Sol*, however, states only that standing cannot be "manufacture[d]" by "choosing to spend money fixing a problem *that otherwise would not affect the organization at all*", which is not the case here. 732 F.3d at 1018 (emphasis added, quotation omitted). In *Comite*, while the court found the ordinance had "forced" the organization to divert resources, it did not hold that was the applicable standard. *Compare ALDF v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1283-84 (2015) ("Where the economic injury is diversion of resources, the proper focus of the inquiry is not the 'voluntariness or involuntariness' of the expenditures" (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Ninth Circuit precedent may, and

Plaintiffs contend should, be properly interpreted to provide direct standing to organizations to sue even if the diversion of resources is voluntary, as long as it is in response to a frustration of their missions. Plaintiffs easily meet this standard.

Even assuming the higher standard Defendants advocate should be applied, the organizational Plaintiffs still have standing. ALDF, for example, has expended substantial resources – from social media campaigns to the filing of administrative petitions – precisely because failing to do so would have resulted in a loss of credibility, support, and organizational goodwill[4] among its donors, peers, and the legal community, which expect ALDF to combat the worst forms of animal cruelty (*i.e.*, force-fed foie gras) and to ensure that the law protects animal health and welfare to the fullest extent possible. (UF ¶99). Indeed, "[i]gnoring the terrible animal welfare consequences and threats to public health posed by force-fed foie gras, and sitting idly by while USDA continued approving this diseased product for human consumption, was simply not an option for ALDF." *Id*.

This was an unavoidable diversion of resources in furtherance of the organizational Plaintiffs' missions and constitutes injury in fact for Article III purposes. And this injury is the direct result of Defendants' allowing force-fed foie gras into the food supply. (UF ¶101). If USDA and FSIS were to initiate rulemaking to remove force-fed foie gras from the marketplace as an "adulterated" product under the PPIA, the resources the organizational Plaintiffs are diverting in response could be directed to other projects, including efforts to protect other animals in furtherance of their overall missions. *Id*. Article III standing is therefore satisfied.

### 5. Plaintiffs' Claims Satisfy the Zone-of-Interests Test.

Finally, Defendants argue the organizational (not individual) Plaintiffs'

---

[4] Defendants argue ALDF's "loss of reputation" is insufficient (Cross-Mot. at 14) but fail to address the more significant harms, such as the loss of financial support from donors.

claims fall outside the "zone-of-interests" of the PPIA and that therefore "prudential standing" is absent. Cross-Mot. at 15-17. The Supreme Court recently clarified in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386-88 (2014) that the "zone-of-interests" test is not a jurisdictional inquiry: "'[P]rudential standing is a misnomer' as applied to the zone-of-interests analysis," which asks whether "a legislatively conferred cause of action encompasses a particular plaintiff's claim[.]" *Id*. at 1387 (quotations omitted).

Defendants' specific argument on this front is that "the overwhelming organizational purpose of each of the four [organizational plaintiffs] is to protect animal health and animal welfare – with concerns about food safety and human health either entirely absent or offered merely as a makeweight argument to support their true goals." Cross-Mot. at 15. Defendants contend this means they fall outside the PPIA's "zone-of-interests," but Defendants overstate the requirement and understate the organizational Plaintiffs' interest in the human health consequences of practices such as force-feeding.

Defendants omit that the "zone-of-interests" test requires only that a court determine a plaintiff's interests are among those "*arguably* within the zone of interests to be protected" by the statute. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co*., 522 U.S. 479, 492 (1998) (emphasis in original, quotation omitted). As noted in Plaintiffs' Motion (at 17), *Lexmark* recently emphasized, "in the APA context, that the test is not especially demanding," and that the "conspicuous" inclusion of the word "arguably" in the test indicates "that the benefit of any doubt goes to the plaintiff." *Lexmark*, 134 S.Ct. at 1389. The zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id. Lexmark* explicitly held that this "lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit

1   for violations of numerous statutes of varying character that do not themselves

2   include causes of action for judicial review." *Id.*; *see also Organized Village of*

3   *Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 964 (9th Cir. 2015) (same).

4        Here, especially given the APA context, Plaintiffs' claims easily fall within

5   the zone-of-interests of the PPIA. First, Defendants' characterizations

6   notwithstanding, each organizational Plaintiff has the human health consequences

7   of animal cruelty among its interests. Mot. at 15. Given the PPIA's focus on the

8   protection of consumers of poultry products (*see* 21 U.S.C. § 451), the

9   organizational Plaintiffs' claims are certainly, at a minimum, "arguably" among

10  those to be protected by the PPIA. Second, it is also entirely reasonable to

11  conclude that a statute prohibiting the "buying, selling, or transporting in

12  commerce, or importing, dead, dying, disabled, or diseased poultry" is aimed at

13  ensuring animal health as well (which in turn ensures human health). 21 U.S.C.

14  § 460. By necessity, Defendants are concerned with the health of animals in order

15  to maintain a healthy food supply. Healthy food from farm animals starts with

16  disease prevention on farms and in slaughterhouses. By regulating the food

17  supply, Defendants must administer the food system systematically from farm to

18  table. The PPIA makes the buying, selling, or transporting of birds that are

19  afflicted with disease, or are otherwise dying, unlawful. Inevitably, therefore, the

20  health of animals must fall within the general interests of the PPIA. If it were

21  otherwise, and the PPIA was solely concerned with human health, there would be

22  no statutory language referencing the diseased state of the birds.

23        Defendants rely extensively on a New York state court decision, *Humane*

24  *Soc. of US, Inc. v. Brennan*, as having decided "essentially" the same issues as the

25  ones in this matter, holding plaintiffs did not come within the "zone of interests"

26  protected by the New York state agricultural laws. Cross-Mot. at 16, citing

27  *Humane Soc. of U.S., Inc. v. Brennan*, Index No. 7704-06, at p. 5 (N.Y. Sup. Ct.

28  March 18, 2008) (AR1252-63). In contrast to that action, however, here, in

addition to a different statutory scheme at issue, Plaintiffs are not seeking to establish standing solely though evidence of animal cruelty. Plaintiffs' standing is based upon the risks to human health. That there may be a direct link between animal health and risks to consumers does not eviscerate Plaintiffs' standing.

**III.   Summary Judgment Should Be Granted in Favor of Plaintiffs and Defendants' Cross-Motion for Summary Judgment Should Be Denied.**

On the merits, Defendants oppose Plaintiffs' Motion for Summary Judgment and cross-move for summary judgment on two primary grounds, each of which should be rejected. First, Defendants argue all but one study attached to the Petition were directed solely to concerns for animal welfare and that this evidence was thus "properly ignor[ed]". Cross-Mot. at 20. Second, Defendants argue the "Solomon study" showing a link between force-fed foie gras and the onset of amyloid-related diseases was insufficient on its own to support the Denial. *Id.* at 23-24. Defendants contend the Denial was thus proper.[5]

**A.   Defendants' Interpretation of the PPIA Should Not Be Given *Chevron* Deference.**

At the heart of this case is Defendants' determination that hepatic lipidosis does not constitute adulteration within the meaning of the PPIA because it results from a physiological origin – force-feeding – rather than pathological. (UF ¶46). Defendant's Cross-Motion emphasizes the level of deference afforded to an agency's refusal to engage in rulemaking. *See* Cross-Mot. at 18-19. But this argument ignores the fact that, as the Ninth Circuit found in this case on appeal, "the decision whether to promulgate a new rule turned in significant part on the agency's interpretation of a statutory term—here, the term 'adulterated' as used in

---

[5] Plaintiffs object to Defendants' reliance on the Declarations of Alice M. Thaler and W. Scott Hafner (Dkt Nos. 26-1 and 26-2) as impermissible evidence outside the administrative record. These objections are set forth in greater detail in Plaintiffs' Objections to Evidence submitted concurrently herewith. These declarations to do not simply explain "highly technical areas" (Cross-Mot. at 18), they are instead the bedrock of Defendants' arguments.

the [PPIA]. . . . FSIS's denial was therefore premised on questions of statutory construction, which are a quintessential subject of judicial review." *ALDF v. USDA*, 632 Fed. Appx. 905, 907 (9th Cir. 2015), citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

When reviewing an agency's interpretation of a statute that it administers, the Court engages in a two-step inquiry in determining what level of deference is appropriate. *See McMaster v. United States*, 731 F.3d 881, 889 (9th Cir. 2013), citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). First, a court must ask "whether Congress has directly spoken to the precise question at issue." *Id*. If so, then the inquiry is over, and the court must give effect to the "unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. But if the statute is silent or ambiguous, then a court must determine, before step two, what level of deference applies. *McMaster*, 731 F.3d at 889. If a court determines that *Chevron* deference applies, then it "move[s] to step two, where [it] will defer to the agency's interpretation if it is 'based on a permissible construction of the statute.'" *McMaster*, 731 F.3d at 889, quoting *Chevron*, 467 U.S. at 843.

Here, the statute could not be clearer. First, the PPIA commands that "[a]ll poultry carcasses and parts thereof and other poultry products found to be adulterated shall be condemned." 21 U.S.C. § 455(c). And, in turn, the statute defines when the term "adulterated" shall apply to a poultry product, including in pertinent part, when the product "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human consumption." 21 U.S.C. § 453(g)(3).

Even a cursory review of the statute reveals that Congress, in order to protect the public health from unsafe poultry products, intended for the term "adulterated" to sweep broadly. More importantly, there is no ambiguity in the statute regarding Defendants' "physiological vs. pathological origin" distinction.

16

The plain meaning of Congress's definition of the term adulterated – including any poultry product that is "for any other reason . . . unhealthful" clearly includes a condition of physiological origin that results in an unhealthful product, such as force-fed foie gras.[6] Thus, the Court must reject Defendants' construction of the PPIA, "which [is] contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

But even if the Court were to decide that the PPIA is ambiguous with respect to whether a product is "adulterated" depending on whether the condition is of physiological or pathological origin, Defendants' decision is still not entitled to deference under *Chevron* step two. Here, because the Defendants' decision was not "promulgated in the exercise of [the agency's] authority to issue regulations" but rather an interpretive rule lacking the force of law, it is only entitled to *Skidmore* deference. *McMaster*, 731 F.3d at 891 (internal quotation marks omitted). Pursuant to this level of review, "[t]he weight of [the agency's] judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncement and [any other] factors which give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Here, as already established in Plaintiffs' Motion, Defendants' decision was contained in a cursory, two page response. Moreover, as pointed out above, *supra* footnote 7, Defendants' reasoning that force-fed foie gras was not "adulterated" within the meaning of the PPIA is inconsistent with its position on whether poultry that is not treated humanely before slaughter, or is killed other than by slaughter, is adulterated.

---

[6] Indeed, FSIS has interpreted the term "adulterated" to include conditions of physiological origin before. For example, it has explained that poultry products are "more likely to be adulterated" if they "have not been treated humanely" prior to slaughter. Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56624 (Sept. 28, 2005) (emphasis added).

Perhaps most importantly, Defendants' decision that a diseased condition which Defendants conceded is "abnormal" does not render force-fed foie gras "adulterated" within the meaning of the PPIA because it has a physiological origin would lead to absurd results under the PPIA scheme – it would allow abnormal, diseased poultry products to be sold for human consumption.

As the Supreme Court has made clear, if an agency's interpretation of the statute it administers is not supported by the statutory text, it "leads to consequences Congress could not have intended," and can give rise to an "anomalous result[s]," then it "makes scant sense" and is not entitled to *Chevron* deference. *Mellouli v. Lynch*, 135 S.Ct. 1980, 1989 (2015). Thus, because Defendants' decision to deny Plaintiffs' petition for rulemaking is contrary to the clear, unambiguous intent of Congress in enacting the PPIA, or in the alternative is an unreasonable interpretation of the term "adulterated" within the context of the PPIA, the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and thus must be set aside.

**B.    The APA's Arbitrary and Capricious Standard.**

Even if this Court were to afford deference to Defendants' interpretation of "adulteration" under the PPIA, Defendants' denial of the rulemaking petition was arbitrary and capricious because it is contradicted by vast evidence in the record, which Defendants failed to address. Defendants concede that the APA's arbitrary and capricious standard "applies to the denial of a petition for rulemaking" and that the "'court must determine whether the agency articulated a rational connection between the facts found and the choice made.'" Cross-Mot. at 19, quoting *Ariz. Cattle Growers v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). Defendants' Cross-Motion also does not dispute that "an agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008), quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Regarding the applicable level of deference under the APA's arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), Plaintiffs do not contest that it is generally "highly deferential." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). Plaintiffs note the Supreme Court has recently stated Chevron's second step and the "arbitrary and capricious" standard under the APA will often be "the same, because under *Chevron* step two we ask whether an agency interpretation is 'arbitrary and capricious in substance.' " *Judulang v. Holder*, 132 S.Ct. 476, 483 n.7 (2011). Thus, as established above, Defendants' decision is based on an impermissible construction of the PPIA, and thus it is also arbitrary and capricious.

1. **Contrary to the Defendants' Contention, Large Portions of the Petition Do Not Pertain Solely to Animal Welfare, But Demonstrate that Force-Fed Foie Gras Is Diseased, "Adulterated," and Presents Various Health Risks.**

In their Opposition and Cross-Motion, Defendants argue that their disregard of all but one of the *sixty-five* exhibits attached to the Petition amounts to no more than them "properly ignoring all irrelevant evidence relating to animal welfare that was irrelevant to the agency's reasoning[.]" Cross-Mot. at 20. This is a breathtaking mischaracterization of the evidence and complete misstatement of Defendants' obligations under the PPIA. Defendants' failure to examine this evidence and explain its Denial in spite of this evidence renders the Denial arbitrary and capricious.

An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *State Farm*, *supra*, 463 U.S. at 43. The

19

substantial evidence before the agency that it failed to consider shows force-fed poultry suffers from toxemia, septicemia, systemic inflammation, and other conditions rendering force-fed foie gras diseased and "adulterated" under the PPIA and Defendants' own regulations, and also shows an increased risk to consumers of contracting pathogens such as *E. coli*. Specifically, as set forth in Plaintiffs' Motion, the Denial ignored the fact that these animals:

- exhibit systemic inflammatory processes including arthritis and bacterial infections as proscribed by 9 C.F.R. § 381.86 (UF ¶¶27-30);

- suffer from an abnormal physiologic state, as proscribed by 9 C.F.R. § 381.83, caused by the liver expanding to 6 to 10 times its original size, restricting the birds' ability to move and breathe (UF ¶¶11, 19-20, 22);

- are disabled, under 21 U.S.C. § 460(d)[7], *i.e.*, unable to walk due to enlargement of their livers and use of nutritionally deficient feed (UF ¶19-21);

- are dying, as proscribed by 21 U.S.C. § 460(d), and that many do in fact die, because of the ailments caused by force-feeding (UF ¶¶32-34);

- suffer from septicemia, as proscribed by 9 C.F.R. § 381.83, including due to the presence of *E. Coli* and other bacteria (UF ¶26); and

- suffer from toxemia, as proscribed by 9 C.F.R. § 381.83, *i.e.*, the presence toxins in the blood due to the failing liver (UF ¶¶23-24).[8]

---

[7] Defendants argue this section does not apply to producers of foie gras, Cross-Mot. at 22, but cannot dispute this section establishes that poultry products made from "dying, disabled, or diseased" poultry are unfit for human consumption, and would fall within 21 U.S.C. § 453(g)(3).

[8] Defendants claim in passing that force-fed poultry (1) do not exhibit systemic inflammation; (2) do not show evidence of an abnormal physiologic state; and (3) are not dying, disabled, or diseased. Cross-Mot. at 21-22. These assertions are contrary to the evidence described herein and in Plaintiffs' Motion, and should therefore be rejected. Their only support is from the Thaler declaration, which is outside the administrative record and should not be considered by the Court in determining whether the Denial – which was issued in 2009 – was proper. *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("But once EPA has responded to

It is plainly not so that this evidence pertains only to animal welfare. Instead, *each* of these conditions shows force-fed foie gras is adulterated and unfit for human consumption under the PPIA and FSIS's *own implementing regulations*, yet <u>none</u> were addressed in the Denial. FSIS thus "entirely failed to consider an important aspect of the problem." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994).[9] Defendants' belated attempt to justify their disregard of this information therefore fails.

Instead of addressing this evidence, as set forth in greater detail in Plaintiffs' Motion, FSIS (1) offered a circular (and nonsensical) argument that because the physiologic state of the foie gras livers are caused by human practices and not a disease, they were not "adulterated" even though they are admittedly "abnormal" and "affected by hepatic lipidosis"; and (2) concluded that "additional research is needed on the potential human health effects associated with the consumption of foie gras," yet denied the Petition. The PPIA nowhere mentions a "wait-and-see" approach to a diseased and adulterated poultry product that may be unsafe for human health. *Cf. U.S. v. Bacto-Unidisk*, 394 U.S. 784, 798 (1969) (noting the "well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health"). Rather, it commands USDA, through FSIS, to seize and condemn such a product. *See* 21 U.S.C. § 455(c); 9 C.F.R. §§ 381.78, 381.210, *et seq*. Thus, the reasons FSIS gave for denying the Petition are disconnected from the governing statute, and the Denial

---

a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute").

[9] Defendants' interpretation of the law also fails the *Chevron* test described in Section III.A. To the extent contrary to the PPIA, this Court can and should reject Defendants' interpretation without any deference at all. Even assuming *Chevron* deference, however, Defendants' interpretation of the PPIA and its own interpreting regulations to find force-fed foie gras is not adulterated is arbitrary and capricious, not "'a permissible construction of the statute.'" *McMaster*, 731 F.3d at 889, quoting *Chevron*, 467 U.S. at 843.

must therefore be vacated under the APA, 5 U.S.C. § 706(2)(A), as arbitrary and capricious.

### 2. The Solomon Study Demonstrates the Consumption of Force-Fed Foie Gras Constitutes a Potential Risk to Human Health and Is Therefore "Adulterated" and "Unfit for Human Consumption" Under the PPIA.

Defendants next argue in their Cross-Motion that the "Solomon Study" provides "only the most remote support for plaintiffs' assertion that foie gras is a threat to human health" and that it "falls far short of the 'scientific fact, information, or criteria, 21 U.S.C. § 452, required before FSIS can even consider banning a product." Cross-Mot. at 24. Defendants' arguments should be rejected because they overstate the study's limitations, and fail to point to any evidence in the administrative record countering the only conclusion one can reach from the study – that the consumption of force-fed foie gras increases a consumer's risk of developing secondary amyloidosis or other amyloid-related disease.

The Solomon Study explains that commercially available foie gras[10] contains a specific, soluble protein called serum amyloid A-related (SAA) protein which, in a 2007 study published in the Proceedings of the National Academy of Sciences (the "Solomon Study"), served as "a potent" factor in enhancing the onset of secondary amyloidosis, even when ingested orally. (UF ¶38). Although the prevalence of secondary amyloidosis in the human population is unknown, the majority of cases occur in people with "sustained inflammatory processes, particularly rheumatoid and juvenile chronic arthritis." (UF ¶40). As a result, the authors of the 2007 study concluded that "it would seem prudent for children and adults with rheumatoid arthritis or other diseases who are at risk for this disorder

---

[10] Defendants contend that "[i]f, in fact, there were any of the serious problems with all foie gras fowl that plaintiffs contend exist, FSIS inspectors would identify the problems in their inspections and condemn the birds." Cross-Mot. at 22. Of course, the actual foie gras samples that contributed to the onset of secondary amyloidosis in the Solomon study came from foie gras that was inspected, not condemned, and put on the market.

to avoid foods that may be contaminated with AA fibrils." *Id*. Because the AA fibrils "that form potential nucleation sites may persist in the host and support the development of secondary amyloidosis when chronic inflammation occurs at a later date," consumers who may someday develop a chronic inflammatory disease are also at greater risk for contracting secondary amyloidosis after eating foie gras. (UF ¶41). The amyloids in foie gras may also support the development of other amyloid-associated disorders such as Alzheimer's disease or type II diabetes. (UF ¶42).

### a.   The Denial and Defendants' Opposition.

With respect to the Solomon study, FSIS conceded that amyloidosis is common in foie gras and that the Solomon study demonstrated a connection between the presence of amyloid and the onset of Secondary Amyloidosis. (UF ¶47). FSIS discounted the study, however, purportedly because amyloids could be present for reasons other than force-feeding, and because the study involved animals, not humans, under "experimental conditions." (UF ¶48). FSIS ultimately concluded, however, "that *additional research is needed on the potential human health effects associated with the consumption of foie gras*." (UF ¶49) (emphasis added).

In their Cross-Motion, realizing the deficiencies in the Denial's treatment of the Solomon Study and related evidence, Defendants now examine the issue in greater detail. Defendants, based on improperly submitted declarations outside the administrative record, now argue (1) the use of mice predisposed to develop amyloidosis overstates the potential risk; (2) there is no basis to conclude foie gras could contribute to other amyloid-related diseases; (3) there are other sources of amyloids; and (4) the research is only preliminary. Cross-Mot. at 23. Defendants do not and cannot, however, point to any evidence in the administrative record that counters the conclusion drawn from the Solomon Study that the increased amyloids found in force-fed foie gras raises health risks to its consumers.

### b.   There Is No Rational Connection Between Finding Additional Study Is Required and the Denial.

There is simply no "rational connection" between FSIS's conclusion that, based on the Solomon Study, there might be potential health risks associated with foie gras, and its refusal to exclude foie gras from the food supply. Indeed, there is no reason, in logic or fact, to (a) conclude that further research is necessary to ascertain human health risks of foie gras, yet (b) permit that product to enter the human food supply. This irrational conclusion renders the Denial arbitrary and capricious. After all, the goal of the PPIA is "that the health and welfare of consumers be *protected* by *assuring* that poultry products distributed to them are wholesome [and] not adulterated." 21 U.S.C. § 451 (emphasis added). Food that may cause direct risks to human health because of the presence of amyloids should not be allowed into the food supply pending "additional research."[11] The Denial articulated no rational basis for a contrary conclusion and must therefore be set aside.

Defendants seek to explain away this evidence but cannot do so. The Declaration of Scott Hafner upon which Defendants almost entirely rely in attempting to discredit the Solomon Study is not a part of the administrative record and therefore cannot now be used to explain the agency's action. "Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).[12] Moreover, in the absence of

---

[11] Again, Defendants' interpretation of the law that is in conflict with the express terms of the PPIA (*Chevron* step one) is entitled to no deference and should be rejected. *Chevron,* 467 U.S. at 843 (courts must give effect to the "unambiguously expressed intent of Congress").

[12] In a final note, Defendants also attempt to respond to Plaintiffs' argument (Mot. at 20) that the PPIA should be interpreted consistently with the FMIA which holds any "fatty and degenerated liver" to be "adulterated." The best Defendants can muster, however, is that the distinction between "physiologic and pathological liver conditions" just "does not arise under the FMIA" (Cross-Mot. at 27) – presumably because only ducks are force-fed. Defendants'

---

24

contrary evidence, the limitations of the Solomon Study do nothing to alter the conclusion that the increased consumption of amyloids from force-fed foie gras presents a health *risk* to human consumers. In light of the other evidence of health risks, as described above and in Plaintiffs' Motion, Defendants' Denial was simply unjustified, lacked a rational basis, and was contrary to the evidence in the record. It should be set aside as arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A).

## IV.    CONCLUSION

For the reasons detailed above, the Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment, and set aside the Denial and remand the matter to Defendants with instructions to initiate rulemaking consistent with the APA.

 May 13, 2016                          STEPTOE & JOHNSON LLP


                                       By:     /s/ Morgan L. Hector
                                              Morgan L. Hector
                                              Attorneys for Plaintiffs

argument, which does nothing more than create an arbitrary distinction to support its inaction with no support in the text of the PPIA, should be given no deference.