BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
EILEEN M. DECKER
United States Attorney
ERIC WOMACK
DANIEL BENSING
D.C. Bar No. 334268
Attorneys, United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Rm. 6114
Washington D.C. 20530
Telephone: (202) 305-0693
Facsimile:   (202) 616-8460
Daniel.Bensing@USDOJ.gov

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, *et al.*, | ) No. CV12-04028 ODW (PJWx) |
| | ) |
| Plaintiffs, | ) Hon. Otis D.Wright II |
| | ) |
| v. | ) |
| | ) Date:  July 18, 2016 |
| UNITED STATES DEPARTMENT OF | ) Time: 1:30 p.m. |
| AGRICULTURE, *et al.*, | )  Place: Courtroom 11 – Spring St. |
| | ) |
| Defendants. | ) |
| _____ | ) |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Introduction**

Plaintiffs' Opposition Memorandum ("Pl. Opp.") fails to demonstrate that any of the eight plaintiffs has standing to challenge the decision of the Food Safety and Inspection Service ("FSIS") denying the petition to initiate a rulemaking to ban foie gras.  The individual plaintiffs lack Article III standing because they have not identified a concrete injury and also because their own actions are the immediate cause of any harm they suffer.  The organizational plaintiffs lack Article III standing because the denial of the rulemaking petition has not frustrated their organizational goals and additionally they are not within the zone of interests protected by the Poultry Product Inspection Act, 21 U.S.C. §§ 451, *et seq.* ("PPIA").

Even assuming one of the plaintiffs has standing, defendants would be entitled to summary judgment on the merits.  FSIS carefully considered the petition and rationally decided that it did not provide a sufficient basis for the agency allocate limited resources to commence a rulemaking proceeding to consider banning foie gras.  Indeed, plaintiffs' Opposition devotes very little attention to the issue that is central to the merits – whether Congress intended the concept of "adulterated" food products under the PPIA to apply foie gras, the product of a non-pathological condition.  Plaintiffs would have this Court transform the PPIA into a statute that requires FSIS to act as arbiter of what foods are healthy, even where the effects of those food products are well-known to the consumer.  This is clearly not what Congress intended in adopting the PPIA and hence FSIS properly denied the rulemaking petition.   Plaintiffs have not come close to overcoming the highly deferential standard courts apply when reviewing the denial of a rulemaking petition, which involves scientific analysis, policy judgment and the weighing of agency priorities.

**ARGUMENT**

**I.    Plaintiffs Lack Standing**

**A.    Plaintiffs' Assertion of a Procedural Injury Does not Excuse Them From Demonstrating Concrete Injury as Required by Article III.**

At the outset, all plaintiffs seek to avoid the demanding nature of the standard for constitutional standing, *see Lujan v. Defendants of Wildlife*, 504 U.S. 555 (2007), by asserting that because they allege a procedural violation, they "can assert that right without meeting all the normal standards for redressability and immediacy." Pl. Opp. at 3, *quoting Massachusetts v. EPA,* 549 U.S. 497, 517-18 (2007). Plaintiffs then assert that "[t]here need only be 'some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" Pl. Opp. at 3-4, *quoting Massachusetts*, 549 U.S. at 518. But applying that "some possibility" standard does not help plaintiffs.

Plaintiffs' requested relief, an order compelling FSIS to initiate rulemaking proceedings, could not cause FSIS to "reconsider" its decision not to ban foie gras in the continued absence of any significant evidence that foie gras causes harm to human health. Since FSIS would be unable to identify the required "scientific fact, information or criteria" sufficient to justify such a ban, 21 U.S.C. § 452, there is no way that the agency could provide any relief sufficient to address plaintiffs' alleged harm. As the Court explained in *Lujan*, it is not the case that "the Government's violation of a certain . . . class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff." *Lujan,* 504 U.S. at 573, n. 8.

**B.    The Individual Plaintiffs' Alleged Increased Risk to Health From the Presence of Foie Gras on the Market is Far Too Speculative to Support Standing.**

Even assuming that the Ninth Circuit's standard for establishing standing in increased-risk-of-harm cases is somewhat less demanding than that articulated in D.C. Circuit cases like *Food & Water Watch, Inc. v. Vlisack,* 808 F.3d 905 (D.C. Cir. 2015), Pl. Opp. at 6, the individual plaintiffs' claims fall far short of the concrete, imminent injury sufficient to establish Article III standing.  *See e.g. Hartman v. Summers*, 120 F.3d 127, 160 (9th Cir. 1997) ("To confer standing, the threat of future injury must be credible rather than remote or hypothetical.  Petitioner must show a very significant possibility that the future harm will ensue.").

At the outset, this case is notable for the fact that plaintiffs allege imminent, serious harm to health from a product that has never once been shown to cause illness or other harm to human health.  In every other case successfully alleging harm to human health from food products, there is a demonstrated link between the product and health.  Frequently, the government's own research reports will demonstrate the risk of injury.  For example, in *Baur v. Veneman,* 352 F.3d 625, 637 (2d Cir. 2003), "government studies and statements confirm several of Baur's key allegations," including that there was direct evidence that mad cow disease could be contracted from downed livestock.  In *Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002), the Court noted that "plaintiffs base their showing of threatened harm on modeling prepared by the Bureau [or Reclamation] itself."  *Id.* at 948.  By contrast, the individual plaintiffs here have no evidence from government files or any other reliable and definitive source that they are likely to suffer personal harm as a result of FSIS's decision not to consider a ban on foie gras.  Were there in fact a risk to human health from consuming foie gras, such evidence would presumably have come to light over the course of the centuries that humans have been consuming foie gras and similar food products.

Plaintiffs' only purported evidence of adverse human health impacts from the consumption of foie gras is the Solomon study, AR 899-902, which has many limitations that render it insufficient to support plaintiffs' petition.  Notably, the Solomon study uses mice that are predisposed to develop amyloidosis; there are many other sources of proteins that can contribute to amyloidosis in humans; and Dr. Solomon's report was a preliminary research study that did not purport to offer a definitive conclusion about  the impact of foie gras consumption on human health.  *See* Defendants' Motion for Summary Judgment, Dkt. 67 ("Def. MSJ") at 23-24.

Plaintiffs assert that the individual plaintiffs' "fear and anxiety" from the increased risk of developing an amyloid-related disease from foie gras consumption is also sufficient to establish injury for purposes of Article III standing.  Pl. Opp. at 7, n. 2.  However, this is only true where the fear and anxiety are caused by real, evidence-based risk of imminent harm, not dangers that are speculative or wholly imagined, as is the case here.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107, n.8 (1983) ("It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.").

**C.     The Individual Plaintiffs' Own Conduct in Consuming Foie Gras Is the Cause of Any Alleged Injury, Thus Negating Plaintiffs' Standing.**

In evaluating whether a plaintiff has standing, one inquiry the court must make is whether plaintiff's own conduct in any way caused the alleged injury – a finding that would defeat a plaintiff's standing.  All of the individuals allege harm that is the direct result of their own actions, whether the decision is to continue seeking out and eating this luxury food product despite believing it is unhealthful or choosing not to make simple inquiries about the food they are being served to determine if it contains foie gras.  Thus, any injury to the individual plaintiffs is caused by the individual plaintiffs' own dietary choices.  *See Nat'l Family Planning and Reproductive Health Ass'n. v. Gonzales*, 568 F.3d 826, 831 (D.C. Cir. 2006) ("self-inflicted harm doesn't satisfy the basic requirements for standing").

In their Opposition, plaintiffs rely primarily on several unpublished district court decisions[1] construing California consumer protection statutes, see Pl. Opp. at 8 – 9, which are easily distinguished. In those cases, the decision by the plaintiffs to purchase and consume food products was directly influenced by defendants' false advertising, thus partially negating plaintiffs' abilities to make informed choices.  Here, by contrast, there is no allegation that FSIS, or anyone, is inducing the individual plaintiffs to consume foie gras or influencing their decision in any way.  Nor is there any basis to conclude that dismissal of the individual plaintiffs' claims would "thwart the objective" of the PPIA, as was found to be the case with the state statute in *Henderson*, 2011 WL 1362188 at 8.

> **D.    The Denial of Plaintiffs' Request for a Ban on Foie Gras Does Not "Frustrate" the Goals of Any of the Plaintiff Organizations.**

The organizational plaintiffs cannot articulate why the denial of their request that FSIS initiate a process to ban foie gras -- one of many animal welfare issues these plaintiffs regularly address -- is so significant and unique that it alone "frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways."  *Comite De Jornaleros v. City of Redondo Beach,* 657 F.3d 936, 943 (9th Cir. 2011).  While the plaintiff organizations may perceive the production of foie grass to be a significant threat to animal welfare, they cannot dispute that it is only one of many animal welfare issues that the  plaintiff organizations confront through litigation, education, petitions and otherwise in the normal course of their organizational activities.  Consequently, the failure of FSIS to ban foie gras -- i.e. a loss on one of many animal welfare issues the organizations address -- in no way *frustrates* the organizations' overall goals.  *See e.g.* Wells Declaration, Dkt. 61-1, ("ALDF is a national non-profit organization involved in every aspect of animal law.").  They continue to advocate for animal welfare in a manner that

---

[1]  *E.g. Henderson v. Gruma Corp.,* 2011 WL 1362188 (C.D. Ca. 2011); *Koehler v. Litehouse, Inc.,* 2012 WL 6217635 (N.D. Cal. 2012).

demonstrates that their goals are hardly "frustrated." *See Valle Del Sol Inc. v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) ("An organization cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.").

The factual contexts in *Comite de Jornaleros* and *Valle Del Sol,* demonstrate the demanding nature of the governing standard.  The *Comite de Jornaleros* Court found that a city ordinance that banned individuals from soliciting employment on city streets certainly frustrated the plaintiff organization's mission "to strengthen and expand the work of local day laborer organizing groups." *Id.* at 943.  The Court recognized that "the ordinance has discouraged both employees and employers from participating in hiring decisions." *Id.*  Similarly, in *Valle Del Sol*, the Court found that a state statute that criminalized the harboring and transportation of unauthorized aliens frustrated the purpose of organizations dedicated to assisting such individuals.  The Court concluded that "volunteers will be deterred from participating" due to the law.  732 F.3d at 1018 The court accepted the assertions of one organization that it "reasonably fears that its staff will be subject to investigation or prosecution under the statute and may be deterred from conducting" various organizational functions. *Id.*

The harm to the ongoing ability of these organizations to function stands in sharp contrast to the organizational harm alleged in this case.  Certainly ALDF's concern that the failure to pursue the foie gras issue will cause the loss of "credibility, support and organizational goodwill," Opp. at 12, greatly overstates the impact that this issue will have on any of the plaintiff organizations.  In any event, as *Comite De Jornaleros* and *Valle Del Sol* demonstrate, this is not the sort of harm to the organization itself that is required by the Ninth Circuit to establish organizational standing.

### E.     The Plaintiff Organizations Are not Within the Zone of Interests Protected by the PPIA.

The four plaintiff organizations are, by their own admission in filings in this Court, *see* Complaint, ¶¶ 51 – 58, as well as in statements on their web pages, focused overwhelmingly, if not exclusively, on animal, not human welfare.  The following statement at the ALDF website, describing the organization's overall goals, is typical of the goals of the four organizational plaintiffs:

> The Animal Legal Defense Fund's *mission is to protect the lives and advance the interests of animals through the legal system*. ALDF accomplishes this mission by filing high-impact lawsuits to protect animals from harm, providing free legal assistance and training to prosecutors to assure that animal abusers are punished for their crimes, supporting tough animal protection legislation and fighting harmful animal protection legislation, and providing resources and opportunities to law students and professionals to advance the emerging field of animal law.

> Founded in 1979 by attorneys active in shaping the emerging field of animal law, ALDF has blazed the trail for stronger enforcement of anti-cruelty laws and more humane treatment of animals in every corner of American life. Today, ALDF's groundbreaking efforts to push the U.S. legal system to end the suffering of abused animals are supported by thousands of dedicated attorneys and more than 200,000 members and supporters.

*See* www.ALDF.org  (emphasis added).  *See also* www.cok.net ("COK focuses on cruelty to animals"); www.farm sanctuary.org ("Our Mission: to protect farm animals from cruelty"); www.aprl.org ("protecting animals") .  In the case of each plaintiff, there is no mention of concerns about risks to human health, a fact that reveals that plaintiffs are not within the zone of interests protected by the PPIA.

In a final attempt to show that they are within the zone of interests of the PPIA, plaintiffs cite to 21 U.S.C. 460 which, *inter alia* restricts the sale of "dead, dying, disabled or diseased poultry."  Pl. Opp. at 14.  Based on this single phrase, plaintiffs assert that the PPIA is also designed to protect the welfare of "diseased" animals.   And plaintiffs then attempt to make the further leap to the conclusion that "[b]y necessity,

Defendants are concerned with the health of animals in order to maintain a healthy food supply." *Id.* That is simply a confusion of language and logic.

Plaintiffs take this one phrase out of context. When read as a whole, it is clear that the provision cited by plaintiffs is concerned with the registration of individuals engaged in transactions of "dead, dying, disabled, or diseased poultry" for the purposes of preventing poultry, "or the unwholesome parts or products thereof," from being used for human food. 21 U.S.C. § 460. It has nothing to do with animal welfare, as its focus is on the forward effect on human welfare. Thus, contrary to plaintiffs' assertions, this provision illustrates that the purpose of the PPIA is to protect human health and public welfare by controlling how and where poultry is slaughtered and produced or sold in commerce, not to protect the well-being of the animals (or as the statute refers to them, products) themselves.

## II. If the Court Finds that Any Plaintiff Has Standing, It Should Hold that FSIS Did Not Act Arbitrarily or Capriciously In Denying the Petition for Rulemaking.

### A. Defendants' Interpretation of the PPIA Is Entitled to *Chevron* Deference.

The fundamental problem with plaintiffs' argument on the merits is that it is premised on a simplistic interpretation of the term "adulterated" in 21 U.S.C. § 453(g)(3). Because one of the many colorful adjectives Congress used to define the term "adulterated" is "unhealthful," plaintiffs insist that FSIS must ban any product that might, under some circumstances or for some consumers, arguably be considered to be "unhealthful." But the term "unhealthful" can arguably apply to many food products currently in the market depending on how, and by whom, they are consumed. For example, peanuts produce extreme reactions in a small minority of the population and regular consumption of high fat foods can result in obesity. As defendants noted in their opening brief, Def. MSJ at 26, the FSIS is not a "national nutritional police" responsible for categorically banning all such "unhealthful" foods products, as plaintiffs' rulemaking petition requested.

Even assuming, however, that the term "adulterated" could carry the weight the weight that plaintiffs' place on it, that would not end the matter.  The Court would still need to decide that FSIS acted irrationally in concluding that the rulemaking petition requesting a complete ban on foie gras was not "supported by *scientific fact, information or criteria*" under 21 U.S.C. § 452 sufficient to justify such a ban.  FSIS requested deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ("*Chevron*") not only to its determination of what kind of arguably "unhealthful" foods were "adulterated," but also to the more directly relevant question of whether defendants' stringent interpretation of the evidence required to meet the "scientific fact, information or criteria" standard is a reasonable one under *Chevron.  See* Def. MSJ at 25.  FSIS interprets section 451 to require more than a single, ambiguous study of potential risks to human health (*i.e.* the Solomon study) before it will take the unprecedented step of *banning an entire category of poultry products* from the marketplace.  Plaintiffs offer no argument to challenge the reasonableness of that interpretation.

Moreover, plaintiffs' argument is entirely premised on plaintiffs' bald factual assertion that "'unhealthful' clearly includes a condition of physiological origin that results in *an unhealthful product, such as . . . foie gras.*"  Pl. Opp. at 17 (emphasis added).  Yet, as noted, there is only the thinnest, questionable support for that assertion, leading FSIS to reasonably conclude that the Solomon study "does not present any data to establish a link between the presence if (sic) amyloid in foie gras and the development of human disease," AR at 1548, and hence did not justify the initiation of a rulemaking.[2]

---

[2]  Plaintiffs cite to a 2005 Federal Register notice where FSIS reminded poultry slaughter establishments that "live poultry must be handled in a manner that is consistent with good commercial practices" and that generally, "poultry products are more likely to be adulterated if, among other circumstances, they are produced from birds that have not been treated humanely."  70 Fed. Reg. 56,624 (Sept. 28, 2005).  But FSIS is not saying that birds that are treated "inhumanely" (whatever that might mean in a particular case) are therefore adulterated under the PPIA.  Regardless of how birds are

FSIS's interpretation of 21 U.S.C. § 452 was promulgated through the decision of FSIS Assistant Administrator Philip S. Derfler in denying the rulemaking petition in 2009.  That letter, AR 1546 – 47, addressed the salient points that would be expected in such a decision – points that are more fully covered in the Thaler Declaration and the Hafner Declaration, which addresses the many limitations of the Solomon Study.  The letter constitutes a sufficiently formal statement of the agency's interpretation of the PPIA to justify deference under *Chevron*.  *See United States v. Mead Corp.,*533 U.S. 218,230 (2001) (*Chevron* scope does not extend only to agency interpretations rendered through rulemaking or formal adjudication).   This carefully considered decision by a senior FSIS official is the polar opposite of the kind of casual opinion letter or other guidance issued by lower level officials that does not deserve *Chevron* deference.

**B.     Plaintiffs Have Provided No Significant Evidence that Foie Gras is a Risk to Human Health and Hence FSIS Properly Denied the Rulemaking Petition.**

Plaintiffs accuse defendants of "breathtaking mischaracterization of the evidence" supporting the rulemaking petition, Pl. Opp. at 19, but then fail to discuss or cite to any of the exhibits included with the rulemaking petition save for the Solomon Study, AR 898 – 902.  Thus plaintiffs concede that of the 1,119 pages of material attached to the rulemaking petition, 1,103 pages were totally irrelevant to the risk to human health – the only issues that FSIS could consider in acting under the PPIA.

Defendants' opening brief fully addressed plaintiffs' arguments for why foie gras should be banned, which essentially consist of deliberate misreading of FSIS regulations and word games about the meaning of terms used in the PPIA and FSIS

---

treated on the farm (where FSIS has no jurisdiction under the statute), each poultry carcass still has to go through post-mortem inspection for an individual determination that it is not adulterated.

regulations.  *See* Def. MSJ at 21 – 23.  Plaintiffs' Opposition does not attempt to rebut the reasons set forth in the FSIS denial letter and the Administrative Record (as explained by the Thaler and Hafner Declarations) as to why force-fed foie gras is not an "adulterated" poultry product under the PPIA, but instead merely restates their initial arguments.  Pl. Opp. at 19 – 23.  As noted, the PPIA does not require FSIS to begin rulemaking proceedings to ban a product solely on the basis of one preliminary study that provides only the most questionable evidence that foie gras presents a health risk.  Def. MSJ at 20 – 21.  Until and unless additional research provides the necessary "scientific fact, information or criteria" to support regulatory action, 21 U.S.C. § 451, FSIS is acting well within its discretion.

Finally, the passing reference for the need for additional research in the denial letter is not the "smoking gun" that plaintiffs' claim, *see* Pl. Opp. at 24 – 25, nor is it even relevant.  The Solomon study provided, at best, some very preliminary evidence that the consumption of foie gras may entail some health risks to some consumers under certain circumstances.  The denial letter therefore advised the petitioners that "[t]o establish any link between the two conditions, [amyloidosis and hepatic lipidosis] or the potential effect on human health of consuming amyloid, will require additional scientific study."  AR at 1548.  It was in that context – pointing out that, while the Solomon study raised some interesting questions, the petition was not supported by sufficient evidence to justify agency action – that the letter suggested the need for additional research.

## C.    Defendants' Declarations Properly Explain the Administrative Record.

The Declarations of Alice Thaler and Scott Hafner should not be stricken, as they properly provide an explanation of the complex subject matter contained in the Administrative Record.  *See* Def. MSJ at 2 – 4.  Thaler, who provided information used in drafting the response to the petition, Thaler Decl. ¶ 4, gives general information about the administration of the statute by FSIS, addressed in

the Administrative Record at AR 1338 – 1530,  which is permissible to understand how the agency operates and why the petition was rejected.  Hafner, a Veterinary Medical Officer, provides a detailed analysis of the significance and limitations of the Solomon Study, AR 898 – 902.  Notably, neither offers a new rationalization for the agency's decision, nor have plaintiffs so alleged.  Instead, the declarants merely provide a more detailed explanation of the reasons for the agency's denial of the rulemaking petition.

This Circuit has long recognized that declarations explaining the complex and technical information contained in an administrative record are permissible in an APA review proceeding.  As one court explained:

> [I]n the often difficult task of reviewing administrative regulations, the courts are not straightjacketed to the original record in trying to make sense of complex technical testimony, which is often presented in administrative proceedings without ultimate review by non-expert judges in mind.  Here, the augmenting materials were merely explanatory of the original record.  No new rationalization of the SO2 regulations was offered by the EPA.

*Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977).

Additionally, agency action under the APA is frequently based on expertise developed by the expert agency over many years of regulating in a particular subject area.  An agency may act, in part, "not only on the basis of the comments received . . . but also upon the basis of information available in its own files, and upon the knowledge and expertise of the agency."  *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 928 (9th Cir. 2009), *quoting Siegel v. Atomic Energy Commission*, 400 F.2d 778, 786 (9th Cir. 1968).  Certainly the knowledge and experience of senior agency scientists like Thaler and Hafner can provide support for agency action, as can information in FSIS files, such as records reflecting the agency's experience in inspecting, and, where necessary, condemning, foie gras birds for signs of disease, Thaler Decl. ¶ 35.[3]  It would be

---

[3]  Although they have objected to the declarations on procedural grounds, plaintiffs have not taken issue with the substance of  the analysis of either Thaler or Hafner.

strange indeed to reject the declarations and remand to the agency, only to leave the unrebutted substance of those declarations to stand as the basis for the agency's decision on remand.

# CONCLUSION

Wherefore, the Court should grant summary judgment on the claims of all plaintiffs as they lack standing, or, in the alternative, grant summary judgment for defendants on the merits.

Respectfully submitted,

BENJAMIN M. MIZER
Principal Deputy Assistant Attorney
General

EILEEN M. DECKER
United States Attorney

ERIC WOMACK
*/s/ Daniel Bensing*
DANIEL BENSING
D.C. Bar No. 334268
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Rm. 6114
Washington, D.C. 20530
Telephone: (202) 305-0693
Facsimile: (202) 616-8460
Daniel.Bensing@USDOJ.gov

<u>Certificate of Service</u>

 I hereby certify that on the 3rd day of June, 2016, I caused the forgoing Reply Memorandum in Support of defendants' Motion for Summary Judgment to be served on counsel for plaintiffs by filing with the court's electronic case filing system.


        */s/ Daniel Bensing*

        Daniel Bensing