O

# United States District Court
# Central District of California

ANIMAL LEGAL DEFENSE FUND;
SARAH EVANS; MICHELLE
SCHURIG; CAROLINE LEE; FARM
SANCTUARY; COMPASSION OVER
KILLING; ANIMAL PROTECTION
AND RESCUE LEAGUE,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; TOM VILSACK,
Secretary of Agriculture; FOOD SAFETY
AND INSPECTION SERVICES; and
ALFRED V. ALMANZA, Deputy Under
Secretary for Food Safety,

                    Defendants.

Case № 2:12-cv-04028-ODW(PJWx)

**ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [67] AND
DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT [61]**

## I.    INTRODUCTION

This is an action for judicial review of a final agency decision under the Administrative Procedure Act ("APA").  In 2009, the Food Safety and Inspection Services ("FSIS")—which administers the Poultry Products Inspection Act, 21 U.S.C. §§ 451–72 ("PPIA")—denied a rulemaking petition aimed at banning force-fed foie gras[1] from the food supply.  Plaintiffs, comprised of four animal rights organizations

---

[1] That is, foie gras derived from the livers of force-fed poultry.

and three individuals, allege that FSIS's denial of the petition was arbitrary, capricious, and contrary to law because force-fed foie gras is clearly unfit for human consumption. Defendants respond that Plaintiffs lack Article III standing, that the PPIA does not protect the interests asserted by the animal rights organizations, and that in any event FSIS acted within its discretion in denying the petition. Both parties now move for summary judgment. For the reasons discussed below, the Court concludes that the animal rights organizations have standing to bring this action and that their interests fall within the "zone" of interests protected by the PPIA, but that Defendants did not act arbitrarily, capriciously, or contrary to law in denying the petition. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment, and **DENIES** Plaintiffs' Motion for Summary Judgment. (ECF Nos. 61, 67.)

## II.   FACTUAL BACKGROUND

Foie gras is a luxury food product made from the liver of a duck or goose. (Administrative Record ("AR") at 138, ECF No. 18.) Before slaughter, the bird is force-fed a special mix of food using a feeding tube (a process also known as gavage). (AR at 143–45.) This causes a large buildup of fat in the bird's liver, which gives the product its signature taste. (*Id.*)

**A.   The Petition**

On November 28, 2007, several individuals and animal rights organizations (including some of the Plaintiffs in this action) petitioned FSIS to initiate rulemaking "to exclude force-fed foie gras from the food supply as an adulterated and diseased product that is 'unsound, unhealthful, unwholesome, or otherwise unfit for human food.'" (AR at 5 (quoting 21 U.S.C. § 453(g)(3)).) The petitioners argued that (1) the force-feeding process causes hepatic lipidosis in ducks and geese, rendering the birds "unhealthful" under the PPIA, and (2) the consumption of force-fed foie gras may trigger the onset of secondary amyloidosis in humans. (AR at 10–23.) The petitioners state that hepatic lipidosis also causes "various secondary infections and illnesses" in

poultry, but they did not develop those points further.  (AR at 17, 20, 21.)  The petition was accompanied by 65 exhibits, totaling 1150 pages.  (AR at 32–1150.)

On August 27, 2009, FSIS denied the petition.  (AR at 1547–48.)  FSIS acknowledged that one could characterize the livers of force-fed birds as affected by hepatic lipidosis due to the buildup of excess fat in the liver.  (AR at 1547.)  However, FSIS reasoned, unlike fat buildup resulting from disease, fat buildup resulting from a "physiologic condition, i.e. the [purposeful] overwhelming of the hepatocyte's ability to process and export fat," does not render the liver unsafe to consume.  (*Id.*)  FSIS also found that there was insufficient evidence to demonstrate a connection between the consumption of force-fed foie gras and the onset of secondary amyloidosis in humans.  (AR at 1548.)  FSIS explained that the one scientific study on which the petitioners relied concerned only "the administration of amyloid to genetically susceptible mice under experimental conditions," and that "additional scientific study" was required to show "the potential effect on human health of consuming amyloid." (*Id.*)

C.    **The Plaintiffs**

1.    **Animal Rights Organizations**

The four organizations bringing this action are Animal Legal Defense Fund ("ALDF"), Farm Sanctuary, Compassion Over Killing, and Animal Protection and Rescue League.  ALDF "has spent over three decades focusing on issues involving animals and the law," and "its main focus is preventing animal cruelty and advancing the protection of the interests of animals through the legal system." (Wells Decl. ¶ 3, ECF No. 61-1.)  To this end, "ALDF advocates concerning the health consequences of consuming animal products because the practices that exacerbate the harmful health effects of consuming animal products are the same practices that greatly contribute to animal cruelty in animal farming." (*Id.* ¶ 5.)  ALDF has spent resources "raising awareness about the health effects on ducks being raised for foie gras and the human health consequences of the force-feeding process," including issuing press releases,

1    initiating letter-writing campaigns, and petitioning administrative agencies.  (*Id.* ¶ 8;

2    *see also id.* ¶¶ 6, 7, 9–11.)  According to ALDF, "had [it] not diverted these resources

3    to combat force-fed foie gras, it would have suffered a loss of credibility, support, and

4    organizational goodwill among its donors, its peers, and the legal community."  (*Id.*

5    ¶ 12.)   The parties generally agree that Farm Sanctuary, Compassion Over Killing,

6    and Animal Protection and Rescue League are similarly situated to ALDF for standing

7    purposes.  (*See generally* Defs.' Opp'n at 12, 14 n.10, ECF No. 67; Pls.' Stmt. of

8    Undisputed Facts 98, 101, ECF No. 61-6; Friedrich Decl., ECF No. 22-3 (Farm

9    Sanctuary); Meier Decl., ECF No. 61-3 (Compassion Over Killing); Pease Decl., ECF

10   No. 22-7 (Animal Protection and Rescue League).)

11             **2.      Individual Plaintiffs**

12             The individual Plaintiffs in this action are Sarah Evans, Caroline Lee, and

13   Michelle Schurig.  Evans previously consumed force-fed foie gras, but now "avoid[s]"

14   doing so "due to the cruelty involved in the force-feeding process and the nature of the

15   resulting diseased product."  (Evans Decl. ¶ 2, ECF No. 61-3.)  Evans continues to

16   consume other types of duck and goose dishes, however, and is concerned that

17   restaurants may inadvertently serve her force-fed foie gras.  (*Id.* ¶¶ 6–9.)  Lee, like

18   Evans, also "avoid[s]" eating force-fed foie gras, and is likewise concerned about the

19   possibility of eating force-fed foie gras unknowingly; however, unlike Evans, it does

20   not appear that Lee has ever consumed foie gras.  (Lee Decl. ¶ 8, ECF No. 61-4.)  In

21   addition, Lee contends that she is genetically susceptible to developing secondary

22   amyloidosis,[2] and is therefore worried that any inadvertent consumption of force-fed

23   foie gras "could increase [her] risk" of developing the disease.  (*Id.* ¶¶ 5–9.) Finally,

24   Schurig, who previously ate force-fed foie gras but who is now a vegan, asserts that

25   she too is concerned that she will inadvertently consume foie gras at social events

26   "because [she is] not always fully informed about the ingredients of the dishes [she is]

27

28           [2] Lee's son was diagnosed with secondary amyloidosis.  (Lee Decl. ¶ 5.)

4

served." (Schurig Decl. ¶¶ 2, 6, ECF No. 61-5.)

**D.      Procedural History**

In May 2012, Plaintiffs filed this action.  (ECF No. 1.)  In March 2013, the Court dismissed the action for lack of subject matter jurisdiction, reasoning that an agency's decision not to initiate rulemaking was not subject to judicial review under the APA.  (ECF No. 45.)  Plaintiffs appealed from the ensuing judgment.  (ECF Nos. 46, 49.)  In December 2015, the Ninth Circuit reversed, holding that the denial of a petition to initiate rulemaking is reviewable under the APA.  *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x 905, 908 (9th Cir. 2015).  Defendants argued on appeal that Plaintiffs lacked standing to bring this action, but the panel declined to consider those arguments in the first instance.  *Id.*  Judge Chhabria, however, issued a concurring opinion expressing skepticism that the animal rights organizations could establish standing based solely on their "*choice* to spend money to counteract challenged conduct germane to [their] mission."  *Id.* (Chhabria, J., concurring) (emphasis in original).   Following remand, both parties moved for summary judgment. (ECF Nos. 61, 67.)  Those motions are now before the Court for decision.

### III.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).

The district court "is not required to resolve any facts in a review of an administrative proceeding"; rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). As a result, summary judgment is an appropriate vehicle for deciding APA cases. *Id.*

## IV.   DISCUSSION

As previously noted, the parties raise three issues: (1) whether Plaintiffs have Article III standing; (2) whether the interests of the animal rights organizations fall within the zone of interests that the PPIA protects; and (3) whether the denial of the petition was arbitrary, capricious, or contrary to law.

### A.   Standing

Defendants argue that the organizational Plaintiffs assert only a generalized grievance—i.e., general concern for animal welfare—and thus have not suffered a cognizable injury. (Defs.' Opp'n at 12–15, ECF No. 67.) Defendants also argue that the individual Plaintiffs assert only speculative and hypothetical injuries, and thus similarly lack standing. (*Id.* at 6–12.) The Court concludes that the organizations' injuries are sufficient to confer standing, but the individual Plaintiffs' injuries are not.

The "irreducible constitutional minimum" of standing is comprised of three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be "particularized," it must have "affected the plaintiff in a 'personal and individualized way.'" *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (citations omitted). Generalized grievances, which are harms of an "abstract and indefinite nature," do not provide a basis for standing. *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015). As long as the injury is particularized, however, the injury can be "minimal." *Preminger*, 552 F.3d at 763. "[A]n 'identifiable trifle is enough to fight out a question of principle; the trifle is the

basis for standing and the principle provides the motivation.'" *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (quoting *United States v. Students Challenging Regulatory Agency (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 560.

### 1.   Animal Rights Organizations

An organization can assert standing under two theories: (1) in a representative capacity, where there has been an injury to one or more of its members, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); or (2) on its own behalf, where there has been an injury to the organization itself, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc). The organizational Plaintiffs here assert only the second type of standing.

An organization has standing on its own behalf if it can show (1) that the defendant's actions have frustrated its mission; and (2) that it has spent resources counteracting that frustration. *Id.*; *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (organization must show "a drain on its resources from both a diversion of its resources and frustration of its mission"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) ("The allegation that the [defendant's] policy frustrates [the organizations'] goals and requires the organizations to expend resources [that] they otherwise would spend in other ways is enough to establish standing."). However, "standing must be established independent of the lawsuit filed by the plaintiff." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 943 (citations and internal quotation marks omitted). Moreover, "[a]n organization 'cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem.'" *Valle del Sol Inc. v. Whiting*, 732

1  F.3d 1006, 1018 (9th Cir. 2013) (quoting *La Asociacion de Trabajadores de Lake*
2  *Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).

3      The Court concludes that ALDF meets both requirements.  ALDF's mission is
4  to prevent animal cruelty, which includes eradicating the practice of force-feeding
5  poultry.  (Wells Decl. ¶¶ 3, 8.)   FSIS frustrated ALDF's mission by declining to
6  initiate rulemaking that would ban force-fed foie gras from the food supply in the
7  United States, which in turn would have dramatically reduced the market for force-fed
8  poultry.   This forced ALDF to continue expending resources to counteract the
9  practice, including writing press releases and initiating letter-writing campaigns to
10 educate the public about the danger to both human and animal health of force-feeding
11 poultry, and filing other administrative petitions aimed at banning the practice.  (*See*
12 Wells Decl. ¶¶ 6–11.)

13     Defendants make two main counterarguments.  First, Defendants contend that
14 the denial of the petition did not "force" ALDF to expend resources taking on the
15 force-fed foie gras industry; rather, ALDF simply chose to spend money to combat a
16 problem that would otherwise not affect it in a personalized way.  (Defs.' Opp'n at
17 13–15.)  However, as both the Supreme Court and Ninth Circuit have made clear, the
18 frustration of an organization's mission *is* the personalized injury that "forces" the
19 organization to spend money to alleviate the frustration; an organization is only
20 "choosing" to spend money if the defendant's conduct "does not affect the
21 organization at all."  *See Valle del Sol*, 732 F.3d at 1018; *see also, e.g.*, *Havens Realty*
22 *Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (organization whose purpose was to
23 ensure equal housing opportunity had standing to sue the owner of an apartment
24 complex for racial steering, because the steering practices "frustrated [the
25 organization's] efforts to [provide] counseling and referral services" to prospective
26 tenants and required it to "devote significant resources to identify and counteract the
27 defendant's racially discriminatory steering practices"); *Valle del Sol*, 732 F.3d at
28 1018 (organization offering transportation to undocumented immigrants had standing

to challenge a law that criminalized such conduct, because the law would deter its volunteers and because it had diverted resources to educate its members about the law); *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 943 (organization that supported day laborers had standing to challenge a law banning the congregation of day laborers in the street, because the law frustrated the organization's mission to make known laborers' availability to work and because it spent resources educating laborers about the law); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (organization whose purpose was to combat illegal housing discrimination had standing to sue for housing discrimination, because discrimination frustrated the organization's goal and thus forced it to spend resources on an education and outreach campaign to counteract the defendant's discriminatory conduct); *Fair Hous. of Marin*, 285 F.3d at 905 (same). While the "loss of credibility, support and organizational goodwill"[3] that ALDF purportedly would suffer if it decided not to expend such resources may supply additional reasons why ALDF was "forced" to do so, the frustration of its mission is alone sufficient to show that it was not a choice.

Second, Defendants argue that the denial of the petition does not truly "frustrate" ALDF's mission, because the practice of force-feeding poultry is only one

---

[3] Loss of donor support is unquestionably an Article III injury. *See ACLU of Idaho, Inc. v. City of Boise*, 998 F. Supp. 2d 908, 914 (D. Idaho 2014). Moreover, despite Defendants' argument to the contrary, it appears that reputational loss can also constitute an Article III injury. *See Meese v. Keene*, 481 U.S. 465, 475 (1987) ("[T]he need to take such affirmative steps to avoid the risk of harm to his reputation constitutes a cognizable injury in the course of his communication with the public."); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) ("Lexmark does not deny that Static Control's allegations of lost sales and damage to its business reputation give it standing under Article III to press its false-advertising claim, and we are satisfied that they do."); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001); *Foretich v. United States*, 351 F.3d 1198, 1211–12 (D.C. Cir. 2003); *but see Jackson v. Cal. Dep't of Mental Health*, 399 F.3d 1069, 1075 (9th Cir. 2005). And even if it is not certain that these harms would actually and immediately befall ALDF, the Court need not necessarily discount them entirely. *See Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) (where a plaintiff is asserting "procedural rights, our inquiry into the imminence of the threatened harm is less demanding").

of the myriad animal welfare threats that ALDF seeks to eradicate.  (Defs.' Reply at 5–6.)   The Court disagrees.   Fighting force-fed foie gras clearly constitutes a substantial part of ALDF's mission; indeed, ALDF has spent "over a decade . . . pursu[ing] petitions, campaigns, lawsuits, and outreach efforts to address force-fed foie gras."   (Wells Decl. ¶ 6.)   Thus, any substantial setback to ALDF's goal of eliminating force-fed foie gras—which, as discussed, FSIS's denial of the petition is—is fairly characterized as "frustrating" its mission, even if that is only one of several goals pursued by ALDF.

Finally, as both parties generally agree, Farm Sanctuary, Compassion Over Killing, and Animal Protection and Rescue League are similarly situated to ALDF in all material respects.  (Friedrich Decl. ¶¶ 3–9, 11, 12 (Farm Sanctuary); Meier Decl. ¶¶ 3–8 (Compassion Over Killing); Pease Decl. ¶¶ 2–10 (Animal Protection and Rescue League).)   For these reasons, the organizational Plaintiffs have standing to bring this action.

### 2.  Individual Plaintiffs

The individual Plaintiffs, however, do not have standing.  The Supreme Court has held that where, like here, a plaintiff relies only on threatened future injury (as opposed to a past or present injury), the "'threatened injury must be *certainly impending* to constitute injury in fact.'"   *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citations omitted).   "'Allegations of *possible* future injury,'" on the other hand, are insufficient. *Id.* (citations omitted).  Here, the individual Plaintiffs' assertions of possible future injury are far too remote and speculative to confer standing.  There is no evidence before the Court that consuming force-fed foie gras causes immediate injury to the consumer, and there is little, if any, evidence that it appreciably increases one's chance of developing disease over time.  Even if the Court credited the conclusions in the Solomon Study (*see infra* Section IV.C.3.ii), that study found at most that repeated consumption of foie gras over time *may* increase the risk of triggering secondary amyloidosis in genetically susceptible persons.  Neither Evans

nor Schurig are genetically predisposed to developing secondary amyloidosis, and thus the Court is at a loss as to what injury could befall them from eating force-fed foie gras. And while Lee may have more reason to be concerned given her genetic susceptibility, there is still no concrete evidence that foie gras will "certainly" increase her risk of developing secondary amyloidosis. *Clapper*, 133 S. Ct. at 1147. On top of this, each of them now actively avoids eating foie gras, thus greatly reducing (if not eliminating) the likelihood that any of them will ever consume the product again. Plaintiffs' concern that they may one day inadvertently consume foie gras—despite their attempts to avoid it—is plainly insufficient to convert their feared future injury from "remote and speculative" to "certainly impending." *Id.*

## B.   Zone of Interest Test

Defendants contend that the PPIA is concerned solely with human welfare, and thus the organizational Plaintiffs' concern for animal welfare falls outside the zone of interests that the PPIA protects. (Defs.' Opp'n at 15–17.) Defendants also argue that the Court should discount any tangential concern those organizations may have for human welfare, which derives solely from their concern for animal welfare. (*Id.*) The Court is unpersuaded.

The Supreme Court has held that "a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).[4] "That question requires [the court] to determine the meaning of the congressionally enacted provision

---

[4] Defendants erroneously label this test as a "prudential standing" inquiry. *Lexmark Int'l*, 134 S. Ct. at 1387 ("'[P]rudential standing' is a misnomer as applied to the zone-of-interests analysis, which asks whether 'this particular class of persons has a right to sue under this substantive statute.'" (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (2013) (Silberman, J., concurring))).

creating a cause of action.  In doing so, [the court] appl[ies] traditional principles of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014).

As the word "arguably" indicates, the inquiry "'is not meant to be especially demanding.'" *Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). "[T]here does not have to be an 'indication of congressional purpose to benefit the would-be plaintiff.'" *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (quoting *Clarke*, 479 U.S. at 399).  Rather, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Pottawatomi Indians*, 132 S. Ct. at 2210.  The test is particularly lenient in APA cases, where there is a "presumption in favor of judicial review of agency action." *Clarke*, 479 U.S. at 399; *Lexmark Int'l*, 134 S. Ct. at 1389; *Bennett v. Spear*, 520 U.S. 154, 163 (1997) ("[W]hat comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes.").  As a result, "the benefit of any doubt goes to the plaintiff." *Pottawatomi Indians*, 132 S. Ct. at 2210.

Defendants are correct that the PPIA is *primarily* concerned with the effect of "adulterated" and improperly labeled poultry products on human welfare and the poultry production industry.   29 U.S.C. § 451 ("Unwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers."); *id.* § 452 (the PPIA aims "to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated or misbranded").  But even FSIS

has recognized that animal welfare is a relevant concern under the PPIA, for an animal that is unfit for human consumption is often itself unhealthy or has been treated inhumanely.  *See* Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56,624-01, 56,624 (Sept. 28, 2005) ("The Food Safety and Inspection Service (FSIS) is reminding all poultry slaughter establishments that, under the Poultry Products Inspection Act (PPIA) and Agency regulations, live poultry must be handled in a manner that is consistent with good commercial practices, which means they should be treated humanely. . . . [U]nder the PPIA, poultry products are more likely to be adulterated if, among other circumstances, they are produced from birds that have not been treated humanely . . . ."); AR at 1547 (FSIS noting that diseased bird livers may be unfit for human consumption).  Thus, the animal rights organizations' concern for animal welfare "arguably" falls within the zone interests that the PPIA protects, *Ass'n of Data Processing*, 397 U.S. at 153, at least to the extent that the animal welfare issue impacts human health.  Moreover, for the same reason, the Court cannot wholly discount the organizations' concern for human welfare just because it is driven by concern for animal welfare—and there is no question that human welfare falls squarely within the PPIA's zone of interest.  The organizations therefore satisfy the zone of interest test.

## C.   Merits

### 1.   Standard of Review

When a petitioner seeks judicial review of final agency action, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "To determine whether an agency violated the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts found and the choice made." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).  The agency may not "rel[y] on factors which Congress has not

intended it to consider, entirely fail[] to consider an important aspect of the problem, [or] offer[] an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Thus, the Court cannot "consider reasons for agency action which were not before the agency." *Id.*

That said, judicial review of an agency's denial of a rulemaking petition is "'extremely limited' and 'highly deferential.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 527–28 (2007) (quoting *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)); *Cellnet Commc'n, Inc. v. F.C.C.*, 965 F.2d 1106, 1111 (D.C. Cir. 1992) ("[A]n agency's refusal to initiate a rulemaking is evaluated with a deference so broad as to make the process akin to non-reviewability.").  There are two reasons for this, both of which apply here.  First, the decision whether to initiate rulemaking is inextricably intertwined with decisions on agency priorities, *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987), and an agency always "has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts*, 549 U.S. at 527 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984)).  Second, the decision typically involves "a high level of agency expertise," *Am. Horse Prot. Ass'n*, 812 F.2d at 4, and a reviewing court must give substantial deference to "scientific judgments and technical analyses [that are] within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010); *see also The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc) (it is "not the proper role" of the court to "act as a panel of scientists that instructs the [agency] how to validate its hypotheses" or "choose[] among scientific studies," or to "order[] the agency to explain every possible scientific uncertainty").  "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more

persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

### 2.    The PPIA

The PPIA "provide[s] for the inspection of . . . and otherwise regulate[s] the processing and distribution" of poultry and poultry products to prevent "adulterated or misbranded" poultry from entering the food supply. *See* 21 U.S.C. § 452. The PPIA prohibits the sale of "dead, dying, disabled, or diseased poultry," *id.* § 460(d), and requires any "poultry products found to be adulterated [to] be condemned," *id.* § 455(c). There are several grounds on which a poultry product is considered "adulterated," including "if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." *Id.* § 453(g)(3). Condemnation of poultry products must be "supported by scientific fact, information, or criteria." *Id.* § 452. The Secretary of Agriculture has the authority to promulgate rules and regulations "as are necessary to carry out the provisions of [the PPIA]," *id.* § 463(b), which the Secretary has in turn delegated to FSIS, 9 C.F.R. § 300.2(a), (b)(2).

### 3.    Analysis

Plaintiffs challenge FSIS's decision on three grounds: (1) its explanation for why hepatic lipidosis does not render the liver unfit for human consumption is "nonsensical and irrational"; (2) its conclusion that there was insufficient evidence of a connection between consumption of force-fed foie gras and the onset of secondary amyloidosis in humans "ran counter to the evidence before it"; and (3) FSIS entirely failed to consider other bases purportedly included in the petition that support a finding that foie gras is unfit for human consumption.[5]

---

[5] Plaintiffs object to portions of two declarations that Defendants submit in support of their motion for summary judgment, on the basis that judicial review under the APA is generally limited to the administrative record. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Defendants contend that the declarations simply explain technical terms and complex subject matter, and thus are admissible. *Id.*; *cf. Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 928 (9th Cir. 2009) (an agency "'may act not only on the basis of the comments received in response to its notice of rule making, but also upon the basis of information available in its own files, and upon the knowledge and expertise of the agency'" (quoting *Siegel v.*

### i. Hepatic Lipidosis

Plaintiffs argue that FSIS gives a "nonsensical and irrational" explanation for why fatty livers caused by disease are unfit for human consumption, but livers fattened through force-feeding are not. (Pls.' Mot. at 19–21, 23–25, ECF No. 61.) First, they contend that the logic behind FSIS's reasoning is scientifically unsound. (*Id.*) Second, they contend that neither the PPIA nor the relevant regulations distinguish between the causes of particular physiologic states (such as hepatic lipidosis). (*Id.*) The Court disagrees.

As noted above, the Court must defer to an agency's scientific judgments. FSIS reasoned that although force-fed livers contain excess fat and thus could be characterized as affected by hepatic lipidosis, it is not a diseased or otherwise dangerous product because liver fattening is the normal and expected physiologic response to force-feeding.[6] (AR at 1547; Thaler Decl. ¶¶ 26, 38–40, ECF No. 26-1.) FSIS contrasted this with hepatic lipidosis resulting from a disease process, which often causes—in addition to fat build up—inflammation, hemorrhaging, and a buildup of fibrin in the liver tissue, and which FSIS concedes *would* be a basis for condemning the bird. (AR at 1547; Thaler Decl. ¶¶ 25, 26.) This explanation appears eminently reasonable, not "nonsensical and irrational," and is supported by both the administrative record and the agency's own scientists. (*See also* AR at 1154–59, 1540–41.) While Plaintiffs strenuously argue that this is not a scientifically valid

---

*Atomic Energy Comm'n*, 400 F.2d 778, 786 (D.C. Cir. 1968)). As to Thaler's declaration, the Court holds that the testimony relating to septicemia and toxemia does not merely explain the scientific background behind the reasons in the denial, but attempts to provide entirely new grounds for denying the petition. Thus, the Court sustains the objection to this testimony. However, the Court overrules Plaintiffs' remaining objections to the Thaler declaration. As to Hafner's declaration, the Court holds that it simply explains the science behind FSIS's analysis of the Solomon Study, and shows that the agency adequately considered the scientific issues presented by the study. The Court thus overrules Plaintiffs' objections to his declaration.

[6] The bird is typically slaughtered before the fat deposits overwhelm the liver's ability to function. (Thaler Decl. ¶ 40.)

distinction, the Court is required to credit the agency's scientific conclusions over Plaintiffs' where, like here, the agency's reasoning is not totally implausible.

Plaintiffs' argument that the distinction is without basis in the statutory and regulatory scheme fares no better, because this is a classic case in which the Court should give *Chevron* and *Auer* deference to the agency's interpretation of the relevant statutes and regulations, respectively.   The PPIA explicitly requires that the condemnation of poultry be based on "scientific fact, information, or criteria," and that such condemnation be achieved "through uniform inspection standards and uniform applications thereof."   21 U.S.C. § 452.   Despite this, the PPIA and its implementing regulations are filled with broad and ambiguous phrases describing the bases for condemning poultry or removing it from commerce.   Indeed, § 453(g)(3) alone contains seven such words: "filthy," "putrid," "decomposed," "unsound," "unhealthful," "unwholesome," and "unfit."   The implementing regulations contain only slightly less broadly worded phrases, such as "abnormal physiologic state," 9 C.F.R. § 381.83, "affected by an inflammatory process," and "general systemic disturbance," *id.* § 381.86.   The courts are obviously ill-equipped to make the scientific judgments necessary to determine which physiologic conditions render a bird "unsound" or "unwholesome" and thus in need of condemnation—to say nothing of the inability of hundreds of district courts and twelve circuit courts to achieve a uniform standard for such determinations.   As a result, it is a virtual certainty that Congress intended FSIS to supply the "scientific fact, information, [and] criteria" that gives meaning and substance these otherwise hopelessly ambiguous statutory phrases, and to achieve the "uniform application[]" of these standards.  21 U.S.C. § 452.

Here, there is nothing in the PPIA or the implementing regulations that renders FSIS's distinction between causes of hepatic lipidosis unreasonable.   Plaintiffs point, for example, to the requirement that FSIS condemn any poultry carcass that "show[s] evidence of an abnormal physiologic state," 9 C.F.R. § 381.83, and argue that the phrase "abnormal physiologic state" precludes any consideration of what causes that

state.   (Pls.' Mot. at 19–21.)   However, this is far from the only reasonable interpretation of this phrase; indeed, the cause of the physiologic state may be *exactly* what makes it "abnormal."   (*See* Thaler Decl. ¶ 39 ("[A]bnormal physiology is the term used to describe situations where one or more steps in th[e] complex web of interacting body functions is not working as expected."); ¶ 40 ("Fat storage is a liver function that is normal physiology.").)   Similarly, the Court sees nothing inherent in the word "diseased," 21 U.S.C. § 460(d), that requires FSIS to totally disregard the cause of a physiologic state as a basis for condemnation (or, in this case, non-condemnation).

Finally, Plaintiffs point to a regulation enacted under the Federal Meat Inspection Act that requires FSIS to condemn "*all* carcasses showing signs of . . . fatty and degenerated liver," 9 C.F.R. § 311.16 (emphasis added), and argue that this discredits FSIS's attempt to distinguish here between the causes of fatty livers as a basis for condemnation. *See Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996) ("The legislative history of the two Acts and subsequent amendments indicate a congressional intent to construe the PPIA and the FMIA consistently.").   This is unpersuasive.   Section 311.16 requires that the liver be both "fatty *and degenerated*" before being condemned; the regulation does not, as Plaintiffs suggest, categorically mandate the destruction of all carcasses with excess fat in the liver.   Plaintiffs also give no reason why the cause of the fatty liver should not inform whether the liver is "degenerated."[7]   Thus, Plaintiffs' argument fails.

For these reasons, the Court concludes that FSIS acted within its discretion in rejecting the petitioners' arguments concerning hepatic lipidosis.

/ / /

---

[7] And if a fatty liver was *per se* a degenerated state, there would be no need to separately require that the liver be both "fatty" and "degenerated." *Cf. Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) ("In construing a statute, a court should give effect, if possible, to every word and every provision Congress used.")

1

### ii.   Secondary Amyloidosis

2    Plaintiffs again attack the scientific reasoning, and the underlying statutory and

3    regulatory constructions, behind FSIS's conclusion that the study petitioners presented

4    to FSIS ("Solomon Study") did not show a connection between human consumption

5    of foie gras and the onset of secondary amyloidosis.  (Pls.' Mot. at 23–25; Pls.' Opp'n

6    at 22–25.)   And, once again, the Court concludes that FSIS's conclusions and

7    interpretations are rational.

8    FSIS provided a reasonable scientific explanation for its position.  FSIS found

9    that the Solomon Study did not evidence any connection between human consumption

10    of foie gras and the onset of secondary amyloidosis because: (1) the experiments in

11    the study were performed on mice, not humans, and humans are less susceptible than

12    mice to developing secondary amyloidosis; (2) the mice were genetically engineered

13    to have a pre-existing inflammatory process, making them even more susceptible to

14    developing secondary amyloidosis; (3) the mice that developed secondary amyloidosis

15    were injected or fed with "purified and concentrated amyloid fibrils extracted from

16    foie gras," and that the removal of the fat from foie gras "could have altered how a

17    normal stomach . . . would have handled the ingestion"; (4) the authors of the study

18    themselves never concluded that the study evidences a definite connection in healthy

19    humans between eating foie gras and developing secondary amyloidosis, only that "it

20    would seem prudent" for those genetically susceptible to developing secondary

21    amyloidosis to "avoid" eating foie gras; and (5) the study's theory that persons with

22    diabetes and Alzheimers may also be at an increased risk of developing secondary

23    amyloidosis after consuming foie gras was speculative and not even tested in the

24    study.  (AR at 1548; Hafner Decl. ¶¶ 2–16.)[8]  Plaintiffs make conclusory assertions

25    that these reasons are irrational, but give no concrete reason why they are outside the

26

27    [8] "[A] district court [may] consider extra-record evidence to develop a background against which
it can evaluate the integrity of the agency's analysis."  *San Luis & Delta-Mendota Water Auth. v.*

28    *Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

realm of scientific possibility.  Instead, Plaintiffs simply highlight the study's findings about the link between foie gras and secondary amyloidosis in mice, and then state that this should be enough for FSIS to conclude that foie gras is also "unhealthful" for humans to consume.  This is insufficient under the deferential standard of review for denials of rulemaking petitions.  *Marsh*, 490 U.S. at 378.

Plaintiffs also argue that it is irrational for FSIS "to (a) conclude that further study is necessary to ascertain human health risks of foie gras, yet (b) permit that product to enter the human food supply."  (Pls.' Opp'n at 24; *see also id.* at 21 ("The PPIA nowhere mentions a 'wait-and-see' approach to a diseased and adulterated poultry product that may be unsafe for human health.").)  At bottom, this is a question of statutory construction: does the PPIA require FSIS to remove from the food supply any poultry product where it has not affirmatively ruled out any possible threat to human health, or does the agency have the discretion evaluate the likelihood and seriousness of the threat before banning the product?

The Court finds Plaintiffs' absolutist approach untenable.  As previously noted, the statutory scheme taken as a whole clearly points to affording FSIS discretion in carrying out the PPIA's objectives, which must include reasonable discretion as to the quantum of evidence needed before taking agency action as drastic as banning a food product entirely from the market.[9]  In other words, FSIS must have the discretion to determine what type and amount of scientific evidence crosses the threshold from scientific possibility to "scientific *fact*."  21 U.S.C. § 452 (emphasis added).  Indeed,

---

[9] The only language that Plaintiffs point to for support is the PPIA's statement of Congressional purpose, which expresses that the PPIA was enacted to "assur[e]" that poultry products are not adulterated.  21 U.S.C. § 451.  However, as with their other arguments, Plaintiffs appear to rely exclusively on the dictionary definition of the term "assure" without considering the context in which the word is used (including that this phrase is a statement of general congressional intent, not an affirmative command regarding specific action FSIS must take), and its place in the broader statutory scheme. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.  Our duty, after all, is to construe statutes, not isolated provisions." (citations and internal quotation marks omitted)).

if Plaintiffs' interpretation of the PPIA were the rule, it would force FSIS to initiate rulemakings to ban and unban a poultry product every time any study came out that even touched on the health implications of the product.   Not only would this destabilize the entire poultry market, it would wreak havoc on FSIS's resources.  That cannot possibly be what Congress envisioned.

### iii.   Other Bases

Finally, Plaintiffs list a number of other conditions that the force-feeding process apparently produces,[10] and contend that FSIS wholly failed to address why those conditions did not warrant initiating the requested rulemaking.   Defendants respond that these other conditions are merely animal welfare issues that FSIS "properly ignored."   However, Defendants also provide two expert declarations explaining why those conditions do not warrant a different outcome.   The Court concludes that FSIS's failure to address these specific issues does not warrant remanding the matter to the agency, but for a different reason: the petitioners did not adequately preserve the issue for judicial review.

"It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."  *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1297 (D.C. Cir. 2004); *see also Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986); *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010); *cf. Appalachian Power Co. v. E.P.A.*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("'[A] party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.'" (quoting *Tex Tin Corp. v.*

---

[10] Plaintiffs contend that FSIS failed to address the fact that force-fed birds: (1) exhibit systemic inflammatory processes including arthritis and bacterial infections; (2) suffer from an abnormal physiologic state, caused by the liver expanding to 6 to 10 times its original size, restricting the birds' ability to move and breathe; (3) are unable to walk due to liver enlargement and use of nutritionally deficient feed; (4) are dying because of the ailments caused by force-feeding; (5) suffer from septicemia, including due to the presence of E. Coli and other bacteria; and (6) suffer from toxemia, i.e., the presence toxins in the blood due to the failing liver.  (Pls.' Mot. at 22.)

*EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991))).  "An agency cannot be faulted for failing to address such issues that were not raised by petitioners." *Appalachian Power Co.*, 251 F.3d at 1036; *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[T]he role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking.  Therefore, it is unsurprising that parties rarely are allowed to seek 'review' of a substantive claim that has never even been presented to the agency for its consideration." (citations omitted)).  Moreover, "[g]eneralized objections to agency action . . . will not do.  [Instead, a]n objection must be made with sufficient specificity reasonably to alert the agency." *Appalachian Power Co.*, 251 F.3d at 1036.

Here, Plaintiffs did not adequately raise in their administrative petition the other issues that they now contend could form a basis for initiating the rulemaking.  The 25-page petition focused on two points: that "force-feeding induces liver disease [i.e., hepatic lipidosis] in ducks and geese" (AR at 14); and that consumption of foie gras could lead to secondary amyloidosis in humans (AR at 22–24.  The petitioners made passing references to other ailments that the force-feeding process could cause (most of which were simply secondary to hepatic lipidosis), and did not mention *any* of the myriad regulations which Plaintiffs now cite.  (AR at 17, 20, 21.)  This cannot be fairly construed to "alert the agency" that each secondary ailment was a substantive and independent basis for the petition. *Appalachian Power Co.*, 251 F.3d at 1036.  For example, Plaintiffs now make much of the fact that the force-feeding process can cause toxemia or septicemia, yet the petitioners did not mention either condition in the petition or cite the relevant regulation (9 C.F.R. § 381.83).  While this and the other issues may have been lurking somewhere in the 1,150 pages of exhibits that petitioners submitted to FSIS, the Court can hardly fault FSIS for not scouring the exhibits and addressing possible issues that Plaintiffs would later deem important enough to ferret out on judicial review. *See Advocates for Highway & Auto Safety*,

429 F.3d at 1150 ("[A] rulemaking cannot be found wanting simply because an agency fails to address every alternative 'thought conceivable by the mind of man.'" (citation omitted)); *McNair*, 537 F.3d at 988 (the agency need not "explain every possible scientific uncertainty").

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 67), and **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 61).


**IT IS SO ORDERED.**


December 14, 2016

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**